2014-1710
(Interference No. 105,754)

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re:  COMMONWEALTH SCIENTIFIC & INDUSTRIAL RESEARCH
ORGANISATION and
BAYER CROPSCIENCE NV,

*Appellants*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board

## CORRECTED BRIEF OF APPELLANTS

Todd R. Walters, Esq.
Erin M. Dunston, Esq.
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, Virginia 22314
Telephone:  (703) 836-6620

*Counsel for Appellants
Commonwealth Scientific &
Industrial Research Organisation and
Bayer CropScience NV*

June 5, 2015

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellants certifies the following:

1.    The full name of every party or amicus represented by me is:

Commonwealth Scientific and Industrial Research Organisation
and Bayer CropScience NV.

2    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.  The parties in the official caption are the real parties in interest.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Bayer AG.

4.    The names of all law firms and the partners or associates who appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

Todd R. Walters, Christopher L. North, Ph.D., and Erin M. Dunston, of
Buchanan Ingersoll & Rooney PC.

June 5, 2015                          /s/ Todd R. Walters
                                      Todd R. Walters
                                      *Counsel for Appellants*
                                      *Commonwealth Scientific &*
                                      *Industrial Research Organisation and*
                                      *Bayer CropScience NV*

# TABLE OF CONTENTS

Page(s)

I.    STATEMENT OF RELATED CASES............................................................1

II.   JURISDICTIONAL STATEMENT ................................................................2

III.  STATEMENT OF THE ISSUES ...................................................................4

IV.   STATEMENT OF THE CASE .......................................................................5

      A.    Key Motions in the Interference...........................................................5

      B.    The Board's Decisions and CSIRO's Requests for Rehearing ............6

V.    STATEMENT OF THE FACTS ......................................................................9

      A.    Subject Matter of the Interference........................................................9

      B.    The Earliest Possible Critical Date Created by Carnegie's
            Patents Under 35 U.S.C. § 135(b)(1) is January 14, 2004.................10

      C.    CSIRO Copied Claims of the '559 Patent Prior to
            January 14, 2004................................................................................11

      D.    CSIRO's Claims Involved in the Interference Do Not Differ
            From CSIRO's Pre-Critical Date Claims in Any Material
            Limitation ..........................................................................................12

VI.   STANDARD OF REVIEW ...........................................................................16

VII.  SUMMARY OF ARGUMENT.....................................................................18

VIII. ARGUMENT.................................................................................................19

      A.    The Board Erred In Holding CSIRO's Claims 52-62 and 69-106
            of the '183 Application Unpatentable Under 35 U.S.C.
            § 135(b)(1)..........................................................................................19

            1.    The Board's Decision is Contrary to the Plain Language
                  of 35 U.S.C. § 135(b)(1)...........................................................20

# TABLE OF CONTENTS
## (continued)

2.    The Board's Decision is Contrary to the Controlling Precedents ....................................................................24

3.    The Board's Decision is Contrary to the Board's Own Prior Decisions....................................................................32

4.    The Board is Not Permitted to Redraft 35 U.S.C. § 135(b)(1) ................................................................34

B.    The Board Erred in Maintaining the Final Refusal of Claims 52-62 and 69-106 of the '183 Application After the Cancellation of All of Carnegie's Involved Claims............................35

    1.    Carnegie's Claims That Might Have Created A Bar Under 35 U.S.C. § 135(b)(1) Were Cancelled by the Board............................................................36

    2.    Carnegie's Cancelled Claims Are Void *Ab Initio* ....................37

    3.    Finally Refusing Claims 52-62 and 69-106 of the '183 Application Is Contrary to the Interests of Justice ..................38

C.    The Board's Decision that Claims 52-62 and 69-106 of the '183 Application are Unpatentable is Not Supported by the Case Law that the Board Relied Upon............................................................39

    1.    Case Law that the Board Relied Upon in Its First Decision Does Not Permit the Board to Redraft 35 U.S.C. § 135(b)(1) ................................................................39

    2.    Case Law that the Board Relied Upon in Its First Decision on Rehearing Does Not Permit the Board to Redraft 35 U.S.C. § 135(b)(1) ................................................................43

    3.    Case Law that the Board Relied Upon in Its Second Decision on Rehearing Does Not Permit the Board to Impose 35 U.S.C. § 135(b)(1) When the Conditions of Invoking the Statute Do Not Exist............................................44

IX.    CONCLUSION................................................................47

## TABLE OF CONTENTS
### (continued)

ADDENDUM A   Decision on Motions, dated October 12, 2012

ADDENDUM B   Decision Bd. R. 127(d) dated December 11, 2013

ADDENDUM C   Decision on Motions dated February 19, 2014

ADDENDUM D   Judgment Bd. R. 127(b)(4) dated April 2, 2014

ADDENDUM E   Decision on Request for Rehearing dated June 5, 2014

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adair v. Carter,*
    668 F.3d 1334 (Fed. Cir. 2012) ...........................................16, 21, 22, 23, 31

*In re Berger*,
    279 F.3d 975 (Fed. Cir. 2002) ....................................................................16

*In re Bogese*,
    303 F.3d 1362 (Fed. Cir. 2002) .......................................................34, 41, 42

*Campbell v. City of Haverhill,*
    155 U.S. 610 (1895).......................................................................................40

*Case v. CPC Int'l, Inc.*,
    730 F.2d 745 (Fed. Cir. 1984) ....................................................................23

*In re Chapman,*
    595 F.3d 1330 (Fed. Cir. 2010) ..................................................................16

*Chapman v. Beede*,
    296 F. 956 (1924) .........................................................................................29

*Chapman v. Wintroath,*
    252 U.S. 126 (1920).......................................................................................29

*Cooper Techs. Co. v. Dudas*,
    536 F.3d 1330 (Fed. Cir. 2008) ..................................................................35

*Corbett v. Chisholm,*
    568 F.2d 759 (C.C.P.A. 1977)...............................................................*passim*

*Cryns v. Musher,*
    161 F.2d 217 (C.C.P.A. 1947)...............................................................*passim*

*In re Fallaux,*
    564 F.3d 1313 (Fed. Cir. 2009) ..................................................................41

*Fresenius USA, Inc. v. Baxter Int'l Inc.*,
    721 F.3d 1330 (Fed. Cir. 2013) .............................................................36, 37

iv

# TABLE OF AUTHORITIES
**(continued)**

*Googin v. Mahdjuri*,
  209 U.S.P.Q. 667 (Comm'r Pat. 1980)...................................................33, 34

*Jenks v. Knight*,
  90 F.2d 654 (1937) ........................................................................29

*Loughlin v. Ling*,
  684 F.3d 1289 (Fed. Cir. 2012) ....................................................45

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ....................................................17

*In re McGrew*,
  120 F.3d 1236 (Fed. Cir. 1997) ....................................................44

*Mallard v. United States Dist. Court for S. Dist. of Iowa*,
  490 U.S. 296 (1989)......................................................................21

*Merck & Co. v. Kessler*,
  80 F.3d 1543 (Fed. Cir. 1996) ......................................................35

*Ex Parte Ogawa*,
  2002 WL 32173372 (Bd. Pat. App. & Int. 2002)..............................32, 33, 34

*Perez v. Dep't of Justice*,
  480 F.3d 1309 (Fed. Cir. 2007) ..............................................26, 27

*Perricone v. Medicis Pharm. Corp.*,
  432 F.3d 1368 (Fed. Cir. 2005) ....................................................43

*Regents of University of California v. University of Iowa Research Found.*,
  455 F.3d 1371 (Fed. Cir. 2006) ..............................................30, 31

*Richdel, Inc. v. Sunspool Corp.*,
  714 F.2d 1573 (Fed. Cir. 1983) ....................................................36

*Riddlesbarger v. Hartford Ins. Co.*,
  74 U.S. 386 (1868)..................................................................43, 44

*Siemens Healthcare Diagnostics, Inc. v. Enzo Life Sci., Inc.*,
  2013 WL 4411227 (D. Mass.)..................................................45, 46

# TABLE OF AUTHORITIES
## (continued)

*Symbol Techs., Inc. v. Lemelson Med.,*
  277 F.3d 1361 (Fed. Cir. 2002) ...................................................42

*Tafas v. Doll,*
  328 Fed. Appx. 658 (Fed. Cir. 2009) .........................................34

*Tafas v. Doll,*
  559 F.3d 1345 (Fed. Cir. 2009) ..................................................34

*Tafas v. Dudas,*
  541 F. Supp.2d 805 (E.D. Va. 2008) ..........................................34

*Tafas v. Kappos,*
  586 F.3d 1369 (Fed. Cir. 2009) ..................................................35

*In re Tanke,*
  213 F.2d 551 (C.C.P.A. 1954).....................................................25

*Tezuka v. Wilson,*
  224 U.S.P.Q. 1030 (Bd. Pat. App. & Int. 1984)....................33, 34

*Thompson v. Hamilton,*
  152 F.2d 994 (C.C.P.A. 1946)................................................21, 31

*Wallace v. Kato,*
  549 U.S. 384 (2007)..............................................................40, 43

*Webster Elec. Co. v. Splitdorf Elec. Co.,*
  264 U.S. 463 (1924)....................................................................42

## **Statutes**

5 U.S.C. § 706(2) ........................................................17, 21, 24

35 U.S.C. § 102(b) .............................................................29, 30

35 U.S.C. § 102(e) ....................................................................38

35 U.S.C. § 102(g)(1)..................................................................4

35 U.S.C. § 103 .........................................................................38

# TABLE OF AUTHORITIES
## (continued)

35 U.S.C. § 135(a) ...................................................................................7, 37

35 U.S.C. § 135(b) ....................................................................................*passim*

35 U.S.C. § 135(b)(1)..................................................................................*passim*

35 U.S.C. § 141 .................................................................................................3

35 U.S.C. § 281 ...............................................................................................37

35 U.S.C. §§ 300-307 ......................................................................................37

## I.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellants Commonwealth Scientific and Industrial Research Organisation and Bayer CropScience NV (jointly "CSIRO") states that an appeal to this Court from the same proceeding, Interference No. 105,754, was taken by Carnegie Institution of Washington and the University of Massachusetts (jointly "Carnegie").  That appeal was captioned *Carnegie Institution of Washington and the University of Massachusetts v. Commonwealth Scientific and Industrial Research Organisation and Bayer CropScience NV*, Docket No. 2014-1709.  By request of Carnegie, that appeal has been terminated.

Counsel for Appellants further states that there are no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## II.    JURISDICTIONAL STATEMENT

Interference No. 105,754 ("the Interference") was first declared by the United States Patent and Trademark Office ("USPTO") Patent Trial and Appeal Board ("the Board") on June 17, 2010.  *See A120-A126*.  The Interference involves CSIRO's U.S. Patent Application No. 11/364,183 ("the '183 Application") and Carnegie's U.S. Patents Nos. 6,506,559 ("the '559 Patent"), 7,622,633 ("the '633 Patent"), and 7,538,095 ("the '095 Patent").  *See A120-A126; A335-A337*.

A first Decision on Motions in Interference No. 105,754 was entered on October 12, 2012.  *Addendum A; A1-A38*.  A Judgment against CSIRO was also entered.  *A9073-A*9074.  CSIRO moved for rehearing of the first Decision and the accompanying Judgment.  *A9075-A9091*.  A Decision on Rehearing, which vacated the original Judgment, was entered on December 11, 2013.  *Addendum B; A39-A49*. A second Decision on Motions that addressed further pending motions was entered on February 19, 2014.  *Addendum C; A50-A90*.  Judgment against Carnegie was entered on April 2, 2014.  *Addendum D; A91-A93*.  CSIRO moved for rehearing of that Judgment, which also finally refused certain of CSIRO's claims, on May 2, 2014.  *A9116-9129*.  A second Decision on Rehearing was entered on June 5, 2014.  *Addendum E; A94-A99*.  This appeal was timely filed within two months of that second Decision on Rehearing.  *See Addendum E; A94;* Notice of Appeal at 3, *In re: Commonwealth Scientific*, Docket No. 14-01710 (Fed. Cir. Aug. 5, 2015).

2

This Court has jurisdiction over this appeal pursuant to 35 U.S.C. § 141.

## III.   STATEMENT OF THE ISSUES

1.      Whether the Board erred by interpreting 35 U.S.C. § 135(b)(1), contrary to the plain language of the statute, this Court's precedents, and the Board's own prior decisions, to impose an undefined requirement of promptness in prosecution upon applicants after copying claims of an issued patent and thereby holding CSIRO's Claims 52-62 and 69-106 of the '183 Application unpatentable for failing to meet that undefined requirement of promptness despite the conceded fact that CSIRO made such claims less than one year after issuance of the '559 Patent.

2.      Whether the Board erred in finally refusing CSIRO's Claims 52-62 and 69-106 of the '183 Application under 35 U.S.C. § 135(b)(1) after all of the involved Carnegie claims that could possibly have established a bar under the statute were cancelled by the Board pursuant to 35 U.S.C. § 102(g)(1) such that no claims exist in any involved Carnegie patent that could possibly bar Claims 52-62 and 69-106 of the '183 Application under the plain language of 35 U.S.C. § 135(b)(1).

## IV.   STATEMENT OF THE CASE

The Interference was first declared by the Board on June 17, 2010.  *See A120-A126*.  CSIRO was involved in the Interference due to their '183 Application and Carnegie was involved initially due to their '559  and '633 Patents.  *See A120, A122-A123*.  When the Interference was declared, CSIRO's Claims 39, 41-44, and 46-106 of the '183 Application were designated as corresponding to the sole Count and Carnegie's Claims 1-5, 7, 10-12, 15, 16, and 18-21 of the '559 Patent and Claims 1-3 of the '633 Patent were designated to correspond to the Count.  *Id*.

The Interference was re-declared on September 10, 2010.  *A335-A337*.  Carnegie's '095 Patent was added to the interference.  *See A335*.  Claims 1, 3, 6, 8, 11, and 13 of the '095 Patent were designated as corresponding to the Count.  *See A336*.

The interference was re-declared again on November 17, 2010.  *See A365-A366*.  At that time, the Board designated Carnegie's Claims 12, 15, 16, and 18-21 of the '559 Patent as not corresponding to the Count.  *See A365*.

### A.   Key Motions in the Interference

Included within the eleven substantive motions filed by CSIRO during the interference are CSIRO Motions 5 and 6.  *See A713-A758; A462-A492*.  CSIRO Motion 5 sought judgment that Carnegie was not entitled to the benefit of its earliest-filed provisional patent application, U.S. Patent Application No.

60/068,562 ("the Fire Provisional").  *See A713-A758; see also A123*.  CSIRO

Motion 6 moved for judgment that CSIRO Claims 39, 41-44, 46-51, and 68 of the

'183 Application did not correspond to the Count.  *See A462-A492*.

Carnegie's five substantive motions included Carnegie Motion 5, which

sought judgment against CSIRO "on the basis that no involved CSIRO claim is

patentable to CSIRO as having been timely filed under 35 U.S.C. §135(b)(1)."  *See*

*A976-A1018 at A982*.  Carnegie Motion 3 sought judgment that CSIRO's involved

'183 Application was not entitled to the benefit of its two earliest-filed provisional

patent applications, U.S. Patent Applications Nos. 60/198,240 (filed on April 8,

1998) and 60/198,254 (filed on August 3, 1998).  *See A1193-A1212 at A1196-*

*A1197; see also A123*.

Responsive to Carnegie Motion 3, CSIRO filed CSIRO Motion 11,

requesting leave to amend the Cross-Reference to Related Applications in the '183

Application to obviate the alleged defect in the claim to priority asserted in

Carnegie Motion 3.  *See A1047-A1127 at A1051-A1053*.

### B.    The Board's Decisions and CSIRO's Requests for Rehearing

In its first Decision on Motions, the Board granted CSIRO Motion 6, finding

that Claims 39, 41-44, 46-51, and 68 of the '183 Application did not correspond to

the Count.  *See A1-A38 at A2, A18-A27*.  As such, the Board properly held that

these claims were not subject to any judgment on patentability.  *A33*; *Rules of*

6

*Practice Before the Board of Patent Appeals and Interferences*, 69 Fed. Reg. 49960, 49969 (2004) (explaining the definition of an involved claim).

The Board also granted Carnegie Motion 5 as to Claims 52-67 and 69-106, but denied that motion as to Claims 39, 41-44, 46-51, and 68. *See A1-A38 at A2, A4-A18.* That is, the Board found that Claims 52-67 and 69-106 of the '183 Application were barred as untimely under 35 U.S.C. § 135(b)(1) for having been made more than one year after the issuance of the '559 Patent. *Id.*

In view of the Board's first Decision, the interference was re-declared on October 12, 2012. *See A9068-A9070.* CSIRO Claims 52-67 and 69-106 were designated as corresponding to Count 1 and CSIRO Claims 39, 41-44, 46-51, and 68 were designated as not corresponding to Count 1. *See A9069.* Concurrent with the re-declaration, a first Judgment was entered against CSIRO and the Board, citing 35 U.S.C. § 135(a), "finally refused" CSIRO Claims 52-67 and 69-106 of the '183 Application. *See A9073-A9074.*

On November 13, 2012, CSIRO moved for rehearing of the Board's first Decision and the accompanying Judgment. *See A9075-A9091.* In the Board's first Decision on Rehearing, entered on December 11, 2013, the Board modified its first Decision on Motions and vacated the first Judgment. *See A39-A49 at A40, A48-A49.* Specifically, the Board maintained its refusal of Claims 52-62 and 69-106 of the '183 Application. *See A39-A48.* However, the Board found that Carnegie had

not shown that Claims 63-67 were untimely under 35 U.S.C. § 135(b)(1). *See A48-A49*. The Board stated that it would "address remaining motions in a separate decision." *A40*.

That separate decision, a second Decision on Motions, issued on February 19, 2014. *See A50-A90*. The Board granted CSIRO Motion 5, and Carnegie was stripped of the benefit of the Fire Provisional. *See A50, A71-A77*. The Board also granted CSIRO Responsive Motion 11, which permitted CSIRO to amend its benefit claim and obviated Carnegie's attack on CSIRO's benefit of its prior applications. *See A50, A57-A61*.

Due to Carnegie losing the benefit of its priority application, the interference was re-declared again with CSIRO as the Senior Party. *See A9092-A9096*. The Board replaced Count 1 with Count 4 and designated CSIRO Claims 52-67 and 69-106 of the '183 Application, Carnegie Claims 1-5, 7, 10 and 11 of the '559 Patent, Carnegie Claims 1-3 (all) of the '663 Patent, and Carnegie Claims 1, 3, 6, 8, 11, and 13 of the '095 Patent as corresponding to new Count 4. *See A9092-A9096*.

The Interference proceeded to a priority phase. *See A9097-A9102*. However, Carnegie elected to not present a priority motion. *See A91-A93 at A91-A92*. On April 2, 2014, the Board entered a final Judgment against Junior Party Carnegie for Count 4 and cancelled Clams 1-5, 7, 10, and 11 of the '559 Patent, Claims 1, 3, 6, 8, 11, and 13 of the '095 Patent, and Claims 1-3 of the '633 Patent – all of

Carnegie's involved claims. *See A92*. The Board also finally refused CSIRO

Claims 52-62 and 69-106 of the '183 Application due to its earlier determination

that those claims were not patentable under 35 U.S.C. § 135(b)(1). *Id.*

CSIRO moved for rehearing of the final Judgment as to the refusal of Claims

52-62 and 69-106 of the '183 Application. *See A9116-A9129*. The Board denied

CSIRO's request for relief. *See A94-A99*. Thus, CSIRO's Claims 52-62 and 69-

106 of the '183 Application stand as finally refused and the Board considers those

claims "not patentable under 35 U.S.C. § 135(b)(1)." *See id.*

## V. STATEMENT OF THE FACTS

CSIRO Claims 52-62 and 69-106 of the '183 Application should not be

refused or held unpatentable under 35 U.S.C. § 135(b)(1) because CSIRO timely

presented claims prior to the critical date that provide support for those claims.

### A. Subject Matter of the Interference

The subject matter of the Interference pertains to a process now known as

RNA interference, or "RNAi." *See A1420-A1511, at A1435-A1443*. RNAi inhibits

or "silences" the normal expression of a "target" gene by causing rapid destruction

of the specific mRNA produced from the target gene before translation can occur.

*See A1442-A1443*. Double-stranded RNA that corresponds to the coding sequence

of a gene can trigger RNAi when introduced into a cell. *Id.*

Specifically, the claims involved in the Interference are directed to reducing gene expression in a plant cell by the introduction of double stranded RNA. *See A218-A223; A249-A267; see also A2-A4*. In accordance with the specifications of both Carnegie and CSIRO, introduction of double-stranded RNA into a cell includes both introduction of RNA itself from outside the cell and introduction of a construct (*e.g.,* DNA) that causes double stranded RNA to be produced in a cell. *See A1420-A1511, at A1482-A1489; see also A1389-A1412, at A1402, col. 9, ll. 26-48; see also A7142-A7221, at A7163, A7171, A7174-A7175*.

### B. The Earliest Possible Critical Date Created by Carnegie's Patents Under 35 U.S.C. § 135(b)(1) is January 14, 2004

Carnegie was involved in the Interference via the '559 Patent, the '633 Patent, and the '095 Patent. *See A120, A122-A123, A278-A279; A335-A337; A9068-A9070; A9092-A9096*. The'559 Patent issued on January 14, 2003. *See A1389-A1412, at A1389*. The '095 Patent issued on May 26, 2009. *See A1332-A1361, at A1332*. The '633 Patent issued on November 24, 2009. *See A1362-A1388, at A1362*. Thus, the earliest possible critical date under 35 U.S.C. § 135(b)(1) created by Carnegie's involved patents is January 14, 2004, *i.e.*, one year from grant of the earliest-issuing involved Carnegie patent. *See A4*.

### C.     CSIRO Copied Claims of the '559 Patent Prior to January 14, 2004

CSIRO's involved '183 Application was filed on March 1, 2006, and claims priority to four earlier-filed applications:  (1) U.S. Patent Application No. 10/755,328 ("the '328 Application"), filed on January 13, 2004; (2) U.S. Patent Application No. 09/287,632 ("the '632 Application"), filed on April 7, 1999; (3) U.S. Provisional Patent Application No. 60/198,254 ("the '254 Application"), filed on August 3, 1998; and (4) U.S. Provisional Patent Application No. 60/198,240 ("the '240 Application"), filed on April 8, 1998.  *See A123; A8183-A8189 at A8184.*  The '183 Application is a continuation of both the '328 and '632 Applications.  *See A57, A59-A60; see also A8183-A8189 at A8184.*  The '328 Application is a continuation of the '632 Application.  *See A57, A59-A60; A4057-A4063, at A4058.*

When the '328 Application was filed on January 13, 2004, CSIRO copied Claims 1-5 and 7 of the Carnegie '559 Patent.  *See A8*; *see also A4059-A4063.* Specifically, CSIRO filed a Preliminary Amendment that cancelled original Claims 1-38 of the '328 Application and added new Claims 39-45.  *Id.*  Claims 39-44 of the '328 Application correspond to Claims 1-5 and 7 of the '559 Patent.  *See A8; see also A1906-A1971, at A1966.*  Claim 45 depended from Claim 39 and recited that at least one strand of the RNA is produced by transcription of an expression construct in accordance with original Claims 14-20 of the '328 Application.

11

*A4057-A4063, at A4059; A7596-A7674, at A7657-A7659.* Thus, CSIRO copied

issued Claims 1-5 and 7 of the '559 Patent in an application to which CSIRO's

involved '183 Application claims priority less than one year after issuance of the

'559 Patent. *See A8, A57, A59-A60.*

### D.    CSIRO's Claims Involved in the Interference Do Not Differ From CSIRO's Pre-Critical Date Claims in Any Material Limitation

CSIRO Claims 52-67 and 69-106 of the '183 Application were involved in

the interference. *See A120, A122-A123; see also A2, A18-A27.* The Board found

that Claims 52-62 and 69-106 were barred under 35 U.S.C. § 135(b)(1), but upon

rehearing, the Board held that Claims 63-67 were not so barred. *See A4-A18; A48;*

*A51; A95.*

Claims 52-62 and 69-106 of the '183 Application are not materially different

from the claims that CSIRO presented in the Preliminary Amendment filed with

the '328 Application on January 13, 2004 – Claims 39-45 of the '328 Application –

or original Claims 14-20 of CSIRO's applications, including the '328 Application.

*Compare A249-A267, at A253-A256 with A7657-A7659 and A4059; see also, e.g.,*

*A8, A1967-A1971.*

Claims 52-62 and 69-106 of the '183 Application include the material

limitations of CSIRO's copied and original claims. During the Interference,

Carnegie asserted that the material limitations in the claims of the '559 Patent were

introducing a double-stranded RNA molecule into a cell wherein "the first and the

second ribonucleotide strands are separate complementary strands that hybridize to each other to form said double-stranded molecule." *See A976-A1018, at A990, l. 5-A991, l. 19.* CSIRO Claims 52-67 and 69-106 of the '183 Application include these material limitations. *See A254-A266.*

Specifically, Claims 52-61 recite introducing RNA into a cell wherein the RNA is a double-stranded molecule and the first and the second ribonucleotide strands are separate complementary strands. *See A254-A255.* Claims 62-67 recite introducing DNA into a cell that is capable of being transcribed into sense and antisense RNA wherein the sense and antisense RNA molecules are capable of forming a double-stranded RNA. *See A255-A258.* Claims 69-74 recite synthesizing at least two RNAs in the cell wherein the at least two RNAs form a double-stranded structure containing separate complementary strands. *See A258-A261.* Claims 75-106 recite contacting the cell with a construct encoding at least one RNA wherein the RNA comprises or forms a double-stranded structure and wherein the first and the second ribonucleotide strands are separate complementary sequences. *See A261-A267.*

Claims 52-61 of the '183 Application correspond to Claims 39-44 of the '328 Application filed on January 13, 2004. *Compare A254-A255 with A4059.* Carnegie admitted during the Interference that "[w]ith respect to Claims 52-61, these claims have the primary material limitation of the Carnegie claims and the

13

Count, and counterpart claims with the same material limitation was added to CSIRO's '328 Application just prior to the critical date." *A999, ll. 8-10; see also A992, ll. 21-23.* The Board also recognized that "[i]n the present case, there is conceded nexus between CSIRO's pre- and post-critical date claims." *A11.*

With respect to Claims 62-67, Carnegie asserted that their recitations did not inherently include the material limitations of the claims of the '559 Patent, implying that introduction of an expression construct that produces double-stranded RNA in the cell is not inherently introducing double-stranded RNA into a cell. *See A997-A998.* However, in its motion, Carnegie did not cite any testimony to support this contention, or any evidence beyond the text of Claims 62-67 themselves. *Id. (citing only A1017, alleged facts 76, 77(citing only A3966-A4056, at A3971-A3973)).* In its motion, Carnegie did not compare Claims 62-67 with CSIRO's pre-critical date claims. *Id.* Thus, Carnegie did not point out any material difference between Claims 62-67 and the original or copied pre-critical date claims of the '328 Application that was filed on January 13, 2004. *Id.*

Claims 62-67 and 69-106 explicitly or implicitly refer to introduction of an expression construct that produces RNA in the cell. *See A254-A267.* CSIRO's original claims of each of its '632, '328, and '183 Applications recite this feature. *Compare A254-A267 with A7596-A7674, at A7657-A7659 and A7517-A7595, at A7578-A7580; see also A1968-A1971.* The Board found that introducing RNA by

14

introducing DNA that will express the RNA (as recited in Claims 62-67 and 69-106) was implicitly introducing a RNA into a cell (as recited in Claims 52-61). *See A50-A90 at A85-A86.*  Specifically, the Board found that:

> While introducing a DNA construct is not the same as drawing RNA into a cell, it is a method for adding RNA to a cell or bringing RNA into effect in a cell. Thus, broadly understood, introducing RNA into the cell would include introducing RNA by introducing DNA that will express the RNA. In any case, CSIRO's disclosure discusses direct and indirect (via DNA) introduction of RNA.

*A85.*  Thus, the Board held that a claim that recites introducing RNA into a cell implicitly includes introducing DNA capable of expressing that RNA into a cell. *See A86.*  Indeed, both CSIRO's '183 Application and the Carnegie '559 Patent discuss both direct (as RNA) introduction and indirect (by expression of an introduced DNA construct) introduction of RNA.  *See A1420-A1511, at A1484-A1485, ¶¶ 201-202; see also A1389-A1412, at A1402, col. 9, ll. 26-48; A7142-A7221, at A7162, ll. 14-16, A7163, ll. 9-22, A7170, A 7172, ll. 20-25; A7174, l. 21-A7175, l. 2.*  In addition to original Claims 14-20, CSIRO's timely filed Claim 45 of the '328 Application recited that at least one strand of the RNA is produced by transcription of an expression construct.  *A4059; A7657-A7659.*

Moreover, Claims 62-67 correspond to original Claims 14-20 of CSIRO's applications, including the '632 Application, filed on April 7, 1999, and the '328 Application filed on January 13, 2004.  *See A254-A267; A7517-A7595, at A7578-*

*A7580; A7596-A7674, at A7657-7659; A7142-A7221, at A7204-A7206.* For example, Claim 62 of the '183 Application corresponds to original Claim 14 of CSIRO's pre-critical date '632 and '328 Applications. *A254; A7578; A7657.* Similarly, Claim 63 of the '183 Application corresponds to original Claim 15 with the added limitation of dependent Claim 16. *See A255-A256; A7658-A7659.* Dependent Claims 64-67 recite the limitations of original dependent Claims 17-20. *See A255-A257; A7659.*

With respect to Claims 69-106, in its motion, Carnegie asserted only that CSIRO had not "associated" these claims to any pre-critical date claim, but did not point out any material difference between these claims and CSIRO's pre-critical date claims, and did not cite any testimony or evidence beyond the text of Claims 69-106 themselves. *See A998-A999 (citing only A1017, asserted fact 78 (citing only A3966-A4056, at A3973-A3977)).*

## VI.    STANDARD OF REVIEW

This Court reviews "the Board's construction of 35 U.S.C. § 135(b)(1) *de novo*, as statutory interpretation is a question of law." *Adair v. Carter,* 668 F.3d 1334, 1336 (Fed. Cir. 2012); *In re Berger*, 279 F.3d 975, 980 (Fed. Cir. 2002).

In addition, "[t]he Patent and Trademark Office ('PTO') is governed by the Administrative Procedure Act ('APA'), and PTO decisions are reviewed under the APA standard." *In re Chapman*, 595 F.3d 1330, 1336-37 (Fed. Cir. 2010). This

Court must "hold unlawful and set aside agency action, findings, and conclusions found to be − (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." *5 U.S.C. § 706(2)*; *see also In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

## VII.  SUMMARY OF ARGUMENT

Under the plain language of the statute, this Court's precedents, and the

Board's prior decisions, it was error for the Board to hold CSIRO's Claims 52-62

and 69-106 of the '183 Application unpatentable under 35 U.S.C. § 135(b)(1)

because CSIRO made such claims – to substantially the same invention as that

claimed in the '559 Patent – less than one year after issuance of the '559 Patent.

For each of CSIRO's Claims 52-62 and 69-106 of the '183 Application, Carnegie

either admitted that the claims were not materially different from CSIRO's pre-

critical-date claims or failed to present any evidence of a material difference.  The

Board has improperly created an undefined requirement of promptness in

prosecuting an application that is not consistent with the plain language of the

statute.  The Board's decision is unsupported by case law and is contrary to the

controlling precedents of this Court and its predecessor Court.

Furthermore, under the plain language of the statute, it was also error for the

Board to finally refuse CSIRO's Claims 52-62 and 69-106 of the '183 Application

because any Carnegie claims that could possibly have established the bar were

cancelled by the Board's final Judgment and were thereby rendered void *ab initio*.

With the Board's final Judgment, no claims exist in any involved Carnegie patent

that could possibly bar Claims 52-62 and 69-106 of the '183 Application.

18

## VIII.  ARGUMENT

The Board's decision to finally refuse CSIRO's Claims 52-62 and 69-106 of the '183 Application is arbitrary, capricious, and contrary to the statute, precedents of this Court and its predecessor, and prior decisions of the Board.  The Board's decisions and judgment finally refusing CSIRO's claims should be reversed.

### A.    The Board Erred In Holding CSIRO's Claims 52-62 and 69-106 of the '183 Application Unpatentable Under 35 U.S.C. § 135(b)(1)

The Board held CSIRO's Claims 52-62 and 69-106 unpatentable under 35 U.S.C. § 135(b)(1), not because CSIRO violated any condition set forth in the statute, but rather, because they attributed some of the delay in the declaration of the interference to CSIRO's prosecution strategy.  *See A11-A13.*

Administrative Patent Judge Tierney's dissent in the Board's first Decision on Motions was correct.  *See A38.*  Judge Tierney wrote:

> I join the majority's opinion except for section II.A., which
> addresses the statutory bar under 35 U.S.C. 135(b)(1).  The
> theory of the decision, that prosecution delay can affect the bar,
> is unsupported in case law and unnecessary for the operation of
> the statute.

*A38.*  As shown below, the Board's decision is contrary to the plain language of the statute.  The Board's Decision is contrary to the controlling precedents that are directly relevant to the issue.  Indeed, the theory of the Board's Decision was tried and rejected by this Court's predecessor more than sixty-seven years ago.  The Board's own prior decisions demonstrate that in the past, it recognized this fact.

The Board does not have the authority to make a substantive rule, redrafting 35 U.S.C. § 135(b)(1) to impose a requirement for patentability on applicants that Congress did not provide.  None of the case law that the Board relied upon in reaching and justifying its first Decision compels, or even supports, the refusal of Claims 52-62 and 69-106 of the '183 Application.

### 1. The Board's Decision is Contrary to the Plain Language of 35 U.S.C. § 135(b)(1)

The Board's decision to hold Claims 52-62 and 69-106 of the '183 Application unpatentable is contrary to the plain language of 35 U.S.C. § 135(b)(1), which reads:[1]

> A claims which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application *unless such a claim is made prior to one year from the date of which the patent was granted*.

*35 U.S.C. § 135(b)(1)* (emphasis added).

The plain language of 35 U.S.C.§ 135(b)(1) requires only one thing for an applicant to avoid having her claims to the same or substantially the same invention as a claim of an issued patent be barred − that the patent applicant have

---

[1] 35 U.S.C. § 135 as in effect on March 15, 2013, applies to the applications and patents in this case.  *See* Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3(n)(2), 125 Stat. 284, 293 (2011).

made such a claim before one year after the patent was granted.  Contrary to this plain language, the Board has imposed an additional requirement − that the patent applicant pursue an interference within some undefined "prompt" timeframe.  *See A13*.

The Board's redrafting of 35 U.S.C. § 135(b)(1) is arbitrary, capricious, and not in accordance with the law.  *See 5 U.S.C. § 706(2)*.  "Statutory interpretation begins with the language of the statute."  *Mallard v. United States Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 300-01 (1989).  The language of 35 U.S.C. § 135(b)(1) provides repose from those who fail to make such a claim as would provoke an interference within one year after her patent issues.  *See Adair*, 668 F.3d at 1338-39.  However, that repose is explicitly conditional.  *See 35 U.S.C. § 135(b)(1)*.  The only condition required by the statute is that "such a claim" has been made prior to the critical date.  *Id*.  There is no further promise of repose to a patentee once an applicant makes "such a claim" prior to the critical date.  *Id*.  The statute imposes no further deadline or obligation on the applicant to pursue an interference by a date certain.  *Id*.  CSIRO complied with the requirements of 35 U.S.C. § 135(b)(1) and the statute requires no more.  *Id*.

That has been the law of this Court and its predecessor for more than sixty-seven years.  *See Thompson v. Hamilton,* 152 F.2d 994, 997 (C.C.P.A. 1946) (approving the Board's opinion and stating "[w]e are not impressed by the

argument as to constructive abandonment."); *Cryns v. Musher*, 161 F.2d 217, 218-20 (C.C.P.A. 1947) ("all that is required is that he [the appellant] shall be urging claims covering the matter which is claimed in the patent before the critical period has terminated"); *see also Corbett v. Chisholm*, 568 F.2d 759, 764-65 (C.C.P.A. 1977) ("the quality of the patentee's conduct here is of no moment in determining the applicability of the §135(b) bar"); *Adair*, 668 F.3d at 1338-39 ("Any claims filed within the critical period, whether or not later cancelled, may provide pre-critical date support for the later filed patent claim(s), so long as the pre-critical date claims are not materially different from the later filed claim(s)").

All of CSIRO's Involved Claims are supported by claims made before the critical date under 35 U.S.C. § 135(b)(1). *Compare A249-A267, at A253-A256 with A7657-A7659 and A4060; see also, e.g., A8, A1967-A1968.* Claims 52-61 of the '183 Application correspond to Claims 39-44 of the '328 Application filed on January 13, 2004. *Compare A254-A255 with A4059.* The Board's first Decision recognized that CSIRO copied claims of the '559 Patent that corresponded to Claims 52-61 of the '183 Application prior to January 14, 2004. *See A10; see also A249-A267; A4057-A4063.* Indeed, the Board's first Decision states that "there is a conceded nexus between CSIRO's pre- and post-critical date claims." *A11; see also A12* (noting that both parties concede that "the current claims are substantially the same as the timely CSIRO claims").

22

Claims 62-67 of the '183 Application correspond directly to CSIRO's original Claims 14-20, filed in CSIRO's '632, '328, and '183 Applications on April 7, 1999, January 13, 2004, and March 1, 2006, respectively. *See A7517-A7595, at A7578-A7580; A7596-A7674, at A7657-7659; A7142-A7221, at A7204-A7206; A254-A267.*

Thus, CSIRO's Claims 52-67 have direct antecedents in the claims that were made prior to the earliest possible critical date under 35 U.S.C. § 135(b)(1) that could be established by Carnegie's patents. Furthermore, the Board did not find that there was any material difference between Claims 69-106 of the '183 Application and CSIRO's pre-critical date claims. *See A16-A18.*

Carnegie as movant for relief under 35 U.S.C. § 135(b)(1) had the burden of proving that it was entitled to repose. *See, e.g., Case v. CPC Int'l, Inc.*, 730 F.2d 745, 750 (Fed. Cir. 1984). In its motion for relief under 35 U.S.C. § 135(b)(1), Carnegie did not identify any material differences between CSIRO's pre-critical date claims and Claims 52-62 and 69-106 of the '183 Application. *A976-A1018*, at *A991-A999.*

Despite the fact that CSIRO made claims such as Claims 52-67 and 69-106 prior to the critical date, and despite recognizing that "the question becomes whether [CSIRO's present claims] had timely antecedent claims" (citing this Court's precedent in *Adair*), the Board held that CSIRO was not entitled to relate

23

its Claims 52-62 and 69-106 back to its timely-presented claims because a delay in the declaration of an interference was partially attributed to prosecution strategies of Appellants. *See A7-A13.*

The Board has thus improperly redrafted the text of 35 U.S.C. § 135(b)(1) to include a requirement that the applicant not only make claims within one year of issuance but also pursue an interference with "promptitude" − whatever that may mean. *See A13.* The Board's first Decision indicates that the Board "decline[s] to read § 135(b) precedent to provide an unlimited ability to relate an untimely claim back to a timely claim." *A13.* However, there is nothing in the statute that requires, or even suggests, that an applicant must pursue a direct and uninterrupted drive towards an interference nor is there a limitation in the language of the statute that limits the applicant's ability to relate back to a timely claim. *See 35 U.S.C. § 135(b)(1).* The Board's redrafting of the statute is arbitrary, capricious, and not in accordance with the law. *See 5 U.S.C. § 706(2).*

### 2. The Board's Decision is Contrary to the Controlling Precedents

By ignoring the plain language 35 U.S.C. § 135(b)(1) and adding a requirement that an applicant pursue an interference with "promptitude" the Board ignored years of controlling precedent from this Court and its predecessor, the Court of Customs and Patent Appeals ("C.C.P.A.").

Interpreting an earlier version of the same statute having the same meaning as now stated in the version of 35 U.S.C. § 135(b)(1) applicable to this case, the C.C.P.A. long ago held that a party may rely upon a cancelled claim that was presented before the bar date to overcome the bar that was then recited in 35 U.S.C. § 51, enacted August 5, 1939. *See Cryns*, 161 F.2d at 220.

In *Cryns*, the C.C.P.A. considered the case of an applicant that had cancelled interfering claims seven months after a patent had issued and then later provoked an interference nearly two years after the patent had issued by copying a claim of the patent. *Cryns*, 161 F.2d at 218. In *Cryns*, the prosecution decisions of the applicant delayed declaration of an interference for almost two years after the patent issued. The C.C.P.A. held that the applicant was entitled to rely on its original claims to overcome the bar now set forth in 35 U.S.C. § 135(b)(1). *Cryns*, 161 F.2d at 220.

The theory of the Board's decision in the underlying interference that led to *Cryns* – the theory that was rejected by the C.C.P.A. – appears strikingly similar to the theory of the Board's present Decision. *Id.* In the case below *Cryns*, the Board relied upon a series of cases that elaborated an equitable doctrine of estoppel prior to the enactment of R.S. 4903 (then 35 U.S.C. § 51) on August 5, 1939. *Id.* R.S. 4903 is the statute that became, without substantial change, the § 135(b)(1) that is applicable here. *See In re Tanke*, 213 F.2d 551, 552 (C.C.P.A. 1954)

25

(holding that "R.S. 4903, 35 U.S.C. 51, relating to interferences . . . was revised, codified, and enacted into law, effective January 1, 1953, 35 U.S.C. § 135, so far as pertinent, and without substantial change"); *see also Corbett* 568 F.2d at 765.

In reversing the Board's decision, the C.C.P.A. explained that the opinions that preceded the enactment of R.S. 4903, and the estoppel theories upon which they were decided, were no longer authority.  *See Cryns*, 161 F.2d at 220.  The C.C.P.A. held that case law applying a theory of laches prior to the enactment of the statute were no longer applicable.  *Id*.  As it did more than sixty-seven years ago, the Board now errs in invoking a theory of laches that was long ago held to be superseded by the statute that evolved into 35 U.S.C. § 135(b)(1).  "All that is required is that the applicant shall be urging claims covering the matter which is claimed in the patent before the critical period has terminated."  *Cryns*, 161 F.2d at 220.  That holding of the C.C.P.A. is a controlling precedent that is dispositive in this case.

In its first Decision on Rehearing, the Board erred in contending that the holding in *Cryns* was not applicable to the present case.  The Board cited *Perez v. Dep't of Justice*, 480 F.3d 1309, 1312 (Fed. Cir. 2007), for the proposition that the Court's explanation of the law in *Cryns* should not be followed.  *See A39-A49, at A42-A43.*  In *Perez,* this Court held that broad statements in judicial opinions must be interpreted in light of the issue before the court.  *Perez,* 480 F.3d at 1312.

However, *Perez* is not a basis for ignoring precedent where the issues are substantially parallel. The Board wrongly contended that the issue in *Cryns* was not analogous to the present case. The facts and issues in this case and the facts and issues in *Cryns* are indeed parallel, and thus the interpretation of the statute now known as 35 U.S.C. § 135(b)(1) given in *Cryns* should likewise govern the present case.

The Board's own summary of the facts in *Cryns* proves the Board's error. The Board summarized the facts of *Cryns* as follows:

> According to the *Cryns* opinion, the applicant:
> (1) filed original claims that were relevant to the count,
> (2) cancelled those claims but timely added more relevant claims,
> (3) cancelled those claims and added claims apparently not relevant to the count, then
> (4) belatedly copied a claim to instigate an interference.

*A39-A49, at A42* (citing *Cryns*, 161 F.2d at 219). The Board also noted that Cryns had cancelled its copied claims in response to a rejection for lack of written description. *Id.* These events from *Cryns* closely parallel the events of CSIRO's prosecution:

(1) CSIRO filed original claims in the '632 Application before the '559 Patent even issued that were relevant to the Count, but other claims were elected as the result of a restriction requirement. *A7-A8; A7578-A7580.*

(2) CSIRO timely filed the '328 Application introducing Claims 39-44 that were copied from Carnegie's '559 Patent within one year of the issuance

of the '559 Patent. *A9-A10; A4057-A4063.* Those claims were initially rejected through several rounds of prosecution in the '328 and '183 Applications as allegedly lacking written description. *A9-A10; A4064-A4072; A4075-A4081;A4082-A4090.*

(3) CSIRO amended the copied claims to claims that were not relevant to the Count in response to the rejection, but those claims were rejected. *A9-A10; A4091-A4101.*

(4) CSIRO reintroduced its Claims 52-61 of the '183 Application (corresponding to its claims timely copied from the '559 Patent) along with additional claims directed to substantially the same subject matter, namely Claims 62-67 (corresponding to original claims of the '632, '328, and '183 Applications) and Claims 69-106 to provoke this interference. *A9-A10; A3966-A4056, at A3967–A3982; A4110-A4198, at A4110-A4111.*

Thus, contrary to the Board's Decision on Rehearing, the facts of this case parallel the facts and issues presented in *Cryns* almost perfectly and thus the interpretation of the statutory language now provided in 35 U.S.C. § 135(b)(1) that was given in *Cryns* is equally applicable to the present case. For the same reason that Cryns was then entitled to rely upon his pre-critical date claims, CSIRO is now entitled to rely on its pre-critical date claims.

28

Following *Cryns*, in *Corbett,* the C.C.P.A. analyzed the origins of § 135(b) to address an assertion of equitable estoppel that had been made against claims introduced to provoke an interference and reached a similar conclusion. The C.C.P.A began its explanation as follows:

> Initially, the legal principles proscribing delayed copying of patent claims were embodied in an equitable doctrine akin to laches. In *Chapman v. Wintroath*, 252 U.S. 126, 40 S.Ct. 234, 64 L.Ed. 491 (1920), the Supreme Court articulated the proviso that laches could not be found prior to the expiration of the time period set in the statutory predecessor to 35 U.S.C. 102(b) . . . for the establishment of the patent from which the claims were copied as a statutory bar, then two years. Consistent with its equitable nature, the doctrine was not applied in cases where "special circumstances" justified the delay. *Jenks v. Knight*, 90 F.2d 654, 24 C.C.P.A. 1227, 33 USPQ 601 (1937). The situation where the copier had already been claiming substantially the same invention as the patentee was early recognized as such a special circumstance. *Chapman v. Beede*, 54 App.D.C. 209, 296 F. 956 (1924). The stated rationale for this exception was that the then Patent Office should declare an interference whenever copending applications claim substantially the same invention, and, if it fails to do so, the public interest is better served by a belated interference than by the issuance of a second patent.

*Corbett*, 568 F.2d at 764-65. The C.C.P.A. went on to explain:

> In *Cryns v. Musher*, 161 F.2d 217, 34 C.C.P.A. 963, 73 USPQ 290 (1947), this court held that claims cancelled during the year *subsequent* to the issuance of the patent could be relied upon to avoid the R.S. 4903 bar in view of the words "for the first time." Thus, regardless of whether the cancellation of claims might have been relevant to the application of the equitable doctrine of *Chapman v. Wintroath*, **such cancellation was not relevant to the application of its statutory successor.**

29

*Corbett*, 568 F.2d at 765 (bold added).

Following enactment of what is now 35 U.S.C. § 135(b)(1), the C.C.P.A. held that the statute is not an equitable remedy to be applied at the Board's discretion.  "The words 'prior to' in the present code clearly point to a 'critical date' prior to which the copier had to be claiming the invention whether or not the claims were subsequently cancelled."  *Corbett*, 568 F.2d at 765.  Thus, as in *Cryns*, the C.C.P.A. in *Corbett* held that:

> Our review of the history of § 135(b) also disposes of Corbett's estoppel argument.  The amendment of R.S. 4903 and successor enactments converted what had been an equitable doctrine, applicable at the court's discretion, into a statutory requirement, like the statutory time bar of § 102(b), the application of which is mandatory.  *It follows that the quality of the patentee's conduct here is of no moment in determining the applicability of the § 135(b) bar, wherefore we need not consider the matter further*.

*Corbett*, 568 F.2d at 765 (emphasis added).  Thus, the C.C.P.A. reiterated in very clear terms that the equitable doctrine akin to laches, the analysis of "special circumstances," and the rationale for the "special circumstances" doctrine are elements of case law that preceded the enactment of 35 U.S.C. § 135(b) and its precursors that are no longer applicable.  This Court's more recent discussion in *Regents* further demonstrates that *Corbett* remains the law.  *See Regents of University of California v. University of Iowa Research Found*, 455 F.3d 1371, 1376 (Fed. Cir. 2006).

The Board likewise erred in its first Decision on Rehearing in attempting to distinguish the facts of this case from *Corbett*. *See A39-A49, at A42-A43*. The conduct that the C.C.P.A. held was "of no moment" in *Corbett* parallels the present circumstances, where claims directed to substantially the same subject matter as an issued patent were cancelled as a result of a restriction requirement in the '632 Application and reintroduced in a subsequent application. *Corbett*, 568 F.2d at 761, 765.

None of the statute, *Thompson*, *Cryns*, *Corbett, Regents*, *Adair,* or any other decision of this Court limits the window during which an interference can be declared when, as here, an applicant presented such claims prior to the critical date. As the *Corbett* decision explains, "[the PTO] should declare an interference whenever copending applications claim substantially the same invention, and if it fails to do so, the public interest is better served by a belated interference than by issuance of a second patent." *Corbett,* 568 F.2d at 765. This "exception to the one year bar, provided by the 'such a claim' language in section 135(b)(1), allows for belated interferences." *Regents*, 455 F.3d at 1376.

In its second Decision on Rehearing, the Board again attempted to justify its initial finding on equitable grounds. *See A94-A99*. For example, the Board states that "from the beginning, even before codification, this practice has had a mixed equitable and statutory nature, which has persisted through subsequent decisional

law and codification." *Id.* That assertion is contradicted by the C.C.P.A.'s holding in *Cryns* and its further explanation in *Corbett* that the equitable considerations that predated the enactment of the statute are no longer applicable. *See, e.g.*, *Cryns*, 161 F.2d at 219-220; *Corbett*, 568 F.2d at 765.

The Board considered the theory of its decision to be one of first impression. *See A10.* It was not. As explained above, it is a theory that was tried and rejected more than sixty-seven years ago by the C.C.P.A. as being no longer valid after the enactment of what is now 35 U.S.C. § 135(b)(1). While the Board seeks to redraft 35 U.S.C. § 135(b)(1) to include an undefined requirement that an applicant promptly pursue an interference, controlling precedent of this Court makes clear that "the quality of the patentee's conduct . . . is of no moment in determining the applicability of the § 135(b) bar." *Corbett*, 568 F.2d at 765.

### 3. The Board's Decision is Contrary to the Board's Own Prior Decisions

Not only is the Board's final refusal of CSIRO's Claims 52-62 and 69-106 of the '183 Application contrary to the language of the statute and controlling precedent of this Court, it is contrary to the Board's own prior decisions. This further demonstrates the arbitrary and capricious nature of the Board's decision in this case.

The Board's Decision in *Ex Parte Ogawa* rejected an assertion that an equitable application of 35 U.S.C. § 135(b) is appropriate. *See Ex Parte Ogawa*,

32

Appeal No. 2001-1607, 2002 WL 32173372, at *2-3 (Bd. Pat. App. & Int. 2002).

In *Ogawa*, the Board held that a more than four year delay in trying to provoke an

interference was *not* contrary to the purpose of the statute.   *Id.*   The Board

explained that "applicants' claims are not barred if applicant claimed the same or

substantially the same subject matter as claimed by the patentee prior to the critical

date."  *Id.*   The Board stated:

> The issue of whether cancelled claims could be relied upon was
> addressed squarely in *Corbett*.  . . .  Notwithstanding the one-year
> period specified in the statute, patentees could be dragged into an
> interference *anytime during the life of the patent as long as an
> applicant could point to a claim filed prior to the critical date* that
> was the same as or to substantially the same subject matter as a claim
> in a patent.  . . . However, in our view, this is what controlling
> precedent allows an applicant to do.

*Id.* (emphasis added).  The opinion in *Ogawa*, authored by a member of the panel

in the Board's first Decision, was consistent with this Court's precedents and

earlier decisions of the Board that followed those precedents.  *See, e.g.*, *Tezuka v.*

*Wilson*, 224 U.S.P.Q. 1030, 1036 (Bd. Pat. App. & Int. 1984) (*citing Corbett*, 568

F.2d at 765).  For many years after *Cryns* and *Corbett,* and prior to the Board's

first Decision, the USPTO consistently recognized that 35 U.S.C. § 135(b)

converted what was an equitable doctrine, equitable at the court's discretion, into a

statutory requirement.  *See, e.g., Googin v. Mahdjuri*, 209 U.S.P.Q. 667, 668

(Comm'r Pat. 1980).  Only now, in this case, has the Board changed its position.

33

#### 4.     The Board is Not Permitted to Redraft 35 U.S.C. § 135(b)(1)

The Board's first Decision cites *In re Bogese*, 303 F.3d 1362 (Fed. Cir. 2002), for the proposition that the Board has the authority to sanction an applicant for delay. *See A13 n.52.*  However, this Court in *Bogese* pointed out that "[t]o be sure, an administrative agency cannot impose a penalty or forfeiture without providing notice." *Bogese*, 303 F.3d at 1369.  This Court found that the Board had authority to refuse claims for delay only when an applicant had been given ample notice and that Bogese had been given ample notice. *Id.*  Appellants, and the rest of the patent community, have had no such notice because the Board's first Decision on Motions in this case is the first decision since the Court in *Cryns* rejected the theory, to hold that 35 U.S.C. § 135(b)(1) includes a tacit and ambiguous requirement of applicant "promptitude." *See A13.*  And, as noted above, the Board's first Decision is contrary to its typical practice of following this Court's precedent, including *Cryns* and *Corbett*. *See, e.g., Ogawa*, 2002 WL 32173372, at *3, *Tezuka*, 224 U.S.P.Q. at 1036, *Googin*, 209 U.S.P.Q. at 668.

The Board does not have the authority to create a new substantive rule.  The authority of the USPTO is limited to rules that comport with the relevant statute. *See Tafas v. Dudas*, 541 F. Supp.2d 805, 811 (E.D. Va. 2008), *see also Tafas v. Doll*, 559 F.3d 1345, 1362 (Fed. Cir. 2009) (*vacated for en banc rehearing Tafas v.*

34

*Doll*, 328 Fed. Appx. 658 (Fed. Cir. 2009), *appeal dismissed Tafas v. Kappos,* 586 F.3d 1369 (Fed. Cir. 2009)).

The Board's ruling, if allowed to stand, would constitute a substantive rule making that is arbitrary and capricious and does not comport with the plain language of the statute. *See, e.g., Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1336 (Fed. Cir. 2008) (noting that "[a] rule is 'substantive' when it 'effects a change in existing law or policy' which 'affect[s] individual rights and obligations.'"). The Board does not have the authority to make such a rule. *Merck & Co. v. Kessler*, 80 F.3d 1543, 1550 (Fed. Cir. 1996) (stating that "Congress has not vested the Commissioner with any general substantive rulemaking power.")

Because the Board's first Decision and its final refusal of Claims 52-62 and 69-106 of the '183 Application constitutes the imposition of a substantive new rule, and stands in stark contradiction of established precedent, and is arbitrary and capricious, the Board's refusal of CSIRO's claims should be reversed.

**B.    The Board Erred in Maintaining the Final Refusal of Claims 52-62 and 69-106 of the '183 Application After the Cancellation of All of Carnegie's Involved Claims**

A separate and independent basis exists for reversing the final refusal of Claims 52-62 and 69-106 of the '183 Application. All the claims from the '559 Patent that might possibly have created a bar under 35 U.S.C. § 135(b)(1) have been cancelled. Indeed all of Carnegie's interfering claims have been

35

canceled.  Because those claims are void *ab initio*, there can be no bar under 35

U.S.C. § 135(b)(1) for Appellants to satisfy.  *See Fresenius USA, Inc. v. Baxter*

*Int'l Inc.*, 721 F.3d 1330, 1346 (Fed. Cir. 2013).

### 1.    Carnegie's Claims That Might Have Created A Bar Under 35 U.S.C. § 135(b)(1) Were Cancelled by the Board

Under 35 U.S.C. § 135(b)(1), claims of an applicant can only be refused if

claims to the same or substantially the same invention exist in a patent.  *See 35*

*U.S.C. § 135(b)(1)*.  Carnegie elected to abandon the contest and did not file a

priority motion.  *See A91*.  On April 2, 2014, the Board entered judgment against

Carnegie for Count 4 and cancelled all of Carnegie's involved claims:  Claims 1-5,

7, 10, and 11 of the '559 Patent, Claims 1, 3, 6, 8, 11, and 13 of the '095 Patent,

and Claims 1-3 of the '633 Patent.  *See A92*.  Thus, there are no "claim[s] of an

issued patent" to bar Claims 52-62 and 69-106 of the '183 Application under 35

U.S.C. § 135(b)(1).  It is well established that an invalid claim provides the

patentee with no statutory rights.  *See, e.g., Richdel, Inc. v. Sunspool Corp.*, 714

F.2d 1573, 1580 (Fed. Cir. 1983) (finding that the asserted claim was obvious and

stating "[t]he claim being invalid there is nothing to be infringed.").

The Board's final refusal of Claims 52-62 and 69-106 of the '183

Application despite the absence of barring claims is harmful error by the Board.

36

## 2. Carnegie's Cancelled Claims Are Void *Ab Initio*

The fact that the claims of the '559 Patent were once issued in error cannot bar CSIRO from obtaining its Involved Claims. Claims that were once issued and later cancelled have no legal effect. *See, e.g., Fresenius*, 721 F.3d at 1346. For example, claims cancelled in reexamination proceedings are void *ab initio*. *Id*. This Court stated that when a claim is cancelled, the patentee loses any cause of action based on that claim, and any pending litigation in which the claims are asserted becomes moot. *Id.* at 1340. The decision in *Fresenius* was founded on the authority that Congress granted to the USPTO to cancel mistakenly-issued patents. *Id.* at 1338 (citing 35 U.S.C. §§ 300-307).

Because a claim that is cancelled by the USPTO under authority granted by Congress is void *ab initio* it has no legal effect as a claim. *See Fresenius*, 721 F.3d at 1346. That is, it is as if the claim never existed for purposes of 35 U.S.C. § 281. An analogous situation occurs here. Congress authorized the Board to cancel claims of an issued patent during an interference. *35 U.S.C. § 135(a)*. Claims cancelled by the Board in an interference are as void as those cancelled in any other USPTO proceeding authorized by statute. That is, those claims are void *ab initio* for purposes of § 281 of the patent statute and must also be void *ab initio* for purposes of establishing a bar under § 135(b) of the same statute.

Because all of Carnegie's claims that might possibly have created a bar under 35 U.S.C. § 135(b)(1) are void *ab initio* − functionally never existed – those claims cannot bar Claims 52-62 and 69-106 of the '183 Application under 35 U.S.C. § 135(b)(1).

### 3.    Finally Refusing Claims 52-62 and 69-106 of the '183 Application Is Contrary to the Interests of Justice

Having been shown to be the first to invent the subject matter of the Count, CSIRO should not be barred from acquiring claims covering the full scope of its invention by Carnegie's now cancelled claims encompassing the practice of RNAi in plants.  The Board determined from the relevant evidence that Carnegie's priority application did not provide an enabling disclosure for RNAi in plants at the time it was filed and thus Carnegie was made the Junior Party in the re-declared Interference.  *See A77, A81*.

Carnegie elected not to file a priority motion and did not demonstrate a reduction to practice or conception with diligence to a reduction to practice of RNAi in plants prior to the filing date of CSIRO's priority application, which is thus prior art under 35 U.S.C. §§ 102(e) and 103.  *See A91-A93*.  Had the Examiner of Carnegie's patent applications denied Carnegie the benefit of its priority application for claims encompassing the practice of RNAi in plants, as the Board has, Carnegie's claims encompassing RNAi in plants would have been appropriately rejected over Senior Party CSIRO's published applications.

38

Having prevailed on priority in this interference, an interpretation of

35 U.S.C. § 135(b)(1) that finally refuses CSIRO's Claims 52-62 and 69-106 of the

'183 Application is contrary to the interests of justice.

### C. The Board's Decision that Claims 52-62 and 69-106 of the '183 Application are Unpatentable is Not Supported by the Case Law that the Board Relied Upon

None of the case law that the Board relied upon in stating the theory of its

first Decision compels, or even suggests, the result that the Board reached.  *See*

*A12-A13 nn.48-52*.  None of the case law that the Board relied upon in its first or

second Decision on Rehearing justify the Board's final refusal of Claims 52-63 and

69-106 of the '183 Application.  *See A44-A48; A97-A99*.  Indeed, as discussed

further below, the case law that the Board relied upon does not even permit the

Board to act as it has.

### 1. Case Law that the Board Relied Upon in Its First Decision Does Not Permit the Board to Redraft 35 U.S.C. § 135(b)(1)

Highlighting the absence of any precedent that supports the theory of the

Board's first Decision, the Board relied upon non-analogous opinions in an attempt

to justify redrafting the requirements of 35 U.S.C. § 135(b)(1).  *See A12-A13*

*nn.48-52*.  However, the factual situations, and the issues decided in those cases,

bear little or no resemblance to the present case – further evidence of the arbitrary

and capricious nature of the Board's decision.

For example, the Board relied on *Campbell v. City of Haverhill*, 155 U.S. 610, 617 (1895), for the proposition that statutes of repose should be construed to secure prompt enforcement.  *See A12.*  However, that case had no relation to the present situation.  In *Campbell*, the Supreme Court addressed the question of whether statutes of limitations in state law could be applied in patent cases. *Campbell*, 155 U.S. at 617.  The Court held that the statutes of limitations of the states could be applied in pleadings against the remedy for infringement.  *Id.*

Unlike the theory of the Board's first Decision, there was no suggestion in *Campbell* that any statute of limitations could be applied beyond its literal language.  *See id.*  The decision in *Campbell* does not suggest that prompt enforcement means anything more than what the plain language of the applicable statutes provided.  *See id.*

The Board also erred in relying on *Wallace v. Kato*, 549 U.S. 384, 391 (2007), for the proposition that there is no general federal rule of tolling for statutes of repose.  *See A12.*  In *Wallace*, however, the Supreme Court only decided the question of when the statute of limitations for a person arrested to file a civil rights complaint began to run.  *Wallace*, 549 U.S. at 391.  Again, the decision in *Wallace* did not impose any requirement on the plaintiff that was not in the statute itself. *See id.*  In the present case, 35 U.S.C. § 135(b)(1) explicitly defines the date by

40

which an applicant must take a single required action.  The Board has conceded

that CSIRO met that requirement.

The Board also erred in relying on *In re Fallaux*, 564 F.3d 1313, 1316-18

(Fed. Cir. 2009), for the proposition that applicant delay may generally result in the

loss of patent rights.  *See A12.*  In *Fallaux,* the applicant sought and was denied the

benefit of a two-way test to avoid a double patenting rejection.  *In re Fallaux*, 564

F.3d at 1316-18.  The two-way test was only available in very limited

circumstances when a later filed application issued before an earlier filed

application solely due to the actions of the patent office, and those requirements

were not met by Fallaux's applications.  *Id*.  This Court determined that Fallaux

had not met the explicit terms of the law under its precedents and the rules of the

patent office.  *Id*.  That is not the case here.  The one requirement to avoid the bar

under 35 U.S.C. § 135(b)(1) is explicitly stated in the statute and consistently

interpreted in binding precedents, and CSIRO met that requirement.

In the Board's first Decision on Motions, the Board also erred in relying on

*Bogese*, 303 F.3d at 1368-69, for the proposition that otherwise permissible

continuation practice can result in a loss of claims where the practice unnecessarily

delays the issuance of the claims.  *See A13.*  In that case, Bogese had filed *twelve*

continuations over a period of eight years without advancing the prosecution of his

application, and Bogese had been expressly warned by the examiner that his claims

would be rejected under the equitable doctrine of laches. *Bogese*, 303 F.3d at 1363-66. This Court held that the Board could reject claims only where there had been "*unreasonable and unexplained delay*", not merely "*unnecessarily delayed*" as the Board would now have it. *Id*. at 1367 (citing *Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1368 (Fed. Cir. 2002)). Furthermore, this Court held that Bogese had received ample warning from the examiner and prior decisions of the Board, and could not have been penalized otherwise. *Id.* at 1368. That is also not the case here, where Appellants relied on prior precedent in this Court's and the Board's prior decisions discussed above.

Furthermore, the decision in *Bogese* relied explicitly on the holding in *Symbol Techs,* which in turn relied upon *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463 (1924). *Id*. However, as discussed in detail above, this Court's predecessor, the C.C.P.A., held that *Webster*, and other such cases that applied an equitable doctrine of laches in the context of a claims to the same invention were superseded by the enactment of the antecedents of 35 U.S.C. § 135(b)(1) and therefore are not relevant authority for its construction. *See Cryns*, 161 F.2d at 219-220.

It is clear from the foregoing that none of the opinions cited by the Board support the Board's decision to refuse CSIRO's Claims 52-62 and 69-106 under 35 U.S.C. § 135(b)(1) or give it leave to redraft 35 U.S.C. § 135(b).

42

###### 2.   Case Law that the Board Relied Upon in Its First Decision on Rehearing Does Not Permit the Board to Redraft 35 U.S.C. § 135(b)(1)

In its first Decision on Rehearing, the Board relied on a number of additional non-analogous cases in contending that its first Decision on Motions was justified. However, those cases likewise fail to give the Board permission to redraft 35 U.S.C. § 135(b)(1) to impose conditions on an applicant that are not required by the statute.

The Board erred in relying on *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005), for the proposition that an applicant's decisions can affect the outcome of examination. *See A45.* That case has no relation to 35 U.S.C. § 135(b)(1) and its underlying facts are entirely different. In *Perricone*, the patentee was denied the protection of 35 U.S.C. § 121, because the explicit requirements of the statute had not been met in that the USPTO had not actually issued a restriction requirement. *Perricone*, 432 F.3d at 1375. Here, the explicit requirements of 35 U.S.C. § 135(b)(1) have been met.

For the same reason that the Board erred in relying again on *Wallace,* as in its first Decision, which is repeated in its first Decision on Rehearing, the Board also cannot properly rely on *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1868), to increase the requirements of a statute of limitations beyond its terms. *See A46. Riddlesbarger* has nothing to do with 35 U.S.C. § 135(b)(1) or patent law

43

in general.  The Court in *Riddlesbarger* interpreted the terms of an insurance contract.  In *Riddlesbarger* the explicit timeliness requirements of an insurance policy had not been met, whereas here, the explicit requirements of 35 U.S.C. § 135(b)(1) were met.  *Riddlesbarger*, 74 U.S. at 390.

No case law cited by the Board gives it permission to redraft 35 U.S.C. § 135(b)(1) to impose a new requirement on applicants.

### 3.    Case Law that the Board Relied Upon in Its Second Decision on Rehearing Does Not Permit the Board to Impose 35 U.S.C. § 135(b)(1) When the Conditions of Invoking the Statute Do Not Exist

The case law relied upon to support Board's conclusions in its Second Decision on Rehearing do not permit the Board to impose a finding of unpatentability under 35 U.S.C. § 135(b)(1) after the conditions under which unpatentability was initially found no longer exist.

For example, the Board erred in relying on *In re McGrew*, 120 F.3d 1236, 1238, 1239 (Fed. Cir. 1997), to characterize §135(b)(1) as both a statutory bar and a statute of repose.  *See A96*.  *McGrew* did not address the issues in this case. McGrew's claims were subject to rejection under 35 U.S.C. § 135(b)(1) because those claims were made *for the first time* more than one year after the issuance of a patent to substantially the same invention.  *See McGrew*, 120 F.3d at 1238, 1239. No interference could be declared.  *Id.*  Thus, the claims of the patent that created the bar were never subject to cancelation.  *Id.*  That is not true in this case, where

44

all of Carnegie's interfering claims have been canceled and does not explain how claims can be refused when there are no longer any claims of a patent to the same or substantially the same invention.

The Board contended that Carnegie's abandonment of the contest did not render the cancellation of its claims effective until after a potential judicial review, citing *Loughlin v. Ling*, 684 F.3d 1289, 1292-93 (Fed. Cir. 2012). *See A97*. That case held that one is not barred from seeking judicial review after requesting adverse judgment. *Loughlin*, 684 F.3d at 1292-93. However, Carnegie has now requested termination of its appeal and thus, the cancelation of its claims *is* finally decided. Moreover, at the time that the Board issued its final judgment, all of Carnegie's claims stood cancelled and would remain so until a reviewing court determined otherwise. A judgment must be issued according to what is true, not what might be. If, somehow, that part of the judgment had been overturned, the Board could have had an opportunity on remand to issue a judgment taking into account the consequences of judicial review. Its final decision regarding CSIRO's claims should have taken into account the fact that, at that time, there were no longer any issued claims in Carnegie's patents that could possibly bar CSIRO's claims.

The Board also erred in relying on *Siemens Healthcare Diagnostics, Inc. v. Enzo Life Sci., Inc.*, 2013 WL 4411227 at *13 (D. Mass.). *See A99*. In that case, a

decision of the Board considering only one of 202 claims that were challenged under 35 U.S.C. § 135(b) was held to be inadequate when the Board found that one claim was sufficient for a party to proceed in an interference. *Siemens*, 2013 WL 4411227 at *13. The Board was required to consider the patentability of each of the 202 claims. *Id.* The issue that concerned the Court in *Siemens* was that if the Board stopped its consideration after finding one patentable claim, a party could proceed with any number of claims of varying breadth provided that the one single claim was found to be not barred. *See id.* This would mean that a party might proceed in an interference with a broad count, when that party was entitled to provoke an interference over a much narrower claim. *See id.* That issue goes to the question of what the scope of an interference can be, not the final disposition of those claims.

The present question, *i.e.*, whether claims can be held to be barred when there are no longer any claims of an issued patent to create the bar, was not answered by the Court. *See id.* Moreover, as the Board noted, that case was not binding on the present case.

Thus, none of the case law that was relied upon by the Board in its second Decision on Rehearing permits the Board to persist in rejecting an applicant's claims once the conditions under which the claims were initially rejected ceases to exist.

46

## IX.    CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court

reverse the Board's final refusal of CSIRO Claims 52-62 and 69-106 of the '183

Application under 35 U.S.C. § 135(b)(1).

Respectfully submitted,

Date: <u>June 5, 2015</u>                <u>/s/ Todd R. Walters</u>

Todd R. Walters, Esq.
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314
Telephone:  (703) 836-6620
Facsimile:  (703) 836-2021
Email:  todd.walters@bipc.com

*Counsel for Appellants*
*Commonwealth Scientific &  Industrial*
*Research Organisation and*
*Bayer CropScience NV*

# ADDENDUM A

BoxInterferences@uspto.gov                               Paper 453
Telephone: 571-272-4683                    ENTERED: 12 October 2012

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

Patent Interference No. 105,754 (RT)

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION
and Bayer BioScience N.V.
(11/364,183),
Junior Party,

v.

CARNEGIE INSTITUTION OF WASHINGTON
and the University of Massachusetts
(6,506,559; 7,538,095 & 7,622,633),
Senior Party.

Before: RICHARD E. SCHAFER, RICHARD TORCZON and MICHAEL
P. TIERNEY, *Administrative Patent Judges*.

Opinion for the board entered by TORCZON, *Administrative Patent Judge*.

Opinion dissenting in part entered by TIERNEY, *Administrative Patent Judge*.

A1

DECISION
Bd.R. 125
on motions

Junior party (CSIRO) motions 1-11 and senior party (Carnegie)
motions 2-5 and 7 have been considered.

CSIRO motions 1-5 and 7-9 and 11 are DISMISSED as moot.

CSIRO motion 6 to have CSIRO claims 39, 41-44, 46-51 and 68
designated as not corresponding to count 1 is GRANTED.

CSIRO motion 10 to add claims is DENIED.

Carnegie motions 2-4 are DISMISSED as moot.

Carnegie motion 5 to bar CSIRO claims under 35 U.S.C. 135(b)(1)[1] is

GRANTED for claims 52-67 and 69-106, but

DENIED for claims 39, 41-44, 46-51 and 68.

Carnegie motion 7 to exclude exhibits is

DISMISSED as moot for CSIRO replies 1, 2, 5, 7 and 10;

GRANTED for exhibit 2112, paragraphs 26-32 and portions of

CSIRO reply 6 that rely on these paragraph; and

otherwise DENIED.

OPINION

I.  FOREWORD

Two of the Carnegie inventors shared a Nobel Prize "for their discovery that
double-stranded RNA triggers suppression of gene activity in a homology-

---

[1] All references to title 35, United States Code, are to the statues in force
prior to 16 September 2012.

dependent manner, a process named RNA interference (RNAi)."[2]  The

Nobel Prize is not, however, the subject of the interference.  The count,

which defines the scope of admissible priority proofs for the contested

invention,[3] is "The method of application 11/364,183 claim 52 or patent

6,506,559 claim 7."[4]  These claims define the invention as:[5]

| **CSIRO Claim 52** | **[Carnegie claim 7]** incorporated into parent claim 1 |
|---|---|
| A method to inhibit expression of a target gene in a **plant** cell comprising    introduction of a ribonucleic acid (RNA) into the cell in an amount sufficient to inhibit expression of the target gene,    wherein the RNA is a double stranded molecule with a first strand **having** a ribonucleotide sequence which corresponds to a nucleotide sequence of the target gene and    a second strand **having** a ribonucleotide sequence which is complementary to the nucleotide sequence of the target gene,    wherein the first and the second ribonucleotide strands are separate complementary strands | A method to inhibit expression of a target gene in a cell **in vitro [in which the cell is from a plant]** comprising    introduction of a ribonucleic acid (RNA) into the cell in an amount sufficient to inhibit expression of the target gene,    wherein the RNA is a double-stranded molecule with a first strand **consisting essentially of** a ribonucleotide sequence which corresponds to a nucleotide sequence of the target gene and    a second strand **consisting essentially of** a ribonucleotide sequence which is complementary to the nucleotide sequence of the target gene,    wherein the first and the second ribonucleotide strands are separate complementary strands |

[2] Exh. 1081: B. Daneholt, *Advanced Information, The Nobel Prize in Physiology or Medicine 2006*.  We note that RNA abbreviates "ribonucleic acid".

[3] *Case v. CPC Int'l, Inc.*, 730 F.2d 745, 749 (Fed. Cir. 1984); Bd.R. 201.

[4] Paper 1 at 3.

[5] Claim 52 is reproduced from Paper 13 (CSIRO clean claims) and claims 1 and 7 are reproduced from Paper 6 (Carnegie clean claims), with bolding added to highlight wording differences and with indenting added for ease of reading.  See 37 C.F.R. § 1.75(i) (requiring line indentation).

| that hybridize to each other to form said double-stranded molecule, and <br><br>   the double-stranded molecule inhibits expression of the target gene. | that hybridize to each other to form said double-stranded molecule, and <br><br>   the double-stranded molecule inhibits expression of the target gene. |

Hence, the contest is not about the general concept of gene silencing using double-stranded RNA; rather, it is about specifically defined methods for gene silencing in plant cells using double-stranded RNA.

## II. REPOSE

   A. Carnegie motion 5 for repose

      *1. Introduction*

Carnegie has moved[6] for repose under 35 U.S.C. 135(b)(1) over its oldest involved patent, which was granted 14 January 2003.[7]  The statute bars:

> A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent…in any application unless such a claim is made prior to one year from the date on which the patent was granted.

When a party has several involved patents directed to the same invention (i.e., with claims directed to the same count), it is appropriate to use the earliest patent grant date as the critical date for purposes of repose.[8]  Thus, under the statute, the critical date for the bar is 14 January 2004.  Carnegie's

---

[6] Paper 54 (Carnegie Subst. Mot. 5).
[7] Exh. 1042: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 6,506,559 B1 (granted 14 January 2003).
[8] *Berman v. Housey*, 291 F.3d 1345, 1355 (Fed. Cir. 2002).

other involved patents were granted in 2009.[9]  Both 2009 Carnegie patents

claim to be continuing applications of,[10] and are terminally disclaimed

over,[11] the 2003 Carnegie patent.

### 2. Same invention

As a threshold matter, under the statute, the claims must be "the same

as, or for the same or substantially the same subject matter as, a claim of an

issued patent".  In a declared interference, this test is presumed to have been

met for two reasons.  First, Congress created the bar as a statute of repose

against belated interferences.[12]  If the claims corresponding to a count were

not presumed to be the same (or substantially the same) despite the

declaration of an interference on the very same claims, then the patentee

would paradoxically have to prove the appropriateness of the interference in

which it unwilling finds itself.  Such an approach would be antithetical to the

statutory goal of repose.  Second, the Court of Appeals for the Federal

Circuit has held that a declaration is presumed to be correct, subject to a

successful challenge in a subsequent motion.[13]  Carnegie should not have to

prove that which otherwise is presumed to be correct as a matter of law.

CSIRO has a mechanism for challenging the presumption that the claims are

for the same (or substantially the same) invention.  Indeed, CSIRO could

limit—or even eliminate—the scope of the bar by successfully moving to

---

[9] Exh. 1043: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 7,538,095 B2 (granted 26 May 2009), and Exh. 1044: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 7,622,633 B2 (granted 24 November 2009).

[10] Exhs. 1043 (coversheet) & 1044 (coversheet).

[11] Exhs. 1057 & 1062.

[12] *Regents of Univ. of Ca. v. Univ. of Iowa Res. Found.*, 455 F.3d 1371, 1376 (Fed. Cir. 2006).

[13] *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1120-21 (Fed. Cir. 2004).

have claims designated as not corresponding to the count or moving for judgment of no interference-in-fact, respectively.[14]  Similarly, the addition of another count might affect the appropriate critical date if none of the claims for Carnegie's oldest patent correspond to the added count.[15]

Since there is no motion for judgment of no interference-in-fact, we can decide this threshold motion for the existing count and make whatever adjustments are necessary regarding claim correspondence.

In its reply, Carnegie cites *In re Berger*[16] for the proposition that "[t]here is, of course, a fundamental difference between the consideration of claims under Section 135(b)(1) and the designation of claims as corresponding to the count."[17]  Carnegie does not, however, explain how the proposition applies in the present case.

*Berger* involved an appeal from a rejection during examination. Berger argued that the interference rules then in effect[18] should govern how the rejection should be applied.[19]  The court explained that the rule in question:[20]

> was formulated not to determine the effective date of a claim in one party's application for compliance with § 135(b), but instead to define the extent of interfering subject matter as

---

[14] CSIRO has moved  (Paper 41, CSIRO Mot. 6) to undesignated some claims, but has not moved for judgment of no interference-in-fact (probably because it was the party that sought the interference).

[15] CSIRO does contingently move for an additional count without corresponding claims from Carnegie's oldest patent.  Paper 44 (CSIRO Mot. 9).

[16] 279 F.3d 975, 982 (Fed. Cir. 2002).

[17] Paper 129 (Carnegie Reply 6) at 7.

[18] 37 C.F.R. § 1.601 (2000).

[19] 279 F.3d at 981.

[20] 279 F.3d at 982 (citations omitted).

> between applications of potentially conflicting parties.
> Section 1.601(n) is applied, after other prerequisites to
> declaration of an interference are satisfied, to determine which
> claims are properly designated to correspond to the "count."

Significantly, in the present case an interference has already been declared. For the ex parte rejection, the risk for the patentee is still hypothetical. Once the interference is declared, however, the risk for the patentee is very real, thus triggering an immediate need for repose. Consequently, Berger's discussion of an old[21] rule in the context of a rejection has little bearing on the present case.

### 3. Timely antecedent claims

CSIRO's claims 39, 41-44 and 46-106 correspond to count 1.[22] None of these claims were filed on or before the 14 January 2004 critical date.[23] Thus, the question becomes whether these claims had timely antecedent claims.[24]

### a. Findings

Carnegie acknowledges that CSIRO had two related applications pending before the critical date, denominated for our purposes the 632 application and the 328 application.[25] The examiner entered a restriction requirement in the 632 application, in response to which CSIRO elected (in August 2000) the claims of Group II referring to "DNA encoding

---

[21] The provisions in § 1.601 (2002) that *Berger* discusses have no direct progeny in the present interference rules. *Cf.* 37 C.F.R. § 41.207(b) (now applying the court's presumption approach to claim correspondence).

[22] Paper 1 at 3-4.

[23] Paper 129, apdx. 2 (consolidated material facts), Mat'l Fact 45 (admitting that the involved claims were filed on 1 March 2006).

[24] *Adair v. Carter*, 668 F.3d 1334, 1339 (Fed. Cir. 2012).

[25] Paper 54 at 13:2-6. CSIRO has been accorded the benefit of these applications. Paper 1 at 4.

hairpin RNA" but sought to join Group I referring to "stemloop DNA", arguing that "based on the present application, "hairpin RNA" and "an RNA capable of forming stem-loop structures" would be regarded by one of ordinary skill in the art as denoting the same kind of nucleic acid structures, i.e., RNA that can fold into at least one double stranded RNA connected by a single stranded RNA of variable length."[26]  Following the August 2000 election, all CSIRO 632 claims and claim amendments were directed toward the elected embodiment hairpin RNA or stem-loop structures through the 14 January 2004 critical date.[27]

On 13 January 2004, CSIRO filed its 328 application as a continuing application of its 632 application, together with a preliminary amendment canceling original claims 1-38 and replacing them with new claims 39-45.[28] CSIRO substantially copied claims of Carnegie's involved patent with a preliminary amendment to the 328 application.[29]  In filing the preliminary amendment, CSIRO stated its belief that it had complied with the requirements of § 135(b)(1).[30]  In 2005, an examiner rejected claims 39-45 for lack of adequate written description.[31]  CSIRO did not respond to the rejection; instead CSIRO abandoned the application.[32]

CSIRO filed a preliminary amendment to its the involved 183 application in March 2006.  The preliminary amendment added

---

[26] Mat'l fact 48 (admitted).  We note that DNA abbreviates deoxyribonucleic acid.
[27] Mat'l fact 49 (admitted).
[28] Mat'l fact 55 (admitted); Exh. 1011 (Prelim. Amdt.).
[29] Mat'l fact 53 (admitted).
[30] Mat'l fact 56 (admitted).
[31] Mat'l fact 58 (admitted); Exh. 1012.
[32] Mat'l fact 60 (admitted).

claims 39-45, which were the same or substantially the same as claims 39-45 in the parent 328 application.[33]  The preliminary amendment did not address the rejection that had been made against the claims in the 328 application.[34] In July 2007, the examiner declined CSIRO's benefit claim (such that the application was entitled only to its filing date) because the claims lacked sufficient written description support in the earlier specifications [35] and rejected the claims as anticipated by Carnegie's involved patent.[36]  CSIRO responded by amending the claims to recite "an artificial hairpin RNA structure",[37] which CSIRO contended made the claims patentable over Carnegie's patent.[38]

In February 2008, CSIRO had an interview in the involved 183 application with the examiner, during which they discussed whether the claims as amended would avoid an interference with the Carnegie involved patent and also how to overcome the Carnegie patent as prior art.[39]  In the next Office action, mailed in April 2008, the examiner accepted CSIRO's benefit claim in view of the amendments.[40]  To overcome the rejection, CSIRO argued that its claims were distinct from the invention disclosed in Carnegie's patent because Carnegie required separate complementary RNA sequences, while CSIRO's claims require an artificial RNA hairpin loop.[41] When the examiner maintained the rejection, CSIRO in August 2009

---

[33] Mat'l fact 61 and response; Exh. 1014.
[34] Mat'l fact 62 (admitted).
[35] Exh. 1015 at 1-3.
[36] *Id.* at 6-7.
[37] Mat'l fact 64 (admitted).
[38] Mat'l fact 65 (admitted).
[39] Mat'l fact 66 (admitted).
[40] Mat'l fact 67 (admitted).
[41] Mat'l fact 69 (admitted).

maintained claims 39-51, but added new claims 52-61, arguing that independent claims 52 and 57 recited substantially the same invention as claim 7 of Carnegie's involved patent.[42]

     b.  Analysis

       i.  *Claims 52-61*

Carnegie treats the claims in five groups.  For CSIRO claims 52-61, which includes the CSIRO alternative of the count, Carnegie argues that CSIRO abandoned its effort to pursue these claims in a timely manner such that Carnegie should be entitled to repose.  CSIRO notes that Carnegie has not cited authority for this abandonment theory.  Indeed, this theory appears to be one of first impression.

Carnegie concedes that CSIRO "copied"[43] claims before the critical date, but argues that CSIRO abandoned those claims when it amended them in the face of rejections.  CSIRO then appears to have taken steps to avoid an interference with Carnegie until, five years after the critical date, CSIRO reintroduced substantially "copied" claims to get an interference.  Carnegie contends that excusing an intentional effort to avoid an interference for five years would frustrate the statute's purpose of providing repose.

CSIRO notes that precedent permits an interference if an applicant presents claims to the same invention prior to the critical date, even if its actual involved claims were first filed after the critical date, citing § 135(b)(1), *Regents of the University of California v. University of Iowa*

---

[42] Mat'l facts 50 (admitted) and 70-72 (each admitted).

[43] This case, in addition to some recent court decisions on written description, show why the practice of claim copying (unnecessary for an interference since at least the 1970s) should be avoided.  The term "copied claim" is not used in the statutes or rules and has no special significance other than as powerful evidence that an interference is being sought.

*Research Foundation*[44] and *Corbett v. Chisholm*.[45]  *Regents'* discussion of

*Corbett* and the statute is in tension with CSIRO's contention:[46]

> Despite the expected cause-and-effect relationship between the
> filing of an interfering claim and the declaration of an
> interference, this court's predecessor observed that the PTO
> sometimes fails to declare an interference where one exists.  As
> *Corbett* explains, "[the PTO] should declare an interference
> whenever copending applications claim substantially the same
> invention, and, if it fails to do so, the public interest is better
> served by a belated interference than by the issuance of a
> second patent."  568 F.2d at 765.  In other words, while an
> interference based on a post-critical date claim is not desirable,
> where such an interference is merely belated, meaning the same
> interference should have been earlier declared by the PTO, the
> interference should not be barred by operation of section
> 135(b)(1).  Thus, the limited exception to the one year bar,
> provided by the "such a claim" language in section 135(b)(1),
> allows for belated interferences.  Beyond such belated
> interferences, California's construction of section 135(b)(1)
> would permit different interferences because that construction
> removes from section 135(b)(1) any requirement for a nexus
> between the pre- and post-critical date claims.

In the present case, there is conceded nexus between CSIRO's pre- and post-

critical date claims, but the delay was the result of prosecution decisions that

CSIRO made rather than a failure of the Office to recognize that an

interference existed.  The timely claims were rejected despite CSIRO's

suggestion of an interference.[47]  Had CSIRO diligently worked to overcome

---

[44] 455 F.3d 1371 (Fed. Cir. 2006).
[45] 568 F.2d 759 (CCPA 1980).
[46] 455 F.3d at 1376.
[47] *Cf. Brenner v. Manson*, 383 U.S. 519, 528 n.12 (1966) (explaining "there
is no basis for the proposition that even where an applicant for an
interference presents a claim which on its face is unpatentable, a

the rejection,  the resulting delay might have been attributable to the Office for making an improper rejection; instead, CSIRO opted to amend to what it argued was a patentably distinct invention.

Statutes of repose must be construed to secure the prompt enforcement.[48]   The Supreme Court has declined to recognize a general federal rule of tolling for statutes of repose, particularly when it would place "the supposed statute of repose in the sole hands of the party seeking relief."[49]  CSIRO controlled when allowable claims were presented for an interference.  If, as both parties concede, the current claims are substantially the same as the timely CSIRO claims, then why could they not have been submitted back when timely claims were rejected?  They cannot be any more patentable now than they would have been back then.

Prosecution delay can also create time bars in other contexts.  For obviousness-type double patenting, case law requires the use of a two-way analysis when the Office is solely responsible for the lag that created the problem, but otherwise a one-way test is used, even in the absence of proof of nefarious intent on the part of the applicant.[50]  In the *Fallaux* case, the applicant had filed another application to cover a competitor's potential product.  The court noted that such a practice was not in itself improper, but served as evidence that the lag resulted from prosecution choices the

---

complicated and frequently lengthy factual inquiry into priority of invention must inexorably take place."); Bd.R. 102.

[48] *Campbell v. City of Haverhill*, 155 U.S. 610, 617 (1895) (affirming judgment for patent infringement defendant on repose theory).

[49] *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (holding civil rights action not tolled while criminal conviction under review).

[50] *In re Fallaux*, 564 F.3d 1313, 1316-18 (Fed. Cir. 2009).

applicant made.[51]  Similarly, otherwise permissible continuation practice can result in a loss of claims where the practice unnecessarily delays the issuance of the claims, even if some of the delay is attributable to the Office.[52]  Hence, applicant-controlled delay, even absent proof of bad intent, can have adverse consequences.

We decline to read § 135(b) precedent to provide an unlimited ability to relate an untimely claim back to a timely claim.  Like any statutory time bar, § 135(b) was intended to encourage promptitude.[53]  The safe-harbor provision of § 135(b)(1) cannot be reasonably be read to permit intentional delay or even—potentially—intentional frustration of a patentee's repose.

*ii.    Claims 39, 41-44, 46-51 and 68*

Carnegie argues that CSIRO claims 39, 41-44, 46-51 and 68 are not directed to the same (or substantially the same) invention and thus should not be part of the interference.  Carnegie notes that CSIRO has itself urged that these claims do not correspond to the count.[54]  Indeed, CSIRO seeks this relief in its motion 6 (which Carnegie opposes[55]).

As explained above,[56] however, claims corresponding to the count necessarily must be presumed to be directed to the same or substantially the same invention.  Carnegie has not shown that the presumption is wrong other than to cite CSIRO's assertion that they are directed to a different invention.  CSIRO's assertion cannot be taken as an admission that these claims time barred, but rather that CSIRO thinks these claims do not

---

[51] *Id*. at 1317.
[52] *In re Bogese*, 303 F.3d 1362, 1368-69 (Fed. Cir. 2002).
[53] *Berman*, 291 F.3d at 1351.
[54] Mat'l Fact 75; Exh. 1018 (Rev'd Suggestion) at 6-7.
[55] Paper 101.
[56] *Supra* at 4.

correspond to the count (consistent with its motion 6).  Thus, Carnegie has not identified a basis for judgment against these claims.

     *iii.*   *Claims 62-67*

Carnegie notes that CSIRO claims 62-67 were added to CSIRO's application in August 2009,[57] after the critical date.  Carnegie further notes that the independent claims, 62 and 63, provide for first and second chimeric DNAs in transgenic plant cells such that the first and second chimeric DNAs are capable of being transcribed as a sense RNA and its antisense RNA. Carnegie urges that the claims are not directed to the same (or substantially the same) invention because it is not inherent that the DNA would actually be transcribed to form the double-stranded RNA (dsRNA) of the count.  It is reply, however, Carnegie argues that "these claims are unpatentable over the count and stand properly designated as corresponding to the count."[58] CSIRO counters that, in any case, claims 62 and 63 relate back to its timely claims 14 and 15, respectively.

Carnegie's premise—that the claims are not to the same invention— does not lead to the relief it seeks, a judgment of repose.  If the claims are not drawn to the same (or substantially the same) invention, then they are not subject to the § 135(b)(1) bar, no matter how late they are after the critical date.  Thus, if Carnegie were correct, then the relief must be denied.

Carnegie, however, has not overcome the presumption of sameness resulting from the declaration of the interference.  Indeed, Carnegie argues that the claims properly correspond to the count, meaning the subject matter of the count (which is based on one of Carnegie's claims) would have

---

[57] Mat'l Fact 76 (admitted).
[58] Paper 129 at 8:5-7.

anticipated or rendered obvious the subject matter of CSIRO's claims.[59]  In its motion, Carnegie points out differences between its claims and these CSIRO claims, but has not shown that they are not substantially the same. By analogy to situations where one must disprove obviousness, it is not sufficient simply to note differences.[60]

CSIRO does not dispute that its claims are to the same invention, but contends that they relate back to timely claims 14 and 15.  Carnegie notes that CSIRO cancelled these claims in preliminary amendments, first when it copied claims in January 2004[61] and again in March 2006.[62]  In its reply, Carnegie notes that present claims 63 and 63 have been narrowed, but provides no indication of whether the narrowing was necessary to overcome a rejection.[63]  In claim 62, the sequence identity between the sense strand and the targeted gene was narrowed from the range 75-100% to simply 100% and an optional limitation regarding transcription termination is no longer optional.[64]  In claim 63, similar range narrowing to 100% identity occurs and the scope is also narrowed from a virus-resistant eukaryotic organism to a virus-resistant plant.

Narrowing the range to an end-point, especially when the result is the entirety of the reference sense strand for the target gene, is consistent with an inference that the applicant intended to claim the end-point (i.e., the entire strand) all along.  Similarly, making an optional limitation a limiting requirement is consistent with an intent to claim subject matter including the

---

[59] Bd.R. 207(b)(2).
[60] *Minkin v. Gibbons*, P.C., 680 F.3d 1341, 1350-51 (Fed. Cir. 2012).
[61] Mat'l fact 55 (admitted); Exh. 1011 (Prelim. Amdt.).
[62] Mat'l fact 61 and response; Exh. 1014.
[63] Paper 129 at 9-10.
[64] Paper 95, apdx. 5.

optional element all along, analogous to narrowing a claim by incorporating a dependent claim.[65]

Narrowing from a eukaryote to a plant, on the other hand, is material. While a plant is a kind of eukaryote, the genus of eukaryotes is huge with plants being only one subgenus with that genus. In its opposition, CSIRO does not point us to evidence that one skilled in the art would view a change from eukaryote to plant as immaterial. On its face, this change is significant. Hence, claim 63 and its dependent claims 64-67 are barred.

For claim 62, there remains the question of whether CSIRO improperly delayed declaration of an interference by cancelling claim 14 only to present it years later. In its 2009 suggestion for an interference, CSIRO indicated that it believed claim 62 should *not* correspond to a proposed count similar to count 1 of the interference.[66] CSIRO did, however, urge that it should correspond to a second proposed count, thus placing some Carnegie claims at risk of an interference. Hence, as with claims 52-61, CSIRO appears to have controlled the delay in declaring an interference to the prejudice of Carnegie.

     iv.   *Claims 69-106*

Carnegie notes that CSIRO claims 69-74 were added to CSIRO's application in August 2009,[67] after the critical date. Carnegie further notes that CSIRO did not, presumably in its suggestion for an interference, relate these claims back to earlier timely claims. In its suggestion, CSIRO argued

---

[65] *Pioneer Hi-Bred Int'l, Inc. v. Monsanto Tech. LLC*, 671 F.3d 1324, 1329-30 (Fed. Cir. 2012) (discussing dependent claims as a simple case for determining an antecedent).
[66] Exh. 1018 at 7.
[67] Exh. 1010 at 8-11.

that these claims would not correspond to the present count, but urged that they would correspond to a different proposed count to which Carnegie's claim 7 (Carnegie contribution to the present count) and CSIRO's claim 52 (CSIRO's contribution to the present count) would both correspond.[68]  Thus, CSIRO's addition of these claims was intended to place Carnegie's claims at risk in an interference, albeit with a different count.

Carnegie similarly notes that claims 75-106 were added in August 2009,[69] after the critical date and that CSIRO did not identify earlier timely claims.  Again, CSIRO identified the claims as not corresponding to a separate count, but corresponding to its second proposed count, thus placing Carnegie's claims at risk.

For both sets of claims, Carnegie used headings stating that the claims were not for the same or substantially the same invention, although as discussed above the argument focused on the untimeliness of the claims. Carnegie did not actually argue that the claims were not the same or substantially the same.[70]  Unfortunately, CSIRO's opposition addresses the headings, not the actual argument.[71]  When faced with a conflict between a heading and the argument, the actual argument must take precedence.[72]  In any case, the claim are presumed to be directed to the same or substantially the same invention, as discussed previously.

---

[68] Exh. 1018 (August 2009) at 7-8.

[69] Exh. 1010 at 11-17.

[70] Paper 54 at 19.

[71] Paper 95 at 18.

[72] *Cf. Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (explaining that a title might help clarify an ambiguity in statutory language, but cannot be read to limit plain statutory language).

In isolation, both Carnegie's argument and CSIRO's opposition are incomplete, but it is the movant who has the burden to prove the bar.[73] Carnegie's argument does not occur in isolation, however, but rather at the end of a section in which it has successfully argued that CSIRO, after initially seeking an interference, subsequently avoided the same interference for five years. The only apparently timely claims on which CSIRO might have relied have already been considered and rejected as a basis for avoiding the bar.

### 4. Holding

Carnegie has established that claims 52-106 should be barred as untimely. Carnegie has not shown that claims 39, 41-44, 46-51 and 68 should be barred as untimely.

## B. CSIRO motion 6 to change claim correspondence

### 1. Introduction

CSIRO has moved[74] to have claims 39, 41-44, 46-51 and 68 designated as not corresponding to the count. "A claim corresponds to a count if the subject matter of the count, treated as prior art to the claim, would have anticipated or rendered obvious the subject matter of the claim."[75] CSIRO contends that the invention defined in these claims would

---

[73] *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1303 (Fed. Cir. 2002) (explaining that both parties can fail to meet their respective burdens, but failure by one does not impute success by the other).

[74] Paper 41 (CSIRO Mot. 6).

[75] Bd.R. 207(b)(2) (for interferences under 35 U.S.C. 102(g)(1)); *accord Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1062 text & n.6 (Fed. Cir. 2005) (§ 102(g)(2)) (explaining the district court's "statement of the invention captures subject matter that anticipates all two hundred twenty-one claims at bar").

not have been anticipated or obvious from the invention of the count because these claims require a hairpin RNA structure.[76]

As shown in a figure from CSIRO's motion (below), a hairpin RNA structure has a single RNA strand that is folded back on itself such that complementary bases on the overlapping portions of the strand hybridize.[77]  The count requires that the double-stranded RNA have "first and second ribonucleotide strands [that] are separate complementary strands that hybridize to each other to form said double-stranded molecule."  Consequently, CSIRO argues, a hairpin structure does not meet the requirement for separate strands.  Carnegie agrees, but contends that the subject matter would nevertheless have been obvious.[78]

### 2. CSIRO's claims

CSIRO claim 39 is the only independent claim in the group and the only claim to which argument is directed.[79]  It defines the invention as (emphasis added):

A *method for reducing the phenotypic expression of a nucleic acid of interest*, which is normally capable of being expressed in a plant cell comprising the step of introducing into the plant cell a chimeric DNA comprising the following operably linked parts:

---

[76] Paper 41 at 6-13.

[77] Exh. 2001: P.M. Waterhouse et al., *Method and means for obtaining modified phenotypes*, Appl'n No. 11/364,183 (filed 1 March 2006) (CSIRO's involved application) at 14:30-15:8 (defining "hairpin RNA").

[78] Paper 101 (Carnegie Opp. 6) 2-3.  Paradoxically, Carnegie has also argued that these claims are unrelated to the subject matter of the interference, *supra* at 12.

[79] Paper 101 at 2.

a. a promoter operative in the plant cell;

b. a DNA region, which when transcribed, yields *an RNA* comprising an RNA region *capable of forming an artificial hairpin RNA structure comprising two annealing RNA sequences*, *wherein* one of the annealing RNA sequences of the hairpin RNA structure comprises a sense sequence that is identical to at least 100 consecutive nucleotides of a nucleotide sequence of the nucleic acid of interest and *wherein* the second of said annealing RNA sequences comprises an antisense sequence which is identical to at least 100 consecutive nucleotides of the complement of at least part of the nucleotide sequence of the nucleic acid of interest and *wherein* the sense and antisense sequences of the artificial hairpin structure are not naturally occurring in one RNA molecule*, or* the sense and antisense sequences are separated by a spacer region which is heterologous with respect to the target gene; and

c. a DNA region involved in transcription termination and polyadenylation.

As a general rule, "preamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention without which performance of the recited steps is nothing but an academic exercise."[80]  For claim 39, the preamble states the essential purpose of the method.  Carnegie has not suggested an alternative use for the method outside what the preamble states.

The DNA of the claim is transcribed to form *an* RNA strand that can anneal or hybridize to itself to convey the antisense RNA strand.  While the RNA strand need not actually form a hairpin, it must have the ability to form an artificial hairpin.  Moreover, the subsequent "wherein" clauses requiring

---

[80] *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003), *citing Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (interference).

complementary sequences each of at least one hundred consecutive nucleotides reinforces the significance of this capability in the context of the claim.[81]  Hence, whether or not the hairpin structure actually forms or is actually necessary for the method to work, it limits what CSIRO has claimed.

The final "or" clause of step b. is confusing because the comma before the "or" suggests that the heterologous spacer is an alternative for all of the "wherein" clauses of step b. rather than just an alternative within the last "wherein" clause.  This problem does not affect the outcome on the motions before us, but the claim should be clarified if it is subject to further examination.

### 3.    Obviousness of the subject matter of CSIRO claim 39 in view of the subject matter of count 1

The subject matter of CSIRO claim 39 requires a single RNA strand capable of forming a hairpin structure.  The count does not include a hairpin structure; consequently, the focus of the briefing has been on obviousness rather than anticipation.  CSIRO has identified structural, chemical and thermodynamic differences between the subject matter of claim 39 and of the count, but all of these differences are features of a hairpin structure.[82] CSIRO urges that "without an understanding of the mechanism of RNA interference," a person having ordinary skill in the art would not have been able to predict whether a cell could use a hairpin RNA structure for RNA interference.[83]

---

[81] *Griffin*, 285 F.3d at 1033 (noting use of "wherein" clause).
[82] Paper 41 at 9-11.
[83] *Id*. at 12.

a. Findings

A person having ordinary skill in the art in the relevant time frame would have been familiar with in vitro and in vivo DNA-DNA interactions, DNA-RNA interactions and RNA-RNA interactions, which were proposed and discussed extensively in the relevant literature.[84]  Moreover, ordinary skill in the art would have included familiarity with challenges of antisense silencing in plants, animals and fungi, and with the problems of complementary separate strands finding each other in a eukaryotic cell.[85]

An RNA hairpin structure has a loop at one end of the two annealing RNA sequences that is not found in a double-stranded RNA structure formed from separate complementary strands.[86]  Consequently, an RNA hairpin has only two free ends available for enzymatic modification rather than the four free ends found on paired, but separate complementary strands.[87]

CSIRO has provided expert testimony that given the structural, chemical and thermodynamic differences between normal double-stranded RNA and a hairpin RNA, as well as the lack of understanding regarding how RNA interference actually worked, a person having ordinary skill in the art would have considered the result from substituting a hairpin RNA to be

---

[84] Exh. 1091 (Decl. of Wm. Lucas, Ph.D.), ¶¶17 & 19; Exh. 1002 (Decl. of Richard Jorgensen, Ph.D.), ¶69; Exh. 2017 (Decl. Vicki Vance, Ph.D.), ¶93; Exh. 2019 (Detlef Weigel, Ph.D.), ¶27.

[85] Exh. 1091, ¶¶17 & 19.

[86] Paper 120, apdx. 2, Mat'l Fact 65 (admitted).

[87] Mat'l Fact 67 (admitted in relevant part); Exh. 2017, ¶267; Exh. 2019, ¶248.

unpredictable.[88]   The experts do not provide a basis for their
thermodynamics testimony.[89]

Carnegie provides expert testimony that the number of free ends is
thermodynamically immaterial.[90]   CSIRO notes, however, that an article on
which the expert relies (Freier)[91] suggests that the melting temperature (the
temperature at which the strands will separate at standard conditions) must
be incremented for secondary RNA structures, expressly including hairpin
loops, but notes that data is limited.   The other article on which Carnegie's
expert relies (Xia), however, updates the Freier article and states that
terminal effects are less significant when an updated model and more data
are used.[92]   The Xia article is more credible than the unsupported testimony
of CSIRO's experts regarding the thermodynamics of hairpin structures.[93]

Carnegie relies on a journal article (Sijen)[94] to provide an objective
basis for substituting a hairpin structure.  Sijen proposed to study the
mechanism of RNA-mediated virus resistance.  In particular, Sijen examined
whether integrating transgenes as repeated sequences could trigger post-

---

[88] Exh. 2017, ¶¶268-273; Exh. 2019, ¶¶249-254.

[89] Mat'l Facts 105-106 (both admitted).

[90] Paper 101 at 11-12, citing Exh. 1091, ¶¶105-109.

[91] Exh. 2113: S.M. Freier et al., *Improved free-energy parameters for predictions of RNA duplex stability*, 83 Proc. Nat'l Acad. Sci. 9373, 9376, Table 6 & text (Dec. 1986).

[92] Exh. 1091, Apdx. OO: T. Xia Et al., *Thermodynamic Parameters for an Expanded Nearest-Neighbor Model for Formation of RNA Duplexes with Watson-Crick Base Pairs*, 37 Biochemistry 14719, 14730-33 (1998).

[93] As an aside, even using the earlier Freier estimated increment, the effect of a hairpin on one end would surely be swamped by the binding between one hundred or more consecutive base pairs annealed together.

[94] Exh. 1004: T. Sijen et al., *RNA-Mediated Resistance: Role of Repeated Transgenes and Delineation of Targeted Regions*, 8 Plant Cell 2277 (Dec. 1996).

transcriptional silencing, by constructing transgenic plants expressing transgenes with inverted or direct repeats of the viral gene sequences. Sijen found that transgenes with repeated sequences at the transcribed region can confer resistance at increased frequency but also that methylation at the transcribed region of the transgene can play a role in establishing resistance.[95]

Sijen had previously shown that "RNA2", RNA that encodes the movement protein (MP) of cowpea mosaic virus (CPMV) appears to provide RNA-based resistance to CPMV.[96] Sijen used transgenic *Nicotiana benthamiana* plants with MP DNA under the control of a cauliflower mosaic virus 35S promoter and a nopaline synthase 3' termination signal.[97] Sijen understood from the work of others that post-transcriptional silencing in plants correlated with integration of multiple copies of the transgene, preferably including an inverted repeat, so Sijen tried various combinations of direct and inverted repeats.[98] In one reported experiment, Sijen constructed plants with a truncated MP gene (MP48ΔB), with two inverted repeats (sense followed by antisense) of the MP gene (MP48IR) and with two direct, tandem repeats (both sense oriented) of the MP gene (MP48TR). Only one of twenty MP48IR plants (5%) showed resistance to CPMV infection compared to around 20% of the MP48ΔB plants and around 60% of the MP48TR plants. The one MP48IR plant with resistance was surprisingly found to have two direct repeats. For the MP48TR plants, some

---

[95] *Id*. at 2278.
[96] *Id*.
[97] *Id*. 2278-79.
[98] *Id*. at 2283.

ended up with only a single copy of the transgene, but were resistant anyway.[99]

Sijen concluded that direct repeats work better than single transgenes, which in turn are better than inverted repeats (IR). Sijen speculated that inverted repeats produce "(partially) double-stranded RNAs that could be prone to degradation by cellular double-stranded RNases and deliver high instability to the IR transgene transcripts."[100] Sijen does not expressly identify hairpin structures, but Sijen's speculation about double-stranded RNAs suggests that Sijen recognized the possibility of hairpin structures forming when inverted repeats (sense, then antisense) were used.

Sijen is consistent with a finding that hairpin structures would have been obvious to try, but is not consistent with a reasonable expectation of success. A person having ordinary skill in the art familiar with Sijen would note that only one transgenic plant with inverted repeats was resistant and subsequent testing showed that it had direct repeats. Sijen falls short of actually teaching away from using hairpin structures, but it does not encourage a belief that they would be likely to work.

CSIRO has, in passing, denied that Sijen is prior art "under §102(b)".[101] The denial is cryptic inasmuch as CSIRO might not dispute Sijen's availability on another statutory basis. CSIRO has not offered a substantive argument or a clarification on this point. Sijen is facially prior art. We deem CSIRO to have waived any argument it might have made.

---

[99] *Id*. at 2284.

[100] *Id*. at 2287-88. We note that an RNase (or ribonuclease) is an enzyme that degrades RNA.

[101] Mat'l Fact 100 (denied).

b.  Analysis

For the purpose of our analysis, we assume the subject matter of the count is in the prior art.  The principle difference between claim 39 and the count is the artificial hairpin structure.  While the claim does not actually require a hairpin, it does require structure that would permit the formation of a hairpin.  CSIRO's experts have explained why a hairpin structure is different, although their thermodynamics testimony is entitled little weight.  The other differences, while real, do not in themselves show substituting a hairpin structure would not be obvious.[102]

The Sijen article does not support a conclusion of obviousness because the closest embodiment, the one with inverted repeats, does not appear to have worked except in one distinguishable instance.  It is not clear whether Sijen's inverted-repeat embodiment did, in fact, form hairpins (or could form hairpins) much less whether it was the cause of the embodiment's failure.  Sijen does show, however, that those practicing in the art were proficient at creating modified transgenes (including sense-antisense constructs) and inserting them operatively into plants so that the plants expressed RNA sequences apparently capable of causing RNA interference.

In the final analysis, a hairpin RNA structure was a known type of double-stranded RNA structure.  It would have been obvious to try to use a hairpin structure in a method that specifically called for introducing a double-stranded RNA into a cell.  Obvious to try is not the same as legally obvious unless there is some inducement to try and a finite number of

---

[102] *Dann v. Johnston*, 425 U.S. 219, 230 (1976); *cf. Minkin v. Gibbons, P.C.*, 680 F.3d 1341, 1350 (Fed. Cir. 2012) (on proving non-obviousness).

predictable solutions.[103]  Sijen suggests that a self-annealing RNA was an alternative readily within the technical grasp of those in the art, but Sijen also suggests that there would be little inducement to do so because a person having ordinary skill in this unpredictable art would not have expected it to work well if at all.

### 4.  Holding

On the record before us, the subject matter of CSIRO claim 39 would not have been obvious from the subject matter of count 1.  Accordingly, CSIRO claims 39, 41-44, 46-51 and 68 should not be designated as corresponding to the count.

### C.  CSIRO motion 10 to add claims 107 and 108

### 1.  Introduction

CSIRO claims 39, 41-44, 46-51 and 68 are no longer involved in the interference, while CSIRO's remaining involved claims are barred under § 135(b)(1).  CSIRO seeks to remain in the interference by adding claims 107 and 108 to its application.[104]  The motion is formally responsive to the contingency that CSIRO claims 62 or 63 are held to be unpatentable,[105] which contingency was met in the partial granting of Carnegie motion 5.

Claim 107 defines the invention as:[106]

> A method for reducing the gene expression of a gene of interest in plant cells, said method comprising the step of

---

[103] *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (offering design need and market pressure as examples of inducements).
[104] Paper 63 (CSIRO Mot. 10) at 2.
[105] *Id*.
[106] *Id*. at 4-5.

introducing a first and second chimeric DNA, linked on one recombinant DNA such that both chimeric DNAs are integrated together in the nuclear genome of the transgenic plant cells; wherein said first chimeric DNA comprises the following operably linked parts:

  a) a plant-expressible promoter;

  b) a first DNA region capable of being transcribed into a sense RNA molecule with a nucleotide sequence comprising a sense nucleotide sequence of at least 10 consecutive nucleotides having between 75 and 100% sequence identity with at least part of the nucleotide sequence of said gene of interest; and optionally

  c) a DNA region involved in transcription termination and polyadenylation functioning in plant cells; and

  wherein said second chimeric DNA comprises the following operably linked parts:

  a) a plant-expressible promoter;

  b) a second DNA region capable of being transcribed into an antisense RNA molecule with a nucleotide sequence comprising an antisense nucleotide sequence including at least 10 consecutive nucleotides, having between about 75% to about 100% sequence identity with the complement of said at least 10 consecutive nucleotides of said sense nucleotide sequence; and optionally

  c) a DNA region involved in transcription termination and polyadenylation functioning in plant cells;

  wherein said sense and antisense RNA molecules are capable of forming a double stranded RNA by base-pairing between the regions which are complementary.

Claim 108 is similar, but in the preamble instead of "reducing the gene expression of a gene of interest" claim 108 is directed to "obtaining a virus resistant plant", and instead of the first DNA region having identity with the

"gene of interest" claim 108 requires identity with "the genome of a virus, capable of infecting said organism".[107]

Carnegie opposes, arguing that these claims are also barred under § 135(b)(1), that they are distinct from the subject matter of the count and that they are unpatentable over prior art.[108]

### 2. Findings

Claim 107 is the same as original claim 14 of CSIRO's involved 183 application[109] and of CSIRO's 632 application,[110] for which CSIRO was accorded benefit.[111]

Claim 108 is the same as original claim 16 of CSIRO's involved 183 application[112] and of CSIRO's 632 application.[113]

On 1 March 2006, CSIRO filed a preliminary amendment canceling claims 14 and 16 from the 183 application and adding claims 39-45 as proposed claims copied from Carnegie.[114]

On 13 January 2004, CSIRO filed a preliminary amendment canceling claims 14 and 16 from the parent (328) application of the 183 application on

---

[107] *Id*. at 5.  The comma after "virus" is (once again) confusing because the subsequent clause is restrictive, while "said organism" improperly lacks an antecedent basis.  For the purposes of deciding the motion, this limitation will be read "the genome of a virus capable of infecting the plant".

[108] Paper 97 (Carnegie Opp. 10).

[109] Paper 124, apdx. 2, Mat'l Fact 1 (admitted).

[110] Mat'l Fact 3 (admitted).

[111] Paper 1.

[112] Mat'l Fact 2 (admitted).

[113] Mat'l Fact 3 (admitted).

[114] Mat'l Facts 61 (admitted) and 65 (admitted).

13 January 2004 and adding claims 39-45 as proposed claims copied from Carnegie.[115]

CSIRO canceled claims 14 and 16 from the 632 application as non-elected claims.[116]

Claims 14 and 16 were not examined in any of these three applications.[117]

Copied claims 39-45 were rejected in the 328 application and CSIRO allowed the application to go abandoned.[118]

Copied claims 39-45 were rejected in the 183 application and subsequently amended so that they were no longer copies of the Carnegie claims.[119]

Claims 39 and 41-44, the only pending claims of amended claims 39-45, have been held not to correspond to count 1.[120]

### 3. Analysis

As discussed above,[121] case law has construed § 135(b)(1) to permit an applicant to rely on a previously canceled claim because the Office sometimes fails to declare an interference.  Assuming that claims 14 and 16 interfere, the Office arguably was responsible for failing to appreciate the potential interference so the withdrawal of claims 14 and 16 in the 632 application in response to an examiner-imposed restriction requirement is perfectly consistent with the case law.  Similarly, the cancelation of

_____

[115] Mat'l Facts 62 (admitted) and 66 (admitted).
[116] Mat'l Fact 63 (admitted).
[117] Mat'l Fact 64 (admitted).
[118] Mat'l Facts 67 (admitted) and 68 (admitted).
[119] Mat'l Fact 69 (admitted).
[120] *Supra* at 27.
[121] *Supra* at 10-13.

claims 14 and 16 in the 328 application was reasonable because CSIRO added claims that it presumably felt made the need for an interference clearer.  Carnegie cannot reasonably argue prejudice from this substitution because, if it had been effective, the interference would have occurred anyway.  The problem, once again, is that when the copied claims were rejected, CSIRO let them go abandoned in the 328 application and then amended them to address a different invention in the 183 application.  Specifically, CSIRO canceled claims 14 and 16 in the 183 application rather than seeking an interference then and apparently did not promptly file another application to pursue an interference with these claims.

In isolation, there is nothing remarkable about CSIRO's prosecution decisions: applicants often pursue very complex prosecution strategies to maximize the scope and depth of protection for their inventions.  This case does not occur in isolation, however.  Carnegie had an issued patent that CSIRO knew about and had even targeted for an interference.  As explained above, if a party seeking interference with a patent may intentionally control the timing of the interference, then the statutory promise of repose is empty.

### 4.  Holding

Claims 107 and 108 will not be added because doing so would contravene § 135(b)(1).  We do not reach the other bases Carnegie advanced for denying the motion.

III.OTHER MOTIONS

    A. CSIRO motions

       *1.  Motions 1-4 for judgment of unpatentability*

We have determined that Carnegie is statutorily entitled to repose from an interference with CSIRO.  Consequently, we will not entertain CSIRO's patentability attacks against Carnegie's involved claims.[122]

       *2.  Motions 6-9 regarding counts and accorded benefit*

Because Carnegie is entitled to repose, we will not proceed to a priority phase.  Consequently, questions regarding proper count scope and accorded benefit (for Carnegie's earliest constructive reduction to practice of the invention of the count) are moot.

       *3.  Motion 11 to amend benefit claim*

CSIRO's motion to amend its benefit claim is contingent on the grant of Carnegie's motion 3.[123]  Carnegie motion 3 is moot[124] so CSIRO motion 11 is moot as well.

       *4.  Holding*

We do not reach the merits of CSIRO motions 1-4, 6-9 and 11.

    B.  Carnegie motions

       *1.  Substantive motions*

          a.  Motions 2 and 4 for judgment of unpatentability

Carnegie moves for judgment that CSIRO's involved claims are unpatentable for lack of written, enabling disclosure[125] and for anticipation

---

[122] *Berman*, 291 F.3d at 1353 (no error in declining to reach patentability in view of repose).
[123] Paper 62 (CSIRO Mot. 11) at 2.
[124] *Infra* at 33.

or obviousness.[126]  These motions are moot for CSIRO claims 52-67 and 69-106 because these claims have been held to have been time barred under § 135(b)(1).

CSIRO claims 39, 41-44, 46-51 and 68 no longer correspond to the count.  Correspondence is ordinarily required for a claim to be the subject of a judgment in an interference.  As the Director of the United States Patent and Trademark Office explained in promulgating the current interference rules, "only claims that correspond to the count are at risk in an interference, except to the extent a question is raised as to whether a claim that does not correspond should [correspond]."[127]  Consistent with this practice, we do not reach the patentability of these claims because the decision on their correspondence to the count has rendered their patentability moot as far as this interference is concerned.[128]  Note that our treatment of CSIRO's non-corresponding claims is analogous to our treatment of the patentability  of Carnegie's claims in view of our granting of its motion for repose.[129]

b.  Motion 3 attacking benefit accorded to CSIRO

Carnegie challenges the board's according to CSIRO the benefit of two provisional applications as constructive reductions to practice of

---

[125] Paper 64 (Corr. Carnegie Mot. 2) at 2.

[126] Paper 64 (Corr. Carnegie Mot. 4) at 1.

[127] *Rules of Practice Before the Board of Patent Appeals and Interferences*, 69 Fed. Reg. 49960, 49969 (2004) (explaining the definition of an "involved claim").

[128] Cf. 35 U.S.C. 135(a) ("shall determine questions of priority of the inventions and may determine questions of patentability); *cf.* Bd.R. 125(a) (board may take up motions in any order and may grant, deny or dismiss); *accord Berman*, 291 F.3d at 1353 (no error in declining to reach patentability in view of another dispositive motion).

[129] *Supra* at 32.

embodiments within the scope of the count.[130]  Since there is not going to be a priority contest, CSIRO's constructive reductions to practice are no longer relevant.

### 2.  Motion 7 to exclude

Carnegie moves to exclude CSIRO exhibits 2099-2102 and paragraphs 18-37 of exhibit 2112, as well as portions of CSIRO replies 1, 2, 5, 6, 7 and 10 that rely on these exhibits.  Carnegie objected to exhibits 2099-2102 under Federal Rules of Evidence 403 and 611(b) and to all of these exhibits as improperly presenting new issues in reply, citing the Standing Order.[131]  Carnegie also objected to the exhibits during cross examination of a Carnegie expert (Jorgensen).[132]

CSIRO motions 1, 2, 5 and 7 are moot so this motion to exclude is moot for the corresponding CSIRO replies.

### a.  Exhibits 2099-2102

Carnegie contends that the exhibits are untimely because they are first used in replies without good cause for not using them in the corresponding original motions and that the use of exhibits 2099-2102 during Jorgensen's cross examination was outside the scope of his direct testimony.[133]  CSIRO contends that the exhibits are relevant to Dr. Jorgensen's credibility on points raised in his direct testimony and were timely presented during his cross examination.

---

[130] Paper 65 (Corr. Carnegie Mot. 3) at 1.

[131] Exh. 1125: Carnegies objections; Paper 147, apdx. 2, Mat'l Fact 1 (admitted); Paper 2 (Standing Order), ¶122.5.  Carnegie also objected to another exhibit, but does not move to exclude it.

[132] Mat'l Fact 2 (admitted).

[133] Paper 65 at 3-10.

In direct testimony, Dr. Jorgenson stated that "[t]he Carnegie inventors clearly understood that the methods using dsRNA were not going to be limited to worms or even animals."[134]

In direct testimony, Dr. Lucas stated that "[t]he Carnegie inventors also recognized that the methods were not to be limited to worms or even animals and they clearly conveyed the broad application of these methods to the reader."[135]

Exhibit 2099 is a DVD containing two video clips of scientific lectures presented in 2007 and 2008 by one of Carnegie's named inventors, Dr. Craig Mello.[136]

Exhibit 2100 purports to be a certified transcript of Craig C. Mello, RNAi and Development in *C. elegans* (57th Meeting of Nobel Laureates, Lindau, Germany, 2007).

Exhibit 2101 purports to be a certified transcript of Craig C. Mello, Return to the RNAi World: Rethinking Gene Expression, Evolution and Medicine (Imperial College, London, UK 2008).

Exhibit 2102 is an interview of Dr. Craig Mello published in Ambion TechNotes. RNA interviews: Dr. Craig Mello, AMBION TECHNOTES, http:/www.ambion.com/techlib/tn/111/15.html.[137]

Exhibits 2099-2102 were presented to Dr. Jorgensen during his cross examination and he was asked questions about what they implied..[138]

---

[134] Mat'l Fact 19 (admitted).
[135] Mat'l Fact 20 (admitted).
[136] Mat'l Fact 23 (admitted).
[137] Mat'l Fact 31 (admitted).
[138] Exh. 2107: Deposition of Richard A. Jorgensen, Ph.D., at 110-130.

The exhibits can be understood to suggest that Mello at least was uncertain about the applicability of his work in *C. elegans* to plants even as he was pursuing patents on plants, but Dr. Jorgensen interpreted the excerpts presented to him as indicating that Mello was "just being very cautious in saying, scientifically, that he didn't have proof that it existed in other organisms."[139]

CSIRO purports to be using these exhibits to attack the credibility of Dr. Jorgensen's direct testimony that the Carnegie inventors knew the scope of their invention extended beyond use in *C. elegans*. Mello's statements occur years after the fact and can be understood (as Dr. Jorgensen purports to understand them) as simply reflecting a scientific convention of being cautious in describing the scope of experimental results. For this limited purpose, the exhibits are relevant and timely, but not entitled to much weight. Where we relied on Dr. Jorgensen's testimony—for the level of skill in the art—we found it to be consistent with expert testimony from both parties.[140]

Carnegie is concerned that Mello's statements could also be highly prejudicial on the merits of various motions. CSIRO does not purport to be using the exhibits for those purposes, however. While Mello's statements can also be interpreted as reflecting badly on Mello at least in his prosecution of his applications, we do not have or are not reaching any motion where that interpretation is relevant. Consequently, these exhibits do not unduly prejudice Carnegie in this interference.

---

[139] *Id*. 127:20-128:2.
[140] *Supra* at 22.

b. Exhibit 2112

This exhibit is testimony of Dr. Vance responding to Carnegie's use of the Sijen article in Carnegie oppositions 6 and 10.[141] We decided CSIRO motion 10 on the basis of repose,[142] for which this testimony was not relevant.

It is not unreasonable to present testimony to address prior art first raised in an opposition. CSIRO's motion, however, focused on the hairpin limitation in CSIRO claim 39 rather than on the limitations of the dependent CSIRO claims.[143] Consequently, Dr. Vance's testimony on the dependent claims was improper new testimony and paragraphs 26-32, which address the dependent claims, are impermissibly late. The remainder of Dr. Vance's contested testimony relevant to CSIRO motion 6 is directed to addressing Carnegie's use of the Sijen article against CSIRO claim 39.

*3. Holding*

Carnegie motions 2-4 will not be decided on the merits. Carnegie motion 7 is moot with regard to CSIRO replies 1, 2, 5, 7 and 10; justified for paragraphs 26-32 of exhibit 2112, but otherwise not justified.

---

[141] Exh. 2112 (4th Vance Decl'n), ¶¶22-32 & 37.
[142] *Supra* at 31.
[143] *Supra* at .

TIERNEY, *Administrative Patent Judge*, dissenting in part.

    I join the majority's opinion except for section II.A, which addresses the statutory bar under 35 U.S.C. 135(b)(1).  The theory of the decision, that prosecution delay can affect the bar, is unsupported in case law and unnecessary for the operation of the statute.

cc:

TODD R. WALTERS and CHRISTOPHER L. NORTH, Buchanan Ingersoll & Rooney PC, of Alexandria, Virginia, for junior party.

TODD B. BUCK and W. JACKSON MATNEY, JR., Morgan, Lewis & Bockius LLP, of Washington, D.C., for senior party.

ADDENDUM B

BoxInterferences@uspto.gov                                      Paper 458
Telephone: 571-272-4683                      ENTERED: 11 December 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

Patent Interference No. 105,754

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION
and Bayer BioScience N.V.
(11/364,183),
Junior Party,

v.

CARNEGIE INSTITUTION OF WASHINGTON
and the University of Massachusetts
(6,506,559, 7,538,095 & 7,622,633),
Senior Party.

Before RICHARD E. SCHAFER, RICHARD TORCZON and SALLY
GARDNER LANE,[1] *Administrative Patent Judges*.

PER CURIAM.

<u>DECISION</u>
Bd.R. 127(d)
rehearing decision on motions
and vacating judgment

---

[1] *In re Bose Corp.*, 772 F.2d 866 (Fed. Cir. 1985) (substitution where original
judge unavailable).

The junior party (CSIRO) seeks relief[2] from the decision on motions.[3]  The opinion is modified as discussed below and the judgment[4] is vacated.  The panel will address remaining motions in a separate decision.

MEMORANDUM OPINION

CSIRO urges that the board erred in its apprehension[5] of 35 U.S.C. 135(b)(1) and in its application of the law to the facts of the case.  Relief is granted for claims 63-67, but not for the other claims.

I.   THE 135(b)(1) BAR

   A. Claims 52-62 and 69-106

The statute provides:[6]

> A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted.

The statute has a bar (against claiming what is claimed in an issued patent) and an exception (if the claim was filed before the critical date one year after the patent issued).  The decision explained, and CSIRO agrees, that the exception is the proper focus in this case.[7]

---

[2] Paper 457 (CSIRO Misc. Mot. 13, Req. Reh'g).
[3] Paper 453.
[4] Paper 456.
[5] Bd.R. 125(c)(3)(i) (requiring showing that a matter was misapprehended or overlooked).
[6] Patent interferences operate under a grandfather clause providing for the application of a version of the statute that no longer exists.  Pub. L. 112-29, §3(n)(2), 125 Stat. 293 (2011).  Hence, all references in this opinion to title 35, United States Code, are to the version of the code in effect on 15 March 2013. *Sanofi-Aventis v. Pfizer Inc.*, _ F.3d _ n.3, 2013 WL 5911446 (Fed. Cir. 2013).
[7] Paper 457 at 2.

To satisfy the exception, the claim under consideration need not be the same as the claim that was timely filed.  The claim is permitted to have immaterial differences,[8] the claim may actually be a group of related claims[9] and the claim need not have been continuously prosecuted.[10]  In the present case, the last point is the principal point in dispute.

The board held that when an applicant, having timely filed claims that were copied to interfere, then deliberately chooses to put off the interference, the purpose of the statute is frustrated.[11]  CSIRO urges that the board's holding contradicts long-established precedent.[12]

CSIRO contends that statutory construction must begin with the language of the statute.[13]  We agree.  The statute, however, does not expressly address the present facts.  The statute creates an exception for "such a claim" (i.e., an interfering claim) filed prior to the critical date, but does not expressly address what happens if the claim is then canceled, much less deliberately canceled with knowledge that the interference that the applicant is seeking will consequently be delayed indefinitely.

---

[8] *Adair v. Carter*, 668 F.3d 1334, 1339 (Fed. Cir. 2012).
[9] *Pioneer Hi-Bred Int'l, Inc. v. Monsanto Tech. LLC*, 671 F.3d 1324, 1329 (Fed. Cir. 2012).
[10] *Adair*, 668 F.3d at 1339.
[11] Paper 453 at 11-13.
[12] Paper 457 at 4-10, *citing Corbett v. Chisholm*, 568 F.2d 759 (CCPA 1977), *Regents of Univ. of Cal. v. Univ. of Iowa Research Found.*, 455 F.3d 1371 (Fed. Cir. 2006), *Cryns v. Musher*, 161 F.2d 217 (CCPA 1947), *Googin v. Mahdjuri*, 209 U.S.P.Q. 667 (Comm'r Pat. 1980), *In re Tanke*, 213 F.2d 551 (CCPA 1954), *Ex Parte Ogawa*, 2002 WL 32173372 (BPAI 2002) (nonprec.), *and Ex parte Holt*, 19 U.S.P.Q.2d 1211 (BPAI 1991).
[13] Paper 457 at 3, *citing Mallard v. United States Dist. Court*, 490 U.S. 296, 300-01 (1989).

Case law has filled the gap to an extent, holding that cancellation of a claim in itself does not annul the exception.  The earliest such case that CSIRO cites in its request is *Cryns v. Musher*.[14]  In *Cryns*, the applicant had timely filed interfering claims.  The primary examiner[15] held that "it appeared that appellant 'has at all times asserted claims for substantially the same subject matter as that of the present single count of the interference;' [and] therefore, appellant was not estopped to make the claim".[16]

According to the *Cryns* opinion, the applicant:

(1) filed original claims that were relevant to the count,

(2) cancelled those claims but timely added more relevant claims,

(3) cancelled those claims and added claims apparently not relevant to the count, then

(4) belatedly copied a claim to instigate an interference.[17]

The board held the applicant was estopped because the applicant cancelled the second set of claims.  The court reversed the board, holding that the applicant could rely on the timely, relevant, cancelled claims because "all that is required is that he (the appellant) shall be urging claims covering the matter which is claimed in the patent before the critical period has terminated."[18]

While the expansive quote in *Cryns* suggests that any timely claim may be sufficient, the facts of *Cryns* provide reason for caution.  First, the decision also addresses whether the applicant had adequate written description for the relevant

---

[14] Paper 457 at 5-7.

[15] At that time interference motions practice was administered by an examiner.

[16] *Cryns*, 161 F.2d at 218 (apparently quoting an office action).

[17] *Id*. at 219 (summarizing the board decision).

[18] *Thompson v. Hamilton*, 152 F.2d 994, 997 (CCPA 1946), *quoted with approval in Cryns*, 161 F.2d at 220.  *Thompson* was addressing the situation where the timely claim or claims had immaterial differences from the count.

claims (an issue present in this case as well).  While the board and court agreed that the applicant had sufficient support, implicitly a lack of support would have derailed the claims the "all that is required" language notwithstanding.[19]  Second, *Cryns* does not appear to involve the present fact of applicant-controlled delay.  Once the applicant in *Cryns* copied the claim, the subsequent delay resulted from a dispute about whether the claim was supported: there is no indication that the copied claim was then cancelled and not restored until much later.  In sum, Cryns' facts were not CSIRO's facts.  Subsequent cases have cited *Cryns*, but they too have facts more like *Cryns'* than like CSIRO's.

In *Corbett v. Chisholm*, the examiner had placed a restriction requirement on timely, relevant claims in the original application.  The relevant claims were cancelled and later filed as part of a divisional application.[20]  There is no indication in the court's opinion that Corbett was aware of Chisholm's copending application when it elected to cancel the interfering claims.  The only identified source of delay was the examiner's restriction requirement.

The court explained the case law and statutory history:[21]

> Although the amendment restates the substance of the equitable doctrine of Chapman v. Wintroath, adjusted to reflect the new one-year statutory time bar, and provides for the exception recognized in Chapman v. Beede, the intent of Congress, as expressed in  H.R. Rep. No. 970, 76th Cong., 1st Sess. (1939), was clearly to enact a statute of repose.  R.S. 4903, as amended, was to be a statute of limitations, so to speak, on interferences so that the patentee might be more secure in his property right.

---

[19] *Perez v. Dep't of Justice*, 480 F.3d 1309, 1312 (Fed. Cir. 2007) (discouraging reliance on broad language with different context).

[20] 568 F.2d at 761-62.

[21] *Corbett*, 568 F.2d at 765, *citing Cryns*; *Chapman v. Wintroath*, 252 U.S. 12 6 (1920), and *Chapman v. Beede*, 296 F. 956 (D.C. Cir. 1924).

In *Cryns v. Musher*[], this court held that claims cancelled during the year subsequent to the issuance of the patent could be relied upon to avoid the R.S. 4903 bar in view of the words "for the first time." Thus, regardless of whether the cancellation of claims might have been relevant to the application of the equitable doctrine of *Chapman v. Wintroath*, such cancellation was not relevant to the application of its statutory successor.

Although *Corbett* read *Cryns* broadly ("cancellation was not relevant"), *Corbett*'s actual facts are even more readily distinguishable from the present case than *Cryns*' were. In *Corbett*, the delay arose from an examiner's restriction requirement,[22] not from the applicant's decision to cancel now and try again later.[23]

Significantly, *Corbett* also held that Congress intended to create a statute of repose.[24] By its nature, a *statute* of repose is not a rule in equity, although (as here) it may have its origins in equity.[25] Statutes of repose are not unique to patent law. As the Supreme Court has explained:[26]

> They are enacted to restrict the period within which the right, otherwise unlimited, might be asserted. They are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected. The lapse of years without any attempt to enforce a demand creates, therefore, a presumption against its original validity, or that it has ceased to subsist. This presumption

---

[22] Restriction is an agency case-management tool largely governed by the practical needs of the examining corps. *In re Weber*, 580 F.2d 455, 459-60 (CCPA 1978) (Rich, concurring); *accord Bennet v. Fowler*, 75 U.S. 445, 448 (1869).

[23] *Cf. Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005), in which the court declined to accord the patentee the protections of 35 U.S.C. 121 because the separate application arose from the patentee's prosecution strategy rather than from an examiner's restriction requirement.

[24] 568 F.2d at 765; *accord Adair*, 668 F.3d at 1338, and *Regents*, 455 F.3d at 1376 (explaining that the statute places "a time limit on a patentee's exposure to an interference proceeding").

[25] In *Tanke*, however, the court speaks of the effect of the statute as "laches". 213 F.2d at 554.

[26] *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1868).

> is made by these statutes a positive bar; and they thus become statutes
> of repose, protecting parties from the prosecution of stale claims,
> when, by loss of evidence from death of some witnesses, and the
> imperfect recollection of others, or the destruction of documents, it
> might be impossible to establish the truth. The policy of these statutes
> is to encourage promptitude in the prosecution of remedies.

Hence, it is in this legislatively intended context of promptitude that we must

understand the statute.  As the Supreme Court more recently explained:[27]

> Defendants need to be on notice to preserve beyond the normal
> limitations period evidence that will be needed for their defense; and a
> statute that becomes retroactively extended, by the action of the
> plaintiff in [choosing to give priority to related litigation], is hardly a
> statute of repose.

We are loath to construe the statute in a manner that would eviscerate the

legislative intent unless the plain language of the statute compels such a result.

In this case, the statutory language does not expressly address the situation

of a canceled claim:  if it did then the analyses put forth in *Cryns* and *Corbett*

would have been unnecessary.  Rather, the *Cryns* and *Corbett* added a gloss to the

statute to cover the situation where the claim is canceled.  Neither case, however,

had the fact of a claim canceled *by a party already seeking the interference*. This

added fact takes the case outside the literal holdings of *Cryns* and *Corbett* and into

the problem of knowingly frustrating an opponent's repose.

The other court cases do not support CSIRO's contention.  In *Tanke*,[28] the

interfering claims were added to the application before the examiner cited the

opponent's patent to the applicant.  There is no indication that the applicant had

sought an interference and then subsequently canceled the claims or otherwise

---

[27] *Wallace v. Kato*, 549 U.S. 384, 395 (2007).
[28] 213 F.2d at 552-53.

delayed in promptly seeking an interference.  In *Regents*,[29] the applicants promptly sought an interference but were forced to amend the claims, which were then held to contain material differences from the timely claims, making any cancellation issue moot.

CSIRO also relies on United States Patent and Trademark Office authorities. In *Googin v. Mahdjuri*,[30] the examiner permitted the applicant to proceed in the interference despite the § 135(b) bar, holding that the applicant could not have added the interfering claims within the statutory time limit.  The decision was reversed because the examiner had no authority to create an additional, equitable exception to the statutory bar.  CSIRO correctly contends that the case decision stands for the proposition that it is improper to create equitable exceptions to the statutory bar, but its reliance on *Googin* is nevertheless misplaced.  *Googin* prohibits creating exceptions to the repose of the § 135(b) bar, yet CSIRO seeks extension of the case-law gloss on the statute—beyond the facts of those cases—to avoid the bar.  If anything, *Googin* supports the board's decision.

CSIRO cites *Ex parte Holt* for the proposition that "previously decided points of law must be followed unless overruled, and the application of the law to particular facts must be consistent from case to case."[31]  The portion quoted comes from a discussion of "law of the case" and has little bearing on the question before us.  The preceding paragraph discusses when board cases are binding on the board, but this guidance has been overtaken by other guidance.[32]

--------

[29] 455 F.3d at 1376-77.

[30] 209 USPQ at 668 text & n.* (Chairman Calvert on behalf of the Commissioner).

[31] Paper 457 at 8-9, citing 19 USPQ2d at 1214.

[32] See http://www.uspto.gov/patents/process/appeal/stdproced.jsp (visited November 2013) (providing some of the board's standard operating procedures).

CSIRO cites *Ex parte Ogawa* as a contemporary example of the board finding claims within the exception for facts "squarely on all fours" to CSIRO's.[33] As CSIRO notes, the case is not binding precedent of the board.[34]  *Ogawa* contains broad language to the effect that "patentees could be dragged into an interference anytime during the life of the patent" and that "this is what controlling precedent allows an applicant to do".[35]  In *Ogawa*, the applicant filed a reissue application and subsequently sought an interference with an earlier granted patent.  The board understood the examiner to be creating an exception to the exception in the statutory bar when claims are added many years later (four and a half years after the patent issued in *Ogawa*).  While the board sympathized with the examiner's concern, it explained that the applicant's behavior fell within the statutory exception.  In *Ogawa*, there is no indication that the examiner's concern was prompted by deliberate delay on the applicant's part.  *Ogawa* would be closer to the present facts if the applicant had added the claims for an interference, then decided to take its patent instead and only later decided to file its reissue application to seek an interference when it was strategically most convenient to the applicant.  Thus, while *Ogawa* is similar to the situations in *Cryns* and *Corbett*, it is different form CSIRO's facts on precisely the point on which the board decision in this case rested.

Finally, CSIRO cited *In re Bogese* for the proposition that the board erred by imposing an equitable penalty or forfeiture without providing notice.[36]  In the decision, the board cited *Bogese* and *In re Fallaux* as examples "in other contexts"

_____

[33] Paper 457 at 8, citing 2002 WL 32173372 at *4.
[34] Paper 457 at 8.
[35] 2002 WL 32173372 at *4.
[36] Paper 457 at 2, *citing Bogese*, 303 F.3d 1362, 1369 (Fed. Cir. 2002).

where prosecution delay can result in adverse consequences for an applicant.[37]  As the phrase "other contexts" indicates, there are differences between those cases and the present case (and between those cases themselves).  In *Bogese*, agency notice was required because the sanction (for abuse of continuation practice) was an equitable solution with no basis in the statute.  In *Fallaux*, no such notice was required (for imposing a one-way test for obviousness-type double-patenting, even in the absence of bad intent on the part of the applicant) because case law already provided the notice for this rejection, which is based on the purpose of the patent code rather than on any actual provision of the code.  Although both cases come from different contexts, it is interesting to note that both involve equitable enhancements of the statutory scheme, in one case (double-patenting) to enhance the purpose of the statute and in the other (continuation abuse) despite the permissive language of the statute.  While these cases show that equity is not wholly alien to the implementation of a statutory scheme, we stress again that our earlier decision was not an equitable exception to the statute but rather a reading of the statute consistent with its literal language and necessary for its purpose.

CSIRO has not shown prejudicial error in the judgment against CSIRO claims 52-62 and 69-106.

B.  Claims 63-67

CSIRO contends that the board erred in raising *sua sponte* a material limitation in these claims that Carnegie had not raised.  CSIRO further notes that it had pre-critical date claims that would provide support for the limitations in these claims.[38]  CSIRO is correct that we erred in this regard.  Because Carnegie did not

---

[37] Paper 453 at 12-13, *citing In re Fallaux*, 564 F.3d 1313, 1316-18 (Fed. Cir. 2009), *and Bogese*.

[38] Paper 457 at 9

raise this issue in its briefs, we need not seek its views before acknowledging the error.  Relief is granted for these claims.


cc:

TODD R. WALTERS and CHRISTOPHER L. NORTH, Buchanan Ingersoll & Rooney PC, of Alexandria, Virginia, for junior party.

TODD B. BUCK and W. JACKSON MATNEY, JR., Morgan, Lewis & Bockius LLP, of Washington, D.C., for senior party.

# ADDENDUM C

BoxInterferences@uspto.gov                          Paper 459
Telephone: 571-272-4683              ENTERED: 19 February 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

Patent Interference No. 105,754

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION
and Bayer BioScience N.V.
(11/364,183),
Junior Party,

v.

CARNEGIE INSTITUTION OF WASHINGTON
and the University of Massachusetts
(6,506,559, 7,538,095 & 7,622,633),
Senior Party.

Before RICHARD E. SCHAFER, RICHARD TORCZON and SALLY
GARDNER LANE, *Administrative Patent Judges*.

PER CURIAM.

<u>DECISION</u>
Bd.R. 125
on motions

The junior party (CSIRO) has nine motions (1-5, 7-9 and 11) still pending.

The senior party (Carnegie) has three motions (2-4) still pending.

CSIRO motions 1 and 2 are DENIED.

CSIRO motions 3 and 4 are DEFERRED.

CSIRO motions 5, 8 and 11 are GRANTED.

CSIRO motions 7 and 9 are DISMISSED.

Carnegie motion 2 is DENIED.

Carnegie motions 3 and 4 are DISMISSED.

MEMORANDUM OPINION

I.    CARNEGIE MOTIONS

For the Carnegie motions, we focus on CSIRO claims 63-67, which we have held were not shown to have been barred.[1]  CSIRO claim 63, the independent claim, defines the invention as:[2]

> A method for obtaining a virus resistant plant, said method comprising the steps of
> 1) [sic[3]] providing the cells of said organism with a first and second chimeric DNA wherein said first chimeric DNA comprises the following operably linked parts:
>> a) a promoter operative in said cells;
>> b) a first DNA region capable of being transcribed into a sense RNA molecule with a nucleotide sequence comprising a sense nucleotide sequence of at least 10 consecutive nucleotides having 100% sequence identity with at least part of the nucleotide sequence of the genome of a virus, capable of infecting said organism; and optionally
>> c) a DNA region involved in transcription termination and polyadenylation functioning in said cells;
> and wherein said second chimeric DNA comprises the following operably linked parts:
>> a) a promoter operative in said cells;
>> b) a second DNA region capable of being transcribed into an antisense RNA molecule with a nucleotide sequence comprising an antisense nucleotide sequence including at least

---

[1] Paper 458 (Dec'n on Reh'g).
[2] Paper 13 (CSIRO clean claims) at 5-6.  We note that "RNA" abbreviates "ribonucleic acid"; "DNA", "deoxyribonucleic acid".
[3] Claim 63 has no step 2.

         10 consecutive nucleotides, having 100% sequence identity
         with the complement of said at least 10 consecutive nucleotides
         of said sense nucleotide sequence; and optionally
               c) a DNA region involved in transcription termination
         and polyadenylation functioning in said cells;
         and wherein said sense and antisense RNA are capable of
      forming a double stranded RNA by base-pairing between the regions
      which are complementary.

Unlike the count,[4] claim 63 does not directly require the RNA to be separate strands, but the requirement that the RNA is produced from separate DNA sequences, each with its own promoter and termination sequences, implies separate RNA strands.

### A. Motion 2: Written description and enablement

Carnegie seeks judgment that CSIRO's claims did not comply with the written description and enablement requirements[5] of 35 U.S.C. 112(a).[6] Carnegie's central contention is that CSIRO did not disclose or enable double-stranded RNA (dsRNA) as separate strands.[7]

### 1. Enablement

CSIRO observes that Carnegie did not expressly address enablement as a separate basis for unpatentability.[8] In reply, Carnegie does not contest CSIRO's observation.[9] We note no enablement analysis, for example, applying the *Forman*

---

[4] Paper 453 at 19.
[5] Paper 64 (Carnegie Mot. 2) at 2.
[6] *Ibormeith IP LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1377 n.1 (Fed. Cir. 2013) (using new statute labels for convenience because substance has not changed).
[7] Paper 64 at 3.
[8] Paper 93 (CSIRO Opp.) at 3.
[9] Paper 126 (Carnegie Reply).

factors.[10]  Accordingly, we hold that Carnegie has not preserved enablement as a basis for unpatentability.[11]

### 2. Written description

An applicant for a patent must provide in its specification written description of the subject matter it claims such that a person of ordinary skill would apprehend that the applicant had invented what is claimed.[12]  Carnegie relies on the expert testimony to contend that CSIRO's examples do not support what it claims.[13]  CSIRO contends that example 2 in its disclosure provides a working example of the claimed invention.[14]

------------------------

[10] *Ex parte Forman*, 230 USPQ 546, 547 (BPAI 1986), *cited with approval in In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

[11] *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012) (passing reference does not preserve issue).

[12] *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Although the parties (and *Ariad* itself) speak of "possession", we eschew the term as not based in the statute and likelier to promote confusion with priority concepts than it is to aid the written description analysis.  *Cf. Ariad*, 598 F.3d at 1351 (explaining that the term "possession" has never been very enlightening).

[13] Paper 64 at 9-10.

[14] Paper 93 at 16-17.  We note that paragraph 0029 (in the Summary of the Invention section) of CSIRO's disclosure appears to correspond most nearly to the subject matter of claim 63 (even accounting for optional elements of the claim), but neither party addresses this paragraph.  See Exh. 1001: P.W. Waterhouse, M.-B. Wang & M.W. Graham, *Methods and means for obtaining modified phenotypes*, US 2006/0178335 A1, ¶0029.  We are aware that the published application is not the proper basis for analysis.  *See*, *e.g.*, *In re Huston*, 308 F.3d 1267, 1270 n.1 (Fed. Cir. 2002) (admonishing improper citation).  We are, however, constrained by the arguments and record that the parties have provided; hence, because we are not aware of a material difference between the filed and the published disclosures, we will follow the practice of the parties in using this exhibit for the analysis.  *Cf. Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1331 n.5 (Fed. Cir. 2008) (conforming to the district court's usage).

The parties do not agree on what a person of ordinary skill in the art would know and be able to do.[15]  The parties agree that Carnegie's expert, Dr. Jorgensen, when asked during cross examination when "those skilled in the art would have come to believe that double-stranded RNA was produced in the experiments reported in the '183 application" testified "[a]round 2000, 2001."[16]  The relevant time for assessing compliance with the written-description requirement is the filing date of the application in which the contested claims appear.[17]  The filing date for CSIRO's involved application is 1 March 2006.[18]  Accordingly, when CSIRO's involved application was filed, one of ordinary skill in the art would have come to believe that dsRNA was produced in the experiments reported in CSIRO's application.

The parties agree that example 2 is an experiment disclosing the insertion of chimeric DNA transgenes coding for a virus protease into tobacco plants using a transfer DNA (T-DNA) vector.  The transformed plants were challenged with plant virus, potato virus Y (PVY), to determine if there was a correlation between the insertion of the genetic constructs and susceptibility to virus infection.  Example 2 reports three phenotypes (1) resistant plants that exhibited no signs of virus infection, (2) resistant plants that showed a delay in symptoms and only minor lesions and (3) susceptible plants that showed typical symptoms of viral infection; as well as copy numbers of the inserted transgene.[19]  The parties disagree whether example 2 assessed or reported the presence of RNA in the transformed plants.[20]

_____

[15] Paper 126, *e.g.*, mat'l facts 73, 75, 76, 84, 99 & 102 (all denied).
[16] *Id.*, mat'l fact 59 (admitted).
[17] *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000).
[18] Paper 126, mat'l fact 38 (admitted).
[19] Paper 126, mat'l facts 5-8 (admitted).
[20] *Id.*, mat'l fact 9 (denied).

Example 2 is entitled "Comparison of the Efficiency of Using Chimeric Genes Comprising Only Antisense Genes, Only Sense Genes, or Both Genes Simultaneously for Obtaining Virus Resistance in Transgenic Plants".  Consistent with this title, CSIRO discloses gene constructs using the PVY protease encoding sequence (1) in a sense orientation, (2) in an antisense orientation and (3) in a complimentary pair (CoP) orientation.  Each construct was under the control of its own promoter.  Five different promoters were used (35S, S4, S4S4, S7S4 and rolC).[21]  The resulting plants were exposed to the virus, with some showing no symptoms ("ER" or "Extreme Resistant"), some showing reduced symptoms ("ER*") and some showing susceptibility.[22]  Table 3 (right) of the disclosure reports the results.[23]

| TABLE 3 | | | | |
|---------|---|---|---|---|
| Resistance to PVY infection of transgenic tobacco plants comprising either the sense chimeric PVY protease construct, the antisense chimeric PVY protease construct, or both (different CoP constructs). | | | | |
| Sense gene | Antisense gene | Extreme Resistant plants (ER) | "Resistant" plants (ER*) | Total number of transgenic plants |
| 35S-Nia | | 2 | 2 | 27 |
| | 35S-AntisenseNia | 1 | 0 | 25 |
| 35S-Nia | 35S-AntisenseNia | 10 | 22 | 27 |
| 35S-Nia | S4-AntisenseNia | 11 | 2 | 24 |
| 35S-Nia | RolC-AntisenseNia | 7 | 3 | 25 |
| 35S-Nia | S4S4-AntisenseNia | 7 | 7 | 26 |
| 35S-Nia | S7S4-AntisenseNia | 7 | 4 | 25 |

CSIRO reported that the complimentary pairs resulted in more resistance than either the sense or antisense constructs alone.[24]  CSIRO next reported determining the copy number of transgenes, finding that the genomes of some of the CoP plants showing extreme resistance, particularly the 35S-Nia/S4-AntisenseNia plants, only contained a single copy of the gene construct.[25]

---

[21] Exh. 1001, ¶0184.
[22] Exh. 1001, ¶¶0186-87.
[23] *Id.* at 15.
[24] *Id.*, ¶0186.
[25] *Id.*, ¶0187.

Carnegie contends that example 2 is simply a correlation experiment between the presence of transgene DNA and phenotypes (levels of resistance), but that the presence of transcribed RNA was not assessed.[26]  As discussed above, however, by 2006 one skilled in the art would have believed the results of CSIRO's example 2.

We find that Carnegie has not established that, as of CSIRO's relevant filing date, CSIRO's disclosure lacked sufficient written description for the claims before us.  Carnegie motion 2 is DENIED.

B.  Motion 4: Unpatentability over prior art

Carnegie seeks judgment that CSIRO's involved claims are unpatentable because prior art before 7 April 1999 (one of CSIRO's claimed benefit dates) would have made the inventions of CSIRO's involved claims unpatentable. The motion is contingent on our granting Carnegie motion 2.[27]  We have not granted the motion so the contingency has not been met and we do not reach the merits of Carnegie motion 4.  We note, however, that CSIRO's April 1998 provisional application contains disclosure similar to the disclosure discussed above in determining that Carnegie failed to show a lack of written description.[28]

Carnegie motion 4 is DISMISSED as moot.

---

[26] Paper 64 at 4-5.

[27] Paper 66 at 1.

[28] Exh. 2013: P.W. Waterhouse, M.-B. Wang & M.W. Graham, *Methods and means for obtaining modified phenotypes*, U.S. Appl'n 60/198,240 at 14 & 53-56 (8 April 1998).

C. Motion 3 (accorded benefit) and CSIRO motion 11 (response)

In the declaration, CSIRO was accorded benefit of two provisional applications:[29] 60/198,254[30] and 60/198,240.  CSIRO's involved application includes the following benefit claim:

> This application is a continuation of U.S. Application No. 10/755,328, filed January 13, 2004, which is a continuation of U.S. Application No. 09/287,632, filed April 7, 1999, which claims the benefit of Provisional Application No. 60/198,254, filed August 3, 1998 and Provisional Application No. 60/198,240, filed April 8, 1998. The contents of each of these applications are hereby incorporated by reference in their entirety for all purposes.

A figure (right) from Carnegie's motion[31] shows the chain of applications, including the conversion of earlier applications into the two challenged provisional applications.  Carnegie argues that CSIRO's benefit claim to the provisional applications in the abandoned 10/755,328 application was defective such that CSIRO should be deemed to have abandoned its claim to the provisional applications for its involved application.[32]

CSIRO's 10/755,328 application was initially filed as a continuing application of its 09/287,632 application.[33]  CSIRO contemporaneously filed a preliminary amendment to insert the following benefit claim:[34]



---

[29] Paper 1 (Decl'n) at 4.

[30] Exh. 2014: P.W. Waterhouse, M.-B. Wang & M.W. Graham, *Methods and means for obtaining modified phenotypes*, U.S. Appl'n 60/198,254 (3 August 1998).

[31] Paper 65 at 7.

[32] *Id*. at 6.

[33] Paper 127 (Carnegie Reply 3), mat'l fact 17 (admitted).

> This application is a continuation of U.S. Application Serial
> No. 09/287,632, filed April 7, 1999, which is a continuation of Serial
> No. 09/127,735, filed August 3, 1998, which is a continuation of
> Serial No. 09/056,767, filed April 8, 1998.  The contents of these
> applications are hereby incorporated by reference.

According to Carnegie, the reference to the 1998 applications, which had been converted into provisional applications, was inoperative as a matter of law because the 1998 applications were no longer pending.[35]  The examining corps advised CSIRO that its priority claim was defective.[36]  CSIRO's 10/755,328 application was abandoned in 2006.[37]  In 2008, CSIRO amended the benefit claim of its still-pending 09/287,632 application to state "This application claims the benefit of Application No. 60/198,254, filed August 3, 1998 and of 60/198,240, filed April 8, 1998."[38]  We note that the 09/287,632 application has just been granted with CSIRO's claim of benefit to the provisional applications.[39]

This contest is not about whether the provisional applications provide support for what CSIRO now claims; rather, the contest is whether CSIRO complied with the statutory requirements for claim priority and benefit under 35 U.S.C. 119 and 120, respectively.  Carnegie contends that each application in the chain of benefit claims must contain a specific reference to each application for

---

[34] *Id.*, mat'l fact 18 (admitted)

[35] Paper 65 at 9.

[36] Paper 127, mat'l fact 20 (admitted).

[37] *Id.*, mat'l fact 21 (admitted).

[38] *Id.*, mat'l fact 16 (admitted).

[39] P.W. Waterhouse, M.-B. Wang & M.W. Graham, *Methods and means for obtaining modified phenotypes*, US 8,598,332 B1 (granted 3 December 2013), coversheet item 60.

which benefit is claimed.[40]  CSIRO contends that it satisfied the requirement for each application in its benefit/priority chain, but that in any case it has a proper chain of benefit even without its 10/755,328 application.[41]

"Accord benefit" is a term of art that is related to, but distinct from, an applicant claim of priority or benefit under the statute.  Accorded benefit is a recognition of a constructive reduction to practice for the purposes of determining priority under 35 U.S.C. 102(g).[42]  "Earliest constructive reduction to practice", however, incorporates the continuity requirements of sections 119 and 120.[43] Hence, while the question is whether CSIRO has provided a constructive reduction to practice, its compliance with the statutory requirements for claiming benefit and priority are relevant.

CSIRO has responsively moved to cure any possible defect by amending its benefit claim as follows:[44]

### Cross-Reference to Related Applications
This application is a continuation of U.S. Application No. 10/755,328, filed January 13, 2004, ~~which~~ <u>and</u> is a continuation of U.S. Application No. 09/287,632, filed April 7, 1999, which claims the benefit of Provisional Application No. 60/198,254, filed August 3, 1998 and Provisional Application No. 60/198,240, filed April 8, 1998. The contents of each of these applications are hereby incorporated by reference in their entirety for all purposes.

---

[40] Paper 65 at 5, *citing Encyclopaedia Britannica, Inc. v. Alpine Elecs., Inc.*, 609 F.3d 1345, 1352 (Fed. Cir. 2010).

[41] Paper 92 at 1.

[42] Bd.R. 201, "Accord benefit".

[43] *Id.*, "Constructive reduction to practice".

[44] Paper 62 (CSIRO Mot. 11) at 2-3 (with strike-through indicating deletion and underlining indicating insertion).

Carnegie opposes, contending that CSIRO is avoiding the procedural requirement to state that the period of delay in claiming benefit was unintentional.[45]

We accept CSIRO's amendment.  Regardless of whether its original benefit claims were defective, the public interest is best served if the specification is amended to clearly state what CSIRO has tried to claim all along.  Because CSIRO's involved application was copending with its 09/287,632 application when the amendment was filed, it resolves any defect in CSIRO's benefit claim for our purposes, whether the claim in its 10/755,328 is defective or not.

Carnegie is correct that CSIRO should comply with the relevant rule for amendment.[46] The relevant rule required a statement that delay was unintentional when the benefit claim was *delayed*.[47]  Here, the problem was not that the claim was delayed, but rather that it was technically inaccurate in stating what was supposed to have been claimed.  While the public purpose of the patent system is best served by stringent application of the technical requirements (statutory and regulatory) for a clear specification,[48] the purpose of the system does not bar a timely cure (in the absence of evidence of fraud).

Accordingly, we grant CSIRO's motion to amend without resolving whether its benefit claim is defective.  Although CSIRO's motion is technically contingent

---

[45] Paper 96 (Carnegie Opp. 11) at 1, citing 37 C.F.R. § 1.78(a)(3)(iii) (2010).  We note that the rule has changed since the issue was briefed.  Rather than upset reliance interests, we apply the rule as it applied at the time of briefing.  *Brown v. Barbacid*, 436 F.3d 1376, 1379 n.1 (Fed. Cir. 2006).

[46] Bd.R. 121(c)(2) (requiring compliance with 37 C.F.R. part 1).

[47] Rule 78(c)(3)(iii) (2010).

[48] *E.g.*, *Medtronic CoreValve, LLC v. Edwards Lifescis. Corp.*, 2014 WL 229081 at *5-*6 (Fed. Cir. 2014) (declining to read benefit claim to overcome inaccuracies).

on the granting of Carnegie motion 3,[49] CSIRO itself has indicated that its amendment would render Carnegie's motion moot.[50]  CSIRO motion 11 is GRANTED even though Carnegie motion 3 is DISMISSED as moot.

## II. CSIRO MOTIONS

   A. Motion 1: Written description

   CSIRO moves for judgment that all of Carnegie's involved claims are unpatentable for lack of written description.[51]  Carnegie's involved claims are:

   claims 1-5, 7 and 10-11 of its 6,506,559 patent;

   claims 1-3 of its 7,622,633 patent[52] and

   claims 1, 3, 6, 8, 11 and 13 of its 7,538,095 patent.[53]

   Carnegie claim 7 of the 6,506,559 patent, which depends from claim 1 of the same patent, defines the invention as follows:[54]

> A method to inhibit expression of a target gene in a cell in vitro [in which the cell is from a plant] comprising
> introduction of a ribonucleic acid (RNA) into the cell in an amount sufficient to inhibit expression of the target gene,
> wherein the RNA is a double-stranded molecule with a first strand consisting essentially of a ribonucleotide sequence which corresponds to a nucleotide sequence of the target gene and
> a second strand consisting essentially of a ribonucleotide sequence which is complementary to the nucleotide sequence of the target gene,

--------

[49] Paper 62 at 2.
[50] Paper 92 at 1.
[51] Paper 39 at 2.
[52] Paper 1 at 4, modified in Paper 37 at 1.
[53] Paper 27 at 2.
[54] Paper 6 (Carnegie Clean Claims), with brackets indicating the interpolation of claim 7 into claim 1 and with indenting added.

> wherein the first and the second ribonucleotide strands
> are separate complementary strands that hybridize to each other
> to form said double-stranded molecule, and
>> the double-stranded molecule inhibits expression of the
> target gene.

CSIRO contends that Carnegie's disclosure only describes results in a single organism, *Caenorhabditis elegans*, which is not a plant. Hence, CSIRO urges, Carnegie has not shown possession of the method in plants.[55] For example, CSIRO urges that while Carnegie's disclosures discuss applying its methods to plants, "[n]o explanation is provided for how the *C. elegans* data support these broad assertions",[56] but rather, Carnegie "overreaches by theorizing that the method that functions in *C. elegans* will function in other organisms."[57] According to CSIRO, those in the art "would not have found credible the assertions that the method observed to work in a peculiar worm will also work in any cell in 'any organism' — especially not in evolutionarily-divergent organisms", such as plants.[58]

As CSIRO acknowledges, the Carnegie disclosures contain many references to plants, including the application of dsRNA to plants to inhibit activity. For example, Carnegie's description of related art explains that gene-specific interference was known in plants and was similar to phenomena described in *C. elegans*,[59] which indicates Carnegie's understanding of the plant invention as a

---

[55] Paper 39 at 1-2.

[56] *Id*. at 6.

[57] *Id*. at 7.

[58] *Id*.

[59] Exh. 2004: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 6,506,559 B1 at 2:45-51 (granted 14 Jan. 2003). Again, we note the patent is not the original disclosure, but follow the practice of the parties to avoid confusion. See n.14, *supra*.

natural extension of its *C. elegans* results.  Again, in distinguishing the state of the
art from the invention, Carnegie groups plants with nematode (such as *C. elegans*)
as examples where the art-approaches lack a predictable effect.[60]  In summarizing
the invention, Carnegie states that "[t]he cell with the target gene may be derived
from or contained in any organism (e.g., plant, animal, protozoan, virus, bacterium,
or fungus)."[61]  Later Carnegie explains that the plant may be a monocot, dicot or
gymnosperm, listing nearly a hundred plant species as appropriate candidates
(ahead of any other specific candidates, including nematodes).[62]  Carnegie
describes methods for introducing the RNA into a plant, comparing introduction
for *C. elegans* to introduction via plant phloem and roots.[63]  Carnegie discusses
different applications in plants.[64]  We note that the application that resulted in the
6,506,559 patent contained an original claim 7 that defined the invention as
follows (indenting added):[65]

> 1.     A method to inhibit expression of a target gene in a cell
> comprising
>      introduction of a ribonucleic acid (RNA) into the cell in an
> amount sufficient to inhibit expression of the target gene,
>      wherein the RNA comprises a double-stranded structure with
> an identical nucleotide sequence as compared to a portion of the target
> gene.
>           * * *
> 7.     The method of claim 1 in which the cell is from a plant.

---

[60] *Id*. at 3:55-4:1 & 14:62-15:10.

[61] *Id*. at 4:62-64.

[62] *Id*. at 8:12-38.

[63] *Id*. at 9:33-44.

[64] *Id*. at 11:37-12:15.

[65] Exh. 1046: A. Fire et al., Genetic inhibition by double-stranded RNA,
09/215,257 at 41 (filed 18 December 1989).

Written description is a statutory requirement separate from the enablement requirement.[66] While enablement analysis is open to incorporation of unstated knowledge in the art,[67] written description is limited to what those in the art would understand from the disclosure itself without importing additional elements from the knowledge and skill in the art.[68] Written description thus sets specification-based limits on how the claims may be amended during examination in response to prior-art challenges in a way that enablement does not.[69] As noted previously, the relevant time for determining the adequacy of written description is the filing date of the application in which the contested claims appear.[70] Case law holds that an original claim counts as written description without a need to amend the specification.[71]

Carnegie's disclosure expressly states that the invention includes use of the method for plants. Original claim 7 reinforces that plants have always been intended as part of the invention. CSIRO counters that those skilled in the art would not have believed this disclosure without working examples in plants. There is no per se prohibition on prophetic disclosure.[72] As was the case with

---

[66] *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1346 (Fed. Cir. 2010) (en banc), *citing Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 56-57 (1938).

[67] *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004).

[68] *Ariad Pharms.*, 598 F.3d at 1352, *citing Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997).

[69] *Ariad Pharms.*, 598 F.3d at 1346; *accord Schriber-Schroth Co.*, 305 U.S. at 58-59.

[70] *Reiffin*, 214 F.3d at 1346; *accord Ariad Pharms.*, 598 F.3d at 1357.

[71] *In re Gardner*, 480 F.2d 879, 880 (CCPA 1973); *but see Ariad Pharms.*, 598 F.3d at 1349 (an original claim may be part of the original disclosure, but might nevertheless fail to show possession).

[72] *Ariad Pharms.*, 598 F.3d at 1357.

CSIRO's disclosure, the Carnegie inventors need not even have a clear idea why their invention would work, much less disclose that it would work because of some specific mechanism.

CSIRO relies on *Ariad* for the proposition that written description is lacking if those skilled in the art would not have believed the invention to be operative.[73] *Ariad* cites *Brenner v. Manson* [74]for the principle that academic theory is not sufficient for written description. *Brenner* involved a rejection for lack of utility.[75] Case law holds that utility is closely allied with the use aspect of the enablement requirement.[76] Similarly, *Ariad* cites *Fiers v. Revel*[77] for the principle that a research plan is not sufficient for written description. In *Fiers*, the Board had held that Revel's foreign priority application did not enable the invention.[78] Although *Fiers* frames the issue as one of written description, the decision under review that was affirmed is that Revel (despite expressly naming the invention) did not explain how to make it.

Ariad claimed "methods of reducing NF-κB activity, and more specifically reducing binding of NF-κB to NF-κB recognition sites, in cells in response to

---

[73] Paper 39 at 11-13, *citing Ariad Pharms.*, 598 F.3d at 1353 & 1356.

[74] 383 U.S. 519, 536 (1966), *cited in Ariad Pharms.*, 598 F.3d at 1353.

[75] 383 U.S. at 521. *Ariad*, too, purportedly started as a utility case before morphing into a written-description case. *Ariad Pharms.*, 598 F.3d at 1358 (Newman, concurring).

[76] *Process Control Corp v. HydReclaim Corp.*, 190 F.3d 1350, 1358 (Fed. Cir. 1999).

[77] 984 F.2d 1164, 1171 (Fed. Cir. 1993), *cited at Ariad Pharms.*, 598 F.3d at 1356-57.

[78] 984 F.2d at 1170.

external influences like bacterial lipopolysaccharides."[79] The court explained that the problem was that:

> The claims here recite methods encompassing a genus of materials achieving a stated useful result, i.e., reducing NF-κB binding to NF-κB recognition sites in response to external influences.  But the specification does not disclose a variety of species that accomplish the result.

Similarly, the court explained that:

>  Regardless whether the asserted claims recite a compound, Ariad still must describe some way of performing the claimed methods, and Ariad admits that the specification suggests only the use of the three classes of molecules to achieve NF-κB reduction.

In short, Ariad's specification presented a classic genus-species problem, in which the species did not provide adequate support for the claimed genus.

In the present case, Carnegie disclosed a large number of plant species in which Carnegie expected the invention to work.  CSIRO's argument is that those skilled in the art would not have shared Carnegie's expectation.  CSIRO invites the board to interpolate the enablement requirement into the written description requirement.  While *Ariad* contains dicta that suggests such a conflation of written description and enablement, our following CSIRO's invitation would elevate the dicta over the express holding of the court on the very question for which it sat en banc: is written description a separate requirement or not?  The requirements have separate tests, separate standards of review and separate purposes.  While there may be instances where, for procedural reasons, it might make sense to re-frame an argument injudiciously framed under the wrong requirement to avoid a loss on a technicality, this is not such a case because CSIRO has filed a motion for judgment

---

[79] *Ariad Pharms.*, 598 F.3d at 1341.

on enablement as well.  No good purpose is served by allowing CSIRO to try proving the same lack of enablement for plants under two different labels.

CSIRO motion 1 is DENIED.

B.  Motion 2: Enablement

CSIRO moves for judgment that Carnegie's involved claims are unpatentable for failing to enable one of ordinary skill in the art to practice the full scope of the claimed methods without undue experimentation.[80]  Specifically, CSIRO contends that Carnegie only demonstrated the claimed method in *C. elegans* and, given the unpredictability of the art, thus failed to provide adequate guidance on using the method in other organisms, particularly in plants, which are only remotely related to *C. elegans*.[81]

The enablement requirement prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented.  An applicant chooses claim language beyond its disclosed examples at the peril of losing any claim that cannot be enabled across its full scope of coverage.[82]  To be enabling, the disclosure must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.[83]  Because Carnegie's corresponding claims either require

---

[80] Paper 40 (CSIRO Mot. 2) at 2.

[81] *Id*. at 1.

[82] *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380-81 (Fed. Cir. 2012).

[83] *Id*. at 1380.

enablement in plants or include enablement in plants within their scope, we will focus on enablement in plants.[84]  A patent disclosure is presumed to be enabling.[85]

Enablement is determined as of the filing date for the disclosure in which the contested claim appears,[86] i.e., the claim must be enabled as of the disclosure's current filing date rather than an earlier benefit or priority application's filing date.[87]  Carnegie's involved patents have application filing dates of 18 December 1998 for 6,506,559[88] and 30 October 2002 for 7,538,095[89] and 7,622,633.[90]

At the time that the effect of double-stranded RNA in inhibiting gene expression was first described, the mechanism of RNAi was not known.[91]  CSIRO argues that Carnegie's guidance for performing the method in nematodes would not work in plants.[92]  Carnegie provides no working example in a plant.[93]  CSIRO

---

[84] Although it is possible that the generic claims were enabled in plants, but not in other organisms within the genus, a lack of enablement for the non-plant organisms would not resolve the interference between the parties because the directly interfering plant claims would remain.  *Cf.* 35 U.S.C. 135(a) (2012) (amended to permit patentability determinations *to facilitate* resolution of priority).

[85] *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1323 (Fed. Cir. 2005).

[86] *Id.*

[87] *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1255-56 (Fed. Cir. 2004) (affirming that a series of applications were not enabled at the later filing dates either); *cf. Ariad Pharms.*, 598 F.3d at 1357 (written description evaluated for current application, not earlier application); *Reiffin*, 214 F.3d at 1346 (same).

[88] Exh. 2004, coversheet.

[89] Exh. 2002: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 7,538,095 B2, coversheet (granted 26 May 2009).

[90] Exh. 2003: A. Fire et al., *Genetic inhibition by double-stranded RNA*, US 7,622,633 B2, coversheet (granted 24 Nov. 2009).

[91] Paper 104 (Carnegie Opp. 2), mat'l fact 31 (not denied); Bd.R. 122(a) (fact not denied is admitted).

[92] Paper 40 at 5.

[93] Paper 116 (CSIRO Reply), apdx. 2 (Stmt. of Mat'l Facts), mat'l fact 36 (admitted).

contends that a complete absence of data supporting enablement of the claimed invention is sufficient basis to conclude the claims were not enabled.[94]  Case law provides, however, that a lack of data would not be fatal if those in the art would accept the assertions in the disclosure as obviously correct.[95]  Carnegie argues that their contribution was the use of a particular RNA structure, which is not limited to a particular organism.[96]  CSIRO replies that enabling the gist of the invention is not sufficient.[97]  We note that case law permits reliance on the level of skill in the art for enablement except for the novel aspect of the invention.[98]

Plants are not nematodes, which are a kind of animal.  It follows that those *skilled* in the art would not have expected all techniques that would work for an animal (e.g., feeding the RNA to the animal) would also work for plants.[99]  Carnegie points to a Fromm article[100] showing that the art knew how to introduce RNA and DNA into plants over a decade before the critical dates.[101]  Indeed, CSIRO's expert, Dr. Vicki Vance, was using such techniques in her laboratory before the critical date, although she stated that the techniques were difficult.[102]  Dr. Vance's cross-examination testimony indicates that "difficult" applies to simultaneous viral infection for purposes of keeping controlled experiments

---

[94] Paper 40 at 6, *citing Rasmusson*, 413 F.3d at 1323.

[95] *Rasmusson*, 413 F.3d at 1323.

[96] Paper 105 (Carnegie Opp.) at 3.

[97] Paper 116 at 2.

[98] *Crown Ops. Int'l v. Solutia Inc.*, 289 F.3d 1367, 1380 (Fed. Cir. 2002).

[99] *Edwards Lifescis. AG v. CoreValve, Inc.*, 699 F.3d 1305, 1309 (Fed. Cir. 2012).

[100] Exh. 1087: M. Fromm et al., *Electroporation of DNA and RNA into Plant Protoplasts*, 153 METHODS IN ENZYMOLOGY 351 (1987).

[101] Paper 105 at 5.

[102] *Id*. at 5-7, *citing* Exh. 1090 (Vance depo.) at 63-64 & 71-72.

synchronized.[103]  Routine screening, such as selecting the protoplasts in which the RNA was successfully introduced, exemplifies experimentation that is not undue.[104]  Carnegie's expert, Dr. William Lucas, describes a hypothetical experiment within the skill of the art as of the critical dates that would have been consistent with the claimed method.[105]

   A person of ordinary skill in the art as of the critical dates would have had the knowledge and skills of a plant molecular biologist because the invention involves plants and the control of gene expression at the molecular level.[106]  One such skill would have been the expertise to introduce RNA and DNA into plant protoplasts.

   CSIRO also argues that RNA could not easily be introduced throughout a plant because plants have different body plans.[107]  It is not clear how this argument would apply to exemplary claim 7, in which the method is performed on a plant cell.

   CSIRO further argues that the art was complex, that delivering RNA was especially difficult and that even those highly skilled in the art would have encountered difficulties with plants that do not apply to *C. elegans*.[108]  While all of these arguments are sound, it does not follow that the claimed invention was not enabled.  CSIRO invokes the *Wands* factors, but neither party systematically applies the factors to these facts.  In this case, the essential facts are that Carnegie discovered an improved structure for RNA used in gene silencing in *C. elegans*.

---

[103] Exh. 1090 at 64.
[104] *Wands*, 858 F.2d at 736-37.
[105] Exh. 1091 (Lucas decl'n) at 24-25.
[106] Exh. 1090 at 30.
[107] Paper 40 at 9.
[108] Paper 40 at 12.

Carnegie expected that it would work in plants as well.  Those skilled in the art at the critical dates could introduce RNA and DNA structures into plant cells (albeit with difficulty and imperfect success) and select the plants in which the introduction was successful.  Absent a showing that those skilled in the art could not make Carnegie's method work in plant cells, this degree of experimentation is not undue for the biotechnical arts.

We conclude that CSIRO has not shown that the Carnegie patent claims lacked enabling disclosure as of their respective application filing dates.

C.  Motion 5: Attacking accorded benefit

CSIRO moves[109] for judgment that Carnegie is not entitled to the benefit it was accorded for its provisional application.[110]  Accorded benefit differs from benefit claimed under 35 U.S.C. 120 because, despite the similar name, "accorded benefit" is really a presumed constructive reduction to practice, which is a type of anticipation under 35 U.S.C. 102(g) (2012).[111]  The analysis for a constructive reduction to practice is directed to the count rather than to the claims.[112]  CSIRO contends that Carnegie neither described nor enabled a method for inhibiting expression of target genes in plant cells,[113] which is required in the count.  The benefit accorded in the declaration is presumed to be correct[114] so CSIRO as the

_____

[109] Paper 47 (Mot. 5) at 2.
[110] Exh. 2005: A. Fire et al., *Genetic inhibition by double-stranded RNA*, Prov. Appl'n 60/0068,562 (filed 23 Dec. 1997).
[111] Bd.R. 201, Accord benefit.
[112] *Falkner v. Inglis*, 448 F.3d 1357, 1362 (Fed. Cir. 2006).
[113] Paper 47 at 3.
[114] *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1120-21 (Fed. Cir. 2004).

movant has the burden of proof in showing that the accorded benefit should change.[115]

For purposes of written description, we note that the disclosure in the provisional application is similar to the disclosure in the later Carnegie applications, including an original dependent claim 7 directed to using dsRNA to inhibit expression in plants.[116]  Consequently, we must find that one skilled in the art would have appreciated that the Carnegie inventors disclosed that they had invented a plant method within the scope of the count, i.e., the disclosure anticipates the invention of the count.  However, as with other forms of anticipation,[117] a constructive reduction to practice must also enable the use of the invention as of the filing date.[118]

The present count requires enablement of the method in a plant cell.  CSIRO contends that Carnegie's provisional application did not provide data or actual examples in any organism other than *C. elegans*,[119] which contention is consistent with our finding above for the subsequent Carnegie disclosures.  CSIRO notes that the provisional application itself indicates that the mechanism of operation is unclear,[120] which would make it harder to generalize the method to other organisms.  For example, the provisional application explains:[121]

––––––––––––––––––––

[115] *Falkner*, 448 F.3d at 1362; Bd.R. 121(b).

[116] Exh. 2005 at 7, 11 and 27 (claims 1 & 7).

[117] *Pfaff v. Wells Elec., Inc.*, 525 U.S. 55, 67-68 (1998) (requiring enabling documentation in the absence of a reduction to practice).

[118] *Scripps Res. Inst. v. Nemerson*, 78 USPQ2d 1019, 1026 (BPAI 2005).

[119] Paper 47 at 7.

[120] *Id*., citing Exh. 2005 at 19 ("few observations serve to clarify the nature of possible targets and mechanisms for RNA-mediated genetic inhibition in *C. elegans*.").

[121] Exh. 2005 at 14 (citations omitted).

> Working with *C. elegans*, we discovered an RNA structure that would
> give effective and uniform genetic inhibition.  The prior art did not
> teach or suggest that RNA structure was a critical feature for
> inhibition of gene expression. Indeed the ability of sense and antisense
> preparations to produce interference had been taken as an indication
> that RNA structure was not a critical factor.  Instead, the extensive
> plant literature and much of the ongoing research in *C. elegans* was
> focused on the possibility that detailed features of the target gene
> sequence or its chromosomal locale was the critical feature for
> interfering with gene expression.

Despite noting that the extensive prior plant literature expected a different
mechanism in plants, the Carnegie provisional application posits that its method
will work in plants without providing any basis for its position.

The critical date—the filing date—for the provisional application is
23 December 1997.[122]  CSIRO points to a letter and a related commentary in the
19 February 1998 issue of the science journal Nature as evidence of the
expectations of those skilled in the art around the time Carnegie filed its
provisional application.[123]  The commentary[124] discusses a letter from Carnegie
inventors.[125]

In the letter, the Carnegie inventors reported significant results in *C. elegans*,
but acknowledged that they did "not yet know the mechanism of RNA-mediated
interference in *C. elegans*" and offered "[s]ome observations [that] add to the

---

[122] *Id.*, coversheet.
[123] Paper 47 at 12.
[124] R.W. Wagner & L. Sun, *Double-stranded RNA poses puzzle*, 391 NATURE 744
(19 Feb. 1998).
[125] A. Fire, *Potent and specific genetic interference by double-stranded RNA in*
Caenorhabditis elegans, 391 NATURE 806 (19 Feb. 1998).

debate about possible targets and mechanisms."[126]  The Carnegie inventors opined that:[127]

> Double-stranded RNA could conceivably mediate interference more generally in other nematodes, in other invertebrates, and, potentially, in vertebrates.  RNA interference might also operate in plants: several studies have suggested that inverted-repeat structures or characteristics of dsRNA viruses are involved in transgene-dependent co-suppression in plants[.]

In discussing "several possible mechanisms", the Carnegie inventors opine:[128]

> Alternatively, direct RNA-mediated interference at the level of chromatin structure or transcription could be involved.  Interactions between RNA and the genome, combined with propagation of changes along chromatin, have been proposed in mammalian X-chromosome inactivation and plant-gene co-suppression[.]

According to the accompanying commentary, which is entitled "Double-stranded RNA poses [a] puzzle",[129] the Carnegie inventors "describe a remarkable and surprising technique for inhibiting gene function in *C. elegans*."[130]  It continues, "[a]dditional experiments. . ., designed to shed light on the possible mechanism of the dsRNA-mediated inhibition, painted an even more mystifying picture."[131]  The commentary characterized the Carnegie letter as part of a decade-long "puzzle posed by dsRNA."[132]  The commentary posed, and partially answered, the question:[133]

---

[126] *Id*. at 809.

[127] *Id*. at 810.

[128] *Id*.

[129] *Id*.

[130] Exh. 2021 at 744.

[131] *Id*.

[132] *Id*. at 745.

[133] *Id*.

Does a similar phenomenon exist in other organisms? What would happen if transgenic animals or plants were generated expressing both the sense and antisense strands of a transgene? A similar mode of action would not be suspected to occur in mammals, because injection of dsRNA is often used as a control for antisense experiments, albeit at the individual cell (and not organism) level.

The commentary concluded:[134]

Whatever the mechanism might be, dsRNA-mediated inhibition of gene expression will provide a useful alternative for working out gene function in *C. elegans* and, maybe, in other animals and plants.

Both the Nature letter and the commentary identify intriguing avenues for further research rather than a reasonable expectation that routine experimentation will predictably produce similar results in other organisms.[135]

The Nature commentary is uniquely relevant. It is nearly contemporaneous with the provisional filing date. It reflects the objective views of commentators in a prestigious science journal at the relevant time, elucidating Carnegie's discovery for interested scientists,[136] rather than the views of paid experts during litigation.[137] Each party presents expert testimony about the state of the art at the time of filing. Unsurprisingly, CSIRO's experts stress the unpredictability of the art, while Carnegie's experts assure that the art was adequately predictable. Neither set of experts points to objective bases for their testimony of equal or greater relevance than the Nature commentary.

_____

[134] *Id.*
[135] *Cf. Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1374 (Fed. Cir. 1999) (invitation to experiment); *Nat'l Recovery Techs. v. Magnetic Separation Sys.*, 166 F.3d 1190, 1198 (Fed. Cir. 1999) (starting point for further research).
[136] *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1376 (Fed. Cir. 1999) (response of prestigious science journals very probative).
[137] *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003) (greater weight to *ante litem motam* publications).

Carnegie urges that a publication of one of CSIRO's experts, Dr. Vance, belies the unpredictability at the relevant time.[138]  The article, which lists Vance as one of seven authors, begins:[139]

> Homology-dependent gene silencing appears to be a fundamental regulatory mechanism operating in diverse types of organisms[].  The gene silencing phenotype is characterized by reduced levels of the specific mRNA encoded by the suppressed gene(s), and individual cases fall into two major mechanistic classes:  (i) those in which mRNA level is regulated transcriptionally and (ii) those in which it is regulated post-transcriptionally.  Because both classes of silencing are associated with sequence-specific suppression of RNA accumulation and methylation of the corresponding gene[], it is possible that the two major classes of silencing are linked in an as yet undetermined way.  However, the mechanisms leading to the establishment of gene silencing, and the identity of cellular genes that mediate the phenomenon, are unknown.

While the article acknowledges a belief that gene silencing is a fundamental regulatory mechanism in diverse types of organisms, it also notes uncertainty about what the mechanism might be.  Carnegie has not shown the specific relevance of this article to dsRNA or the use of nematode techniques in plants.  The article is consistent with significant uncertainty in the field even ten months after the provisional application was filed and contrasts markedly with Dr. Vance's 2001 review article in the journal Science,[140] which notes the "recent burst of

---

[138] Paper 102 (Carnegie Opp. 5) at 11.

[139] Exh. 1084: R. Anandalakshmi et al., 95 PROC. NAT'L ACAD. SCI. 13079 (October 1998) (citations omitted).

[140] Exh. 1088: V. Vance & H. Vaucheret, *RNA Silencing in Plants—Defense and Counterdefense*, 292 SCIENCE 2277 (22 June 2001).

information about [] different aspects of RNA silencing"[141] and addresses the relevance of the *C. elegans* dsRNA mechanism to plants.

In sum, the record suggests a rapid progress in knowledge, particularly as it applied to the use of dsRNA in plants, from great uncertainty as late as October 1998 to great confidence by June 2001.  We conclude that those skilled in the art would have considered the provisional application's representations about plants to have been unproven and dubious in the absence of either data or a probable mechanism.  Consequently, CSIRO has established that Carnegie should not be accorded the benefit of its provisional application as a constructive reduction to practice of the invention defined in the count.

We acknowledge the seeming anomaly of CSIRO meeting its burden to show no constructive reduction to practice for the 1997 provisional application (for lack of enablement), but not meeting its burden on enablement for the later Carnegie applications (including one filed in December 1998).  Indeed, because constructive reduction to practice is an anticipation, it should be even easier to show because only a single embodiment within the count need be enabled (rather than the full scope of a claim).  Nevertheless, CSIRO established a level of unpredictability in early 1998, but did not establish comparable uncertainty in December 1998 or later.  The record hints that rapid advances in data and understanding in the art changed the technical context in which enablement must be determined.

---

[141] *Id*. at 2277 & 2280 (citing various articles, including ("4") a 2000 CELL article by Zamore, Tuschl, Sharp and Bartel).

   D. Carnegie Motion 7: to exclude Exhibits 2099-2102
      and CSIRO replies relying on these exhibits

   In the earlier decision on motions, the board dismissed Carnegie's motion to

exclude, *inter alia*, Exhibit 2102 and CSIRO reply briefs relying on it because the

decision did not reach CSIRO motions 1, 2 and 5.[142]  In the present decision, we

reach these motions so this portion of the motion is no longer moot.

   Carnegie contends that these exhibits are directed to the merits of CSIRO's

motions and thus were improperly introduced in the reply.[143]  Carnegie seeks

exclusion of these exhibits as unduly prejudicial and outside the proper scope of

the cross examination in which they were raised.[144]  CSIRO counters that the

exhibits were timely presented to challenge Carnegie expert testimony regarding

what "[t]he Carnegie inventors clearly understood" about the applicability of the

dsRNA method to organisms other than *C. elegans*.[145]

   The proper standard for written description and enablement is objective:

what would those skilled in the art at the relevant time have understood.  Hence,

Carnegie's expert testimony is better understood as addressing the apprehension of

a hypothetical person of skill rather than the subjective comprehension of the

inventors.  Nevertheless, the subjective failure of an inventor to attain key details

of the invention can be probative for enablement questions.[146]

_____

[142] Paper 453 at 34-36.
[143] Paper 136 (Carnegie Mot. 7) at 1.
[144] *Id*. at 3, citing Fed. R. Evid. 403 and 611(b).
[145] Paper 142 (CSIRO Opp. 7) at 3.
[146] *E.g.*, *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1382
(Fed. Cir. 2012); *Enzo Biochem*, 188 F.3d at 1373-74 (inability of inventor's team
to practice bacteria method in plants).

Exhibit 2102 is representative of these challenged exhibits.  One Carnegie inventor, Craig Mello, is quoted in the following exchange:[147]

**Ambion: By December 2002, RNAi was named as Science's "Breakthrough of the Year".  Did you anticipate the widespread use of RNAi?**

[Mello:]  I'd have to say absolutely not.  I felt like there was something potentially useful, in that *C. elegans* had this remarkable response to dsRNA.  But back in 1998, there was no reason to think that this would work the same way in other organisms.  Although, of course, we speculated that it might and even patented the idea that it might.  But I think a huge amount of credit goes to the people who took it into other systems and demonstrated that it could work.  For example, Rich Carthew's lab was the first to show that it worked in another organism, flies.  Then there was the beautiful work by the Sharp, Zamore, Tuschel [sic] group showing that they could get these activities in Drosophila extracts; and obviously Greg Hannon's work.  These people deserve a huge amount of credit - and actually have gotten it (laughing).  These were the people that developed the siRNA technology.  Those were things that I think would have fallen out of the other work eventually, but they jumped right in and demonstrated it before we even understood the mechanism.

So it was a big surprise in retrospect.  I can think back to how I felt in 1998, and that was, gee, we have to figure out how this works and see if there is some way we could get it to work in other systems because it is so great.  But I never would have expected it, at that time, to be something that you could already do so easily.  I thought we would need to study it a lot more and thought it would take a lot longer before it became applicable.  It has been an absolutely amazing past few years when you consider all the developments.

Carnegie has not challenged the authenticity of the statement.

---

[147] Exh. 2102: *RNA interviews: Dr. Craig Mello*, AMBION TECHNOTES, http://www.ambion.com/techlib/tn/111/15.html (showing a copyright date of 2011).

Mello's statements regarding the lack of knowledge at the time, the speculative nature of extending the results to other organisms and the credit earned by other researchers for extending the results is quite unfavorable to Carnegie's representations that those skilled in the art would have considered the invention enabled before 1998. Nevertheless, the statements are the unsworn remembrances of a single inventor without any concrete examples of anyone having failed while trying to implement the invention in plants. Consequently, these exhibits will not be excluded, but they will be accorded modest weight. In particular, these exhibits are consistent with other evidence of a surprisingly rapid advance, largely by researchers other than the Carnegie inventors, in determining that applicability of the *C. elegans* discovery to other organisms.

E. Motions 3 and 4: Prior art

CSIRO moves for judgment that all[148] of Carnegie's involved claims are unpatentable in view of the combined disclosures of articles by Waterhouse[149] and Rocheleau[150] because Carnegie is not entitled to the benefit of its provisional

---

[148] Paper 454 (Redecl'n) at 2:
    6,506,559 claims 1-5, 7, 10 and 11;
    7,538,095 claims 1, 3, 6, 8, 11 and 13 and
    7,622,633 claims 1-3.
[149] Exh. 2006: P.M. Waterhouse, MW. Graham & M.-B. Wang, *Virus resistance and gene silencing in plants can be induced by simultaneous expression of sense and antisense RNA*, 95 PROC. NAT'L ACAD. SCI. USA 13595 (Nov. 1998). We note that the authors are the named CSIRO inventors.
[150] Exh. 2007: C.E. Rocheleau et al., *Wnt signaling and an APC-related gene specify endoderm in early C. elegans embryos*, 90 CELL 707 (22 Aug. 1997). We note that the authors include Carnegie named inventor C.C. Mello, as well as Mussa Ali.

application.[151]  Alternatively, CSIRO moves for judgment that claims 1-5, 10 and
11 of the 6,506,559 patent are unpatentable[152] from a Guo article.[153]

### 1.  Carnegie's claimed priority and benefit

CSIRO's first prior-art motion requires denial of Carnegie's claim to the
priority of its provisional application.[154]  As the movant, CSIRO has the burden of
proof.  As noted previously, our holding on constructive reduction to practice is a
holding on anticipation and thus not directly a determination of enablement for a
claim.  Nevertheless, on the facts of this case, the result is the same.  We found that
the state of the art when the provisional was filed was sufficiently unpredictable
that those skilled in the art would not have considered the provisional application
enabled for practicing the invention in plants.  Both the count and Carnegie's
claims require enablement in plants.  It follows that CSIRO has shown that
Carnegie is not entitled to the priority of its provisional application for the purpose
of deciding the prior art motions.

CSIRO did not prevail in its attack on the written description and
enablement of Carnegie's subsequent patent applications.  Both the priority and
benefit statutes require compliance with the same written description and
enablement standards.[155]  CSIRO has not presented an essentially different
argument to deny Carnegie its claimed benefit of its patent application filing dates.
Carnegie continues to enjoy their benefit for the purposes of these prior art

---

[151] Paper 49 (CSIRO Mot. 3) at 1.
[152] Paper 48 (CSIRO Mot. 4) at 2.
[153] Exh. 2008: S. Guo & K.J. Kemphues, *par-1, a gene required for establishing
polarity in* C. elegans *embryos, encodes a putative Ser/Thr kinase that is
asymmetrically distributed*, 81 CELL 611 (19 May 1995).
[154] 35 U.S.C. 119.
[155] 35 U.S.C. 119 & 120 require compliance with 35 U.S.C. 112(a).

motions. Accordingly, Carnegie's critical date—its earliest patent application filing date, to which all of its patents claim benefit—is 18 December 1998.

### 2. Waterhouse

The Waterhouse paper is dated November 1998.[156] In its opposition, Carnegie notes that, if it is not given the benefit of its provisional application filing date, then the Waterhouse paper is prior art under 35 U.S.C. 102(a).[157] When a party is not entitled to an earlier effective filing date, the party may nevertheless overcome a reference with evidence of prior invention.[158] Carnegie proposes to antedate the Waterhouse paper during the priority phase of the interference.[159] Carnegie has not yet presented these antedating proofs. Because Carnegie's antedating proofs (i.e., proofs of prior invention) are likely to overlap its interference priority proofs (i.e., proofs of prior invention) considerably, it would be more efficient to combine the resolution of this motion with the priority determination.[160]

### 3. Rocheleau and Guo

Regarding the Rocheleau paper, CSIRO only argues that the involved claims of Carnegie's 6,506,559 patent are unpatentable, i.e., CSIRO presents no argument for the unpatentability of the involved claims in Carnegie's 7,538,095 and 7,622,633 patents.[161] Similarly, regarding the Guo paper, CSIRO only presents

---

[156] Exh. 2006 at 13959.
[157] Paper 104 (Carnegie Opp. 3) at 1.
[158] *E.g.*, *In re Costello*, 717 F.2d 1346, 1348-49 (Fed. Cir. 1983).
[159] Paper 104 at 1.
[160] Because Carnegie has lost the accorded benefit of its provisional application, it will be the junior party and thus will not be able to avoid presenting a priority case.
[161] Paper 49 at 6-10.

arguments for the 6,506,559 involved claims.[162]  Because the patentability arguments reach less than all of the Carnegie involved claims, decision on the patentability motions would not obviate the need for a priority determination. Carnegie will be the junior party, and thus the presumptive loser on priority.[163] The unpatentability of these claims on additional bases is moot unless Carnegie prevails on priority.  Accordingly, it makes more sense to address these motions during the priority phase, contingent on Carnegie prevailing in the priority contest.

### 4.  Holding

Carnegie is not entitled to the priority of its provisional application, but further determination of the patentability of Carnegie's involved claims over prior art is deferred to the priority and, even then, contingent on Carnegie prevailing on priority.

### F.  Motions 8 and 9: Changing the count

### 1.  The proposed counts

CSIRO requests replacement of the present count (count 1) with:

count 3 if its motion 7 is granted,[164]

count 4 if its motion 7 is not granted, or[165]

count 5 if neither count 3 nor count 4 is adopted.[166]

Motion 7 was dismissed[167] so the contingency for adopting count 3 is not met.

---

[162] Paper 48 at 2.
[163] Bd.R. 207(a)(1); *Brown v. Barbacid*, 276 F.3d 1327, 1332 (Fed. Cir. 2002).
[164] Paper 43 (CSIRO Mot. 8) at 2.
[165] *Id*.
[166] Paper 44 (CSIRO Mot. 9) at 2.
[167] Paper 453 at 2.

Count 1 defines the interfering subject matter as "The method of application 11/364,183 claim 52 or patent 6,506,559 claim 7."[168]  CSIRO's proposed count 4 would add the methods of CSIRO's 11/364,183 claims 62 and 63 and of Carnegie's 7,622,633 claim 1 to the definition of the interfering subject matter.  According to CSIRO, it is unclear whether count 1's "introduction of a ribonucleic acid (RNA) into the cell in an amount sufficient to inhibit expression of the target gene" includes "the use of RNA formed inside the cell".[169]  CSIRO would like to broaden the count to cover this alternative expressly.  Carnegie's claim 1, for example, provides:[170]

> A method to inhibit expression of a target gene in a cell in a plant comprising
> contacting the cell with *an expression construct that produces at least two separate ribonucleic acids (RNAs)* in an amount sufficient to inhibit the expression of a target gene,
> wherein the RNAs form a double-stranded structure containing separate complementary strands,
> wherein the first strand corresponds to a nucleotide sequence of the target gene and the second ribonucleotide strand is complementary to the nucleotide sequence of the target gene,
> wherein the first and the second ribonucleotide strands are separate complementary sequences that hybridize to each other to form said double-stranded structure, which inhibits expression of the target gene.

CSIRO claims 62 and 63 have similar language.  As noted earlier, claim 63 includes the limitation "providing the cells of said organism with a first and second

---

[168] Paper 1 at 3.
[169] Paper 43 at 1.
[170] Exh. 2003 at 26:31-43 (emphasis and indenting added).

chimeric DNA" that encode "a sense RNA molecule" and "an antisense RNA molecule", respectively.[171]

### 2. Broadest reasonable interpretation

The first question CSIRO's motions raise is whether count 1 already includes the use of DNA for the "introduction of a ribonucleic acid (RNA) into the cell in an amount sufficient to inhibit expression of the target gene". The language comes from claim 52 of CSIRO's 11/364,183 application. A count must be given its broadest reasonable interpretation, with reference to a party's disclosure only when necessary to resolve ambiguity.[172] The parties have not pointed to an express definition of "introduce an RNA into a cell". In modern English, "introduce" commonly denotes "add" or "bring into effect" rather than its etymological source meaning of "drawing into". While introducing a DNA construct is not the same as drawing RNA into a cell, it is a method for adding RNA to a cell or bringing RNA into effect in a cell. Thus, broadly understood, introducing RNA into the cell would include introducing RNA by introducing DNA that will express the RNA. In any case, CSIRO's disclosure discusses direct and indirect (via DNA) introduction of RNA:[173]

> *The RNA can either be introduced directly, or can be introduced by means of a chimeric DNA* comprising a promoter operative in the host cell of interest, particularly a plant-expressible promoter, and a DNA region functioning as a suitable 3' end formation and polyadenylation signal (terminator) functioning in the host cell, with in-between a DNA region which can be transcribed to yield the RNA molecule comprising the sense and antisense nucleotide sequence.

---

[171] Paper 13 at 5-6.

[172] *DeGeorge v. Bernier*, 768 F.2d 1318, 1321-22 (Fed. Cir. 1985); *accord Manning v. Paradis*, 296 F.3d 1098, 1102 (Fed. Cir. 2002) (specification limiting).

[173] Exh. 2001 at 29:24-30.

We conclude that those skilled in the art would have understood CSIRO's claim language to include both direct and indirect introduction of RNA. The count does not need to be changed to embrace the indirect introduction of RNA that CSIRO wishes to prove. Hence, CSIRO motion 8 is moot because adding the claims would not broaden the count, but would instead expressly state what is already implicit.

It follows, however, that adding the claims would do no harm either because they simply state expressly what is already implicit. Thus, there may be a forensic efficiency to be gained by including claims that expressly correlate to CSIRO's proofs.

### 3. Same invention

Carnegie opposes substitution of count 4 because the added claims "are not directed to the same invention[, but rather] to obvious variants of the invention of the count."[174] A count may embrace obvious variants as long as the count still satisfies a two-way unpatentability analysis.[175] Carnegie contends that the DNA invention is outside the scope of the present count, but does properly correspond because it is an obvious variant of the invention in count 1.[176] Even if we assume the correctness of Carnegie's contention, the contention simply restates CSIRO's point, to wit, that it has claims in jeopardy (corresponding) yet cannot rely on proofs within their scope to establish priority. Indeed, Carnegie's contention concedes that the two-way patentable-indistinctness test is met in at least one direction (from the RNA count to the obvious DNA claims).

---

[174] Paper 99 (Carnegie Opp. 8) at 2:18-21.
[175] *Rolls-Royce PLC v. United Tech. Corp.*, 603 F.3d 1325, 1330 (Fed. Cir. 2010), *citing* Bd.R. 203(a); *Aelony v. Arni*, 547 F.2d 566, 570 (CCPA 1977) (no overlap required if claimed inventions are patentably indistinct).
[176] Paper 99 at 4-5.

The DNA method also renders the RNA method obvious.  Both are methods of introducing RNA into plant cells.  As discussed above, CSIRO's disclosure reports that the methods are known alternatives for introducing RNA into a cell.  The invention lies in the introduced RNA, not in how it was introduced.  Carnegie relies on the testimony of Dr. Jorgensen that those skilled in the art would not have believed prior to the 1998 Fire article that DNA was being introduced solely to create dsRNA,[177] but this testimony does not address CSIRO claimed purpose of creating dsRNA.  As with a double-patenting analysis, the obviousness comparison is between claims and thus cannot ignore what the claims themselves state.

Carnegie also contends that CSIRO has not demonstrated that its proffered best proof lies within the proposed count, specifically that its proof does not show dsRNA.[178]  Carnegie's argument recapitulates its arguments regarding CSIRO's lack of written description for claim 63.  CSIRO notes that it need only proffer what it would prove if count 4 were adopted.  CSIRO is correct: it is not obligated to prove priority at this point.  A proffer is not a substitute for the priority phase, rather it simply provides a basis for believing that a change in the scope of the count will be productive.  As discussed above regarding the written description, introduction of the DNA constructs encoding sense and antisense RNA, coupled with the predicted result, reasonably anticipates the subject matter of claim 63 for purposes of a proffer.  Whether such proofs would be sufficient in themselves, or whether CSIRO will supplement them to sufficiency, is a question best addressed during the priority phase.

---

[177] *Id*. at 6, citing Exh. 1092, ¶57.
[178] *Id*. at 5-6.

### 4. Admissibility

Carnegie contends that some of CSIRO's proffered exhibits are inadmissible.[179]  A proffer is just an offer of evidence, not necessarily the evidence itself.  Consequently, the inadmissibility of the evidence is moot at this point.

Carnegie contends that the Green letter[180] is inadmissible because it is a foreign proof dated before 1 January 1996. As Carnegie notes an "applicant for patent . . . may not establish a date of invention for purposes of title 35 U.S.C., that is earlier than Jan. 1, 1996 by reference to or knowledge, or use, or other activity, in a World Trade Organization member country".  This is not an evidentiary rule, rather it is a limit on the earliest effect of such proofs.  As a consequence of the statute, the Green letter may not be given any effect to "establish a date of invention . . . earlier than Jan. 1, 1996".  That is, regardless of how much earlier than 1996 the proof is dated, we can only treat it as proving priority back to 1 January 1996.[181]

Carnegie contends other proofs are dated too late to be relevant.[182]  As noted above, at this point CSIRO need only proffer what it intends to prove.  We will not prejudge CSIRO's priority case before it is actually made.  If in the event CSIRO's priority case turns out to be frivolous, Carnegie can move for an appropriate remedy then.

---

[179] *Id.* at

[180] Exh. 2033 (Ltr. to Green, 1994).

[181] The statutory effect is analogous to a priority proof that establishes a range of dates rather than a specific date.  In such cases, the proof is fixed to the last date in the range.  *Haultain v. DeWindt*, 254 F.2d 141, 142 (CCPA 1958) ("where testimony merely places the acts within a stated time period, the inventor has not established a date for his activities earlier than the last day of the period.").

[182] Paper 99 at 9-10.

### 5. *Effect of barred claims*

The board has held that claims 52 and 62 of CSIRO's 11/364,183 application are barred under 35 U.S.C. 135(b)(1).[183]  The claims have not been shown to be barred by prior art so this is not a situation in which the count[184] embraces prior art. Because a count is just a construct for testing priority to a common invention—unlike a claim—the count itself does not have to be patentable to either party.[185] Consequently, while CSIRO is not entitled to claims 52 and 62, we have not been given a reason to remove them from count 4 and we do not independently see a reason to do so.

### 6. *Holding*

CSIRO motion 8 is GRANTED.

Because we grant CSIRO motion 8, the contingency for CSIRO motion 9 is not met.  Motion 9 is DISMISSED as moot.

## III. CONCLUSION

Both parties still have involved claims corresponding to the count that have not been held unpatentable.  Carnegie's loss of accorded benefit to its provisional application together with the new count necessitate a redeclaration of the interference.

---

[183] Paper 458 (Reh'g dec'n) at 10.
[184] Bd.R. 201, "Count" ("the scope of admissible proofs on priority").
[185] *Hunt v. Treppschuh*, 523 F.2d 1386, 1389 (CCPA 1975).

cc:

Todd R. Walters and Christopher L. North, Buchanan Ingersoll & Rooney PC, of Alexandria, Virginia, for junior party.

Todd B. Buck and W. Jackson Matney, Jr., Morgan, Lewis & Bockius LLP, of Washington, D.C., for senior party.

# ADDENDUM D

BoxInterferences@uspto.gov                     Entered: 2 April 2014
Telephone: 571-272-4683

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

Patent Interference No. 105,754

CARNEGIE INSTITUTION OF WASHINGTON
and the University of Massachusetts
(6,506,559; 7,538,095 & 7,622,633),
Junior Party,

v.

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION
and Bayer BioScience N.V.
(11/364,183),
Senior Party.

Before: RICHARD E. SCHAFER, RICHARD TORCZON and SALLY G. LANE,
*Administrative Patent Judges*.

TORCZON, *Administrative Patent Judge*.

JUDGMENT
Bd.R. 127(b)(4)
abandonment of contest

A priority motion from the junior party (Carnegie) was due 28 March 2014.

Carnegie did not file the motion. No change to the filing schedule was stipulated

or otherwise authorized. Board staff investigated. Carnegie advised the staff that

it would not be filing its priority motion and that the board could enter judgment so that Carnegie might pursue an appeal.[1]  The board relies on this representation to proceed directly to judgment without the delay of an order to show cause.

A junior party is the presumptive loser on priority.[2]  A junior party that does not file a priority motion does not overcome the presumption that the senior party was in fact the prior inventor.  Accordingly, we—

ENTER JUDGMENT AGAINST the junior party, Carnegie, for count 4, the sole count in the interference;[3]

CANCEL all of Carnegie's involved patent claims, which are:[4]

6,506,559 – 1-5, 7, 10 and 11,

7,538,095 – 1, 3, 6, 8, 11 and 13 and

7,622,633 – 1-3; and

FINALLY REFUSE claims 52-62 and 69-106 of senior party CSIRO's involved 11/364,183 application, which are not patentable to CSIRO.[5]

A copy of this judgment will be entered in the administrative records of the involved patent and the involved application.

---

[1] *Loughlin v. Ling*, 684 F.3d 1289, 1292-93 (Fed. Cir. 2012).  Note that any party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office.  37 C.F.R. part 90.

[2] *Brown v. Barbacid*, 276 F.3d 1327, 1332 (Fed. Cir. 2002); Bd.R. 207(a)(1).

[3] Paper 460 at 2.

[4] *Id*.

[5] Paper 458 at 10.

Interference No. 105,754                                                    Page 3

cc:

Todd B. Buck and W. Jackson Matney, Jr., Morgan, Lewis & Bockius LLP, of
Washington, D.C., for junior party.

Todd R. Walters and Christopher L. North, Buchanan Ingersoll & Rooney
PC, of Alexandria, Virginia, for senior party.

# ADDENDUM E

BoxInterferences@uspto.gov                    Entered: 5 June 2014
Telephone: 571-272-4683

UNITED STATES PATENT AND TRADEMARK OFFICE
PATENT TRIAL AND APPEAL BOARD

Patent Interference No. 105,754

CARNEGIE INSTITUTION OF WASHINGTON
and the University of Massachusetts
(6,506,559, 7,538,095 & 7,622,633),
Junior Party,

v.

COMMONWEALTH SCIENTIFIC AND
INDUSTRIAL RESEARCH ORGANISATION
and Bayer BioScience N.V.
(11/364,183),
Senior Party.

Before: RICHARD E. SCHAFER, RICHARD TORCZON and SALLY G. LANE,
*Administrative Patent Judges*.

TORCZON, *Administrative Patent Judge*.

DECISION
Bd.R. 125
on request for rehearing

## I. INTRODUCTION

The board entered judgment on priority against the junior party (Carnegie) and cancelled all of Carnegie's involved claims.[1]  The board also finally refused some of the claims of the senior party (CSIRO).[2]  CSIRO seeks reconsideration of the judgment against its claims.[3]

## II. CSIRO'S FINALLY REFUSED CLAIMS

When the interference was declared, all of CSIRO's pending claims (39, 41-44 and 46-106) were designated as corresponding to count 1, the sole count at the time.[4]  Subsequently, the board held CSIRO claims 52-67 and 69-106 to have been barred under 35 U.S.C. 135(b),[5] while CSIRO claims 39, 41-44, 46-51 and 68 were re-designated as not corresponding to the count.[6]  The board subsequently vacated its decision for CSIRO claims 63-67, but not for the other CSIRO claims.[7]  Accordingly, the status of the CSIRO claims is:

| Claims | Corresponding to the count (now count 4) | Barred under 35 U.S.C. 135(b)(1) |
|---|---|---|
| 39, 41-44, 46-51 and 68 | | |
| 52-62 and 69-106 | X | X |
| 63-67 | X | |

---

[1] Paper 463.

[2] *Id*.

[3] Paper 466 at 2.

[4] Paper 1 at 3-4.

[5] All citations to Title 35, United States Code, in this opinion refer to the statutes in effect on 15 March 2012.

[6] Paper 454 at 2.

[7] Paper 458 at 2.

CSIRO contends that "[s]ince Carnegie's involved claims have been canceled, the decisions holding that Claims 52-62 and 69-106 of the '183 Application are barred under 35 U.S.C. § 135(b) have been rendered moot."[8]

Section 135(b)(1) provided:

> A claim which is the same as, or for the same or substantially the same subject matter as, a claim of an issued patent may not be made in any application unless such a claim is made prior to one year from the date on which the patent was granted.

For much of its history, there was no section 135(b)(2) and section 135(b)(1) existed in substantially the same form as simply section 135(b). CSIRO is correct that the provisions of section 135(b)(2) are not applicable to this proceeding.[9]

Section 135(b) has been characterized both as a statute of repose and as a statutory bar.[10] The statute had its origins[11] in the Supreme Court's *Chapman v. Winroath* decision.[12] *Chapman* involved a patent interference in which Chapman, the earlier applicant, did not file interfering claims until nearly two years after Winroath's patent had issued.[13] The Court accepted that a non-statutory laches theory could apply to a late claimant; however, drawing an analogy to the time periods for existing statutory bars, the Court held that a delay of less than two years should not create a bar.[14] Because Chapman had delayed less than two years, the Court concluded that laches was inappropriate on the record before it.[15]

---

[8] Paper 466 at 3.

[9] *Id*. at 4-5.

[10] *In re McGrew*, 120 F.3d 1236, 1238 (repose), 1239 (basis for rejection) (Fed. Cir. 1997).

[11] *Corbett v. Chisholm*, 568 F.2d 759, 765 (CCPA 1977). *Corbett* also discusses section 135(b) as a statute of repose and as a statutory bar, at 765.

[12] 252 U.S. 126 (1920).

[13] *Id*. at 132.

[14] *Id*. at 237.

[15] *Id*. Congress subsequently changed most of the bar periods to one year.

Consequently, from the beginning, even before codification, this practice has had a mixed equitable and statutory nature, which has persisted through subsequent decisional law and codification. For example, the interference rules treat a claim to repose by an involved patentee as a threshold issue,[16] but board practice has treated the bar invoked by a party other than the patentee as a patentability issue but not a threshold issue.[17]

CSIRO contends that the bar is moot because Carnegie abandoned the contest.[18] Carnegie abandoned its efforts at the board to pursue remedies in court.[19] Abandoning the contest to seek judicial review is a procedural expedient, not a concession on the merits.[20] Accordingly, Carnegie's concession does not in itself render the board decision on the merits moot.

CSIRO also argues that, with the judgment, Carnegie's claims are void *ab initio* and thus cannot bar CSIRO's claims.[21] This argument is essentially a variation on the previous mootness argument because it assumes that the merits of Carnegie's claims have been completely adjudicated. The argument is also logically unsound because it would defeat all arguments for repose. Any opponent could argue that if only the board would forebear deciding repose until after priority was adjudicated then the repose argument would become moot. If CSIRO's contention were correct, repose would become a nullity.

CSIRO's invocation of *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, a case in which a decision on reexamination mooted an infringement action, is inapposite.

---

[16] Bd.R. 201, *Threshold issue*.

[17] *Strelchenko v. Campbell*, 2002 WL 1300267 (BPAI 2002) (order) (declining to treat § 135(b) bar based on third-party patent as a threshold issue).

[18] Paper 466 at 3.

[19] Paper 463 at 2.

[20] *Loughlin v. Ling*, 684 F.3d 1289, 1292-93 (Fed. Cir. 2012).

[21] Paper 466 at 6.

The question before the *Fresenius* court was whether the claims were enforceable in an infringement action even though they were cancelled in a reexamination. The court concluded that a reexamination determination of unpatentability (like a court determination of invalidity) would prevent enforcement of the claims. The court's phrase "void ab initio" does not mean that the claims never existed, but rather that they were never patentable. Reexaminations are ordinarily[22] based on prior art dating from before the patent's filing date, which would have rendered the patent claims unpatentable during the original examination as well (and thus unenforceable anyway). In contrast, repose protects the patentee after one year regardless of whether the patent claims are unpatentable for any reason, including unpatentability under 35 U.S.C. 102(g)(1).

CSIRO's most compelling argument is that barring some of the claims does not serve the purpose of repose if, as in this case, other claims remain that lead to a judgment on priority.[23] Facially, CSIRO's position is quite logical, but it does not account for the long-standing view of section 135(b)(1) as both a statute of repose and as a statutory bar. A bar may create abrupt differences between closely related circumstances.[24] In any case, although the board practice has previously been consistent with CSIRO's view that even one unbarred claim renders the bar moot for purposes of an interference, that practice has been judicially rejected.[25] While the one court decision reaching this conclusion created law of the case rather than a binding precedent, we note that the court in question (the District Court for the

---

[22] Hypothetically, a later issued patent could create a double-patenting problem. *In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997) (reexamination can determine double patenting). The question is not before us so we need not speculate further.
[23] Paper 466 at 5-6.
[24] *Cf.* 35 U.S.C. 102(a) and 102(b).
[25] *Siemens Healthcare Diagnostics, Inc. v. Enzo Life Science, Inc.*, 2013 WL 4411227 at *13 (D. Mass.).

District of Massachusetts) is a possible venue in the present case and could reach the same conclusion in this interference as a matter of *stare decisis*.  Accordingly, we cannot conclude as a matter of logic that a decision under section 135(b)(1) holding some but not all of a party's claims barred must necessarily violate the statute.

III. HOLDING

We have considered CSIRO's arguments and have reconsidered our decision, but hold that the requested relief is warranted.

cc:

TODD B. BUCK and W. JACKSON MATNEY, JR., Morgan, Lewis & Bockius LLP, of Washington, D.C., for junior party.

TODD R. WALTERS and CHRISTOPHER L. NORTH, Buchanan Ingersoll & Rooney PC, of Alexandria, Virginia, for senior party.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 5th day of June, 2015, the foregoing

CORRECTED BRIEF OF APPELLANTS is being filed with the Clerk of the

Court using the CM/ECF System.

Date:  <u>June 5, 2015</u>          <u>/s/ Todd R. Walters          </u>
                          Todd R. Walters, Esq.
                          Buchanan Ingersoll & Rooney PC
                          1737 King Street, Suite 500
                          Alexandria, VA 22314
                          Telephone (703) 836-6620
                          Facsimile (703) 836-2021
                          Email:  <u>todd.walters@bipc.com</u>

                          *Counsel for APPELLANTS*
                          *Commonwealth Scientific &  Industrial*
                          *Research Organisation and*
                          *Bayer CropScience NV*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

 X  The brief contains <u>10,652</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), or

___ The brief uses a monospaced typeface and contains <u>[state the number of]</u> lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

 X  The brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> in a <u>14 pt. Times New Roman font</u>, or

___ The brief has been prepared in a monospaced typeface using <u>[state name and version of word processing program]</u> with <u>[state number of characters per inch and name of type style]</u>.

<u>June 5, 2015</u>                          /s/ Todd R. Walters
                                        Todd R. Walters
                                        *Counsel for APPELLANTS*